THE UNION BANK OF MARYLAND *vs.* RIDGELY.—June, 1827.

A plea of special *non est factum* is a general issue plea, and like other general issue pleas need not be pleaded before the rule day, but may be received when the cause is called up for trial.

When an amendment of the pleadings is made at the trial under the act of 1809, *ch.* 153, *s.* 1, time is to be given during the term, to the adverse party to prepare to support his case; yet the cause is not, therefore, to be continued, unless the court shall be satisfied that a continuance is necessary.

Whatever apparent inconsistency there may be between the pleas of general performance and *non est factum,* it is the settled practice under the statute, 4 *Ann, ch.* 16, to receive them; for defendants are not confined to pleas strictly consistent.

The only pleas now disallowed on the mere ground of inconsistency are the general issue and tender, and the reason is, that one goes to deny the existence of any, while the other admits some cause of action.

The discretion vested in the courts by the act of 1809, *ch.* 153, to order and allow amendments to be made in all proceedings whatever, before verdict, so as to bring the merits of the question between the parties fairly to trial, is not a capricious but a sound legal discretion; to the proper exercise of which the party claiming it is entitled, and from which, he cannot properly be debarred by any rule, that is the mere creature of the court.

*It is a general rule* of evidence that in a suit brought by a bank, one who is a stockholder and interested in the event of the suit is not a compe-. tent witness in behalf of the institution, but that rule is not without ex- ception—as where an interested corporator is called upon to prove him- self either to be or to have been the depository of the muniments of his corporation.

An interested corporator, however, is not a competent witness to prove, that a book continued to be one of the muniments of his corporation after he had ceased to be the depository thereof.

The adoption of a code of by-laws by a corporation need not necessarily be by writing, but may be proved as well by the acts and uniform course of proceedings of such corporation, as by an entry or memorandum in writing.

Where a plaintiff in his replication sets out a code of by-laws of a corpo- ration, which prescribe the duties of an officer of such corporation, and then assigns as a breach a violation of duties so prescribed, on which breach issue is tendered by the defendant and joined by the plaintiff, such by-laws are virtually admitted by the defendant in his pleadings.

It is a general principle of pleading, that where a plea produces a direct affirmative and negative by denying the allegation in the declaration, it should conclude to the country, whether the affirmative of the issue is held by the plaintiff or defendant; and that the proof of the affirmative rests on him who asserts it.

When new matter is introduced on either side, the pleading ought to con- clude with a verification.

In the application of these rules, the plea of general *non est factum* in an action of debt on a bond, which by denying the allegation in the decla- ration, that it is the writing obligatory of the defendant, makes the issue between the parties, concludes to the country, and throws the whole proof of the execution of the bond, including the delivery, upon the plaintiff, who in that case asserts the affirmative.

Under an issue joined upon a plea of general *non est factum,* the defendant may give in evidence any thing which goes to show that the instrument of writing was originally void at common law—as lunacy, fraud, cover- ture, &c. or that it had become void subsequent to its execution—as by erasure, alterations, &c. for that plea puts in issue as well its continuance as a deed, as its execution.

A defendant may plead specially any matter which he might give in evi- dence under the plea of general *non est factum;* but if he chooses to do so, being new matter, he must do it with a verification, and holding the affirmative, he draws the burthen of proof upon himself.

If a defendant seeks to avoid a bond for duress, infancy, usury, &c. which cannot be given in evidence under the general issue, (the bond not be- ing therefore void, but voidable,) he must plead such new special mat- ter with a verification, and the proof lies upon him. In every such case the issue is upon the matter specially alleged in the plea.

The defendant may give in evidence, under the plea of general *non est fac- tum,* that the instrument of writing was delivered as an *escrow* on a con- dition not performed; and it is settled he may plead it specially, and that

the proper conclusion to that plea is to the country; because it is a *special negative* to the affirmative in the declaration—the allegation in the declaration that it is the writing obligatory of the defendant, including the allegation of the delivery of it as a deed; and it is this conclusion to the country, that raises the question, whether the proof is on the plaintiff or defendant.

Where the delivery of a deed as an *escrow* is pleaded, the issue is upon that special matter, which being alleged and relied upon by the defendant to show that is not his deed, the proof of that allegation rests upon him; and if there be no proof on the part of the defendant, the possession of the instrument by the plaintiff, is *prima facie* evidence of the delivery as a deed, and is sufficient to sustain the issue on his part.

If the delivery as an *escrow* be proved on the part of the defendant, as alleged in the plea, the proof of the performance of the condition lies upon the plaintiff, where the affirmative is with him.

And where the defendant pleaded that he signed the supposed writing obligatory at the request of H, and as his surety, and returned the same to H, to be by him submitted to the obligees, (a corporation,) for their approbation and acceptance; and if the same should be approved and accepted by them, that then the same was to be considered and delivered as the act and deed of the defendant; and that the same never was approved of by the said obligees by any act in their corporate capacity, and so it was not his deed; in the absence of all evidence on the part of the defendant, the possession and production of the instrument of writing by the obligees would be sufficient *prima facie* evidence of the delivery and acceptance, to entitle them to a verdict, on the issue joined on such a plea.

It seems to have been formerly held, that a corporation aggregate could only act by its common seal—could do nothing without deed; but that doctrine is now no where sanctioned as a universal proposition.

The acts of corporations may now be evidenced by writing without seal.

The assent and acts of corporations, like those of individuals, not reduced to writing, may be inferred from other facts and circumstances, without a violation of any known rule of evidence.

A corporation may be bound by the acts of its duly authorised agent, although such acts are not reduced to writing.

Where the charter of a bank required its cashier to give bond, with two or more sureties, to the satisfaction of the president and directors, a bond executed by the cashier, and others, as his sureties, reciting his appointment as cashier, was found deposited among the archives and valuable original papers and documents of the bank, in an iron chest in the banking house of the corporation, the cashier continued to act in that capacity for years after the date of the bond, without any re-appointment. In an action on such bond by the corporation—*Held*, that in the absence of all testimony respecting the execution of the bond, the jury ought to be permitted to infer that it was duly executed and delivered by the defendant, and accepted by the plaintiffs, which acceptance necessarily included the approbation of the board of directors, or their satisfaction with the sureties, and was not necessary to be in writing.

Where the pleadings in a cause put in issue the facts that certain false and deceptious entries were made in the books of a banking corporation by its clerks, with the connivance of the cashier, on proof that such books were kept by the clerks of such bank, and such entries were in their handwriting, the books are evidence to show what entries were in them, which can only be done by their production, and are proper to lay a foundation for other testimony to show fraud, malconduct, neglect, or violation of duty by such cashier.

Where by the charter of a bank the directors were to be chosen annually, and they "for the time being, have power to appoint a cashier, and such other officers under them, as may be necessary for executing the business of said corporation," a cashier so appointed is an officer of the corporation, the duration of whose office, in the absence of any express limitation, is limited only by the duration of the charter, subject to the removal of the incumbent by the directors, as occasion might require, and is not necessarily an annual officer.

In construing a bond the court must look to the intention of the parties at the time it was executed, and the contract must be expounded as the law was, when the contract was made.

Where an act of incorporation, under which a bond was taken to secure the good conduct of one of the officers of the corporation, was limited in its duration to a certain period, the bond must have the same limitation; because the parties, looking to that act, it would seem to be very clear that no responsibility was contemplated beyond the period of its specified existence. The extension of the charter beyond the period of its first limitation by legislative authority, does not enter into the contract, and cannot enlarge it.

The day laid in pleadings is frequently not material, as in trespass, where the injury charged may be proved to have been committed on a day before or after the time stated in the declaration; provided it appears to have been before the action was brought.

In assigning the breaches of the condition of a bond, which was taken and intended as a security for a limited period, the time of the commission of the breach, is so far material, that it must be laid to be within such period; and an allegation of a breach beyond that period, renders the whole assignment defective, and bad on demurrer, as it then appears on the record that the defendant is charged beyond his legal responsibility.

APPEAL from *Baltimore* County Court. This was an action of debt, brought by the appellants against the appellee, as one of the sureties in the following writing obligatory, to wit. "Know all men by these presents, that we, *Ralph Higginbothom, Robert Purviance, Daniel Delozier, Edward Johnson* and *Nicholas G. Ridgely,* are held and firmly bound unto the *President and Directors of the Union Bank of Maryland,* and their successors, in the just and full sum of fifty thousand dollars, to be paid to the said *President and Direc-*

*tors of the Union Bank of Maryland*, or their certain at-
torney, their successors or assigns: To which payment well and
truly to be made and done, we bind ourselves, jointly and
severally, our, and each of our executors, administrators and
assigns, firmly by these presents: sealed with our seals, and
dated this thirtieth day of March, in the year of our Lord,
eighteen hundred and five. Whereas, the said *President and
Directors of the Union Bank of Maryland* have taken and
employed the said *Ralph Higginbothom* in the capacity of
Cashier, and such other business as the said *President and Di-
rectors of the Union Bank of Maryland* shall think fit to
employ him about. Now the condition of the above obliga-
tion is such, that if the above bound *Ralph Higginbothom*
shall and do, from time to time, make and give to the *Presi-
dent and Directors of the Union Bank of Maryland*, and
their successors, a just and true account in writing, and dis-
charge himself of, for and from, and likewise pay and deliver
unto the said *President and Directors of the Union Bank of
Maryland*, and their successors, all such sum or sums of
money, bills, notes, goods and things whatsoever, which he
shall from time to time receive, discharge, or which shall come
to his hands, charge or custody, of or belonging to the said
*President and Directors of the Union Bank of Maryland*,
or their successors, or of any other person or persons whatso-
ever, wherewith they, the said *President and Directors of
the Union Bank of Maryland*, or their successors, shall be
charged or chargeable; and shall in all things, well and truly
perform the duties of Cashier, to the said *President and Di-
rectors of the Union Bank of Maryland;* and also, if the said
*Ralph Higginbothom, Robert Purviance, Daniel Delozier,
Edward Johnson* and *Nicholas G. Ridgely*, or either, or any
of them, either or any of their heirs, executors, or administra-
tors, shall and do make and give, or cause to be made and
given, unto the said *President and Directors of the Union
Bank of Maryland*, or their successors, full satisfaction and
recompense of and for all such monies, bills, notes, goods,
wares and effects, or other things whatsoever, of or belonging
to the said *President and Directors of the Union Bank of
Maryland*, or their successors, or of any other person or per-

sons wherewith they, the said *President and Directors of the Union Bank of Maryland,* or their successors, shall or may be charged or chargeable, which, at any time or times, shall appear to have been received or discharged by, or come to the hands charge or custody of the said *Ralph Higginbothom,* and which he shall not duly account for, pay, deliver or discharge himself from, to the said *President and Directors of the Union Bank of Maryland,* and their successors, or which he shall be found, confessed or proved to be wasted, embezzled, misspent or otherwise made away with, or unjustly detained by the said *Ralph Higginbothom,* or by any other person or persons by or through his means, privity or procurement, then the above obligation to be void and of none effect, otherwise to be and remain in full force and virtue in law." Signed and sealed by the obligors. The defendant, (the appellee,) craved oyer of the bond, and pleaded.

*First Plea.* "That the plaintiffs ought not to have or maintain their aforesaid action thereof against him, the said *Nicholas,* because he says, that the said *Ralph Higginbothom,* in the condition of the said writing obligatory mentioned, from the time of the appointment of the said *Ralph,* as Cashier, by the said plaintiffs, and from the time of the making of the said writing obligatory, hitherto hath well and truly observed, performed, fulfilled and kept, all and singular the matters and things in the condition of the said writing obligatory mentioned and comprised, in all things therein contained on his part and behalf to be observed, performed, fulfilled and kept; and hath from time to time made and given unto the said plaintiffs, a just and true account in writing, and hath discharged himself of, for and from, and hath likewise paid and delivered unto the said plaintiffs, all such sum or sums of money, bills, notes, goods and things whatsoever, which he, the said *Ralph,* did, from time to time, receive, discharge, or which came to his hands, charge or custody, of or belonging to the said plaintiffs, or of or belonging to any other person or persons whatsoever, wherewith the said plaintiffs should or might have been charged or chargeable; and also, that he, the said *Ralph,* hath, in all things, well and truly performed the duties of a cashier to the said plain-

tiffs, to wit, at the county aforesaid, and this the said *Nicholas* is ready to verify: wherefore he prays judgment if," &c.

*Second Plea.* "That the plaintiffs ought not to have or maintain their aforesaid action thereof against him, the said *Nicholas*, because he says, that by a certain act of the general assembly of this state, made and passed at a session of assembly, begun and held at the city of *Annapolis*, on the fifth day of November, in the year eighteen hundred and four, and ended the twentieth day of January, eighteen hundred and five, entitled, An act to incorporate the stockholders in the *Union Bank of Maryland*, the proprietors of shares in the said bank, as well as those who might thereafter become stockholders, their successors and assigns, were created and made a corporation and body politic, by the name and style of The *President and Directors of the Union Bank of Maryland;* and it was, amongst other things, enacted by the said act, that the same, that is to say, the said act, should continue in force until the expiration of the year eighteen hundred and fifteen, and until the end of the next session of assembly thereafter. And the said *Nicholas* further says, that at the time the said *Ralph Higginbothom*, in the said supposed writing obligatory mentioned, was appointed cashier of the said *Union Bank of Maryland*, by the directors thereof, and at the time of the making of the said writing obligatory, to wit, on the thirtieth day of March, in the year eighteen hundred and five, the said *President and Directors of the Union Bank of Maryland*, were acting under, and conformably to, the said act of assembly; and under and by virtue, and in pursuance of said act, the said *Ralph Higginbothom* was appointed cashier as aforesaid, and that the said supposed writing obligatory was made and delivered to secure the faithful performance of the duties of cashier, and of the other acts and things therein mentioned, by the said *Ralph*, for and during, and until the expiration of the said act of incorporation or charter, and no longer, to wit, at the county aforesaid. And the said *Nicholas* further says, that the said *Ralph Higginbothom*, from the time he was so appointed cashier as aforesaid, and from the time of making of the said supposed writing obligatory, and from thence until the expiration of the year eighteen hundred and fifteen, and until the end

of the next session of assembly thereafter, to wit, until the sixth day of February, eighteen hundred and seventeen, hath well and truly observed, performed, fulfilled and kept, all and singular the matters and things in the condition of the said supposed writing obligatory mentioned and comprised, in all things therein contained, on his part and behalf to be observed, performed, fulfilled and kept; and hath from time to time, made and given unto the *President and Directors of the Union Bank of Maryland,* for the time being, a just and true account in writing, and hath discharged himself of, for and from, and hath likewise paid and delivered unto the *President and Directors of the Union Bank of Maryland,* for the time being, all such sum or sums of money, bills, notes, goods, and things whatsoever, which he, the said *Ralph* did, from time to time, receive, discharge, or which came to his hands, charge or custody, of or belonging to the *President and Directors of the Union Bank of Maryland,* for the time being, or of or belonging to any other person or persons whatsoever, wherewith the said *President and Directors of the Union Bank of Maryland,* for the time being, or their successors, should or might have been charged or chargeable; and also, that he, the said *Ralph,* hath, in all things, well and truly performed the duties of a cashier to the *President and Directors of the Union Bank of Maryland,* for the time being, to wit, at the county aforesaid; and this the said *Nicholas* is ready to verify: Wherefore he prays judgment if," &c.

*Third Plea.* "That the plaintiffs ought not to have or maintain their aforesaid action thereof against him, the said *Nicholas,* because he says, that the act of assembly incorporating the said *President and Directors* by its original limitation, would have expired long before the commencement of the said action, to wit, on the sixth day of February, in the year eighteen hundred and seventeen, and that the said act was continued and extended by an act of assembly, passed at December session, eighteen hundred and fifteen, entitled, An act declaring the continuation and extension of the charters of the several banks therein mentioned, upon condition that the said *President and Directors* fulfilled and complied with the terms and conditions of the act of assembly, passed at December session, eighteen hun=

dred and thirteen, entitled, A supplement to the act, entitled, An act to incorporate a company to make a turnpike road leading to *Cumberland*, and for the extension of the charters of the several banks in the city of *Baltimore*, and for other purposes. And the said *Nicholas* in fact says, that the said *President and Directors* have not fulfilled and complied with the terms and provisions of the said last act; because the said *President and Directors* have not subscribed for as much stock in the company incorporated by the said act, as by the second section of the said act, the said *President and Directors* were directed and ordered to subscribe for; and because the said *President and Directors*, though directed and ordained by the seventh section of the said act so to do, have not paid annually on the first day of January, after the first day of January, eighteen hundred and fifteen, the sum of twenty cents upon every hundred dollars of the capital stock of the said *President and Directors*, which was and has been actually paid into the treasury of the western shore of the *state of Maryland*, but, on the contrary, the said *President and Directors* have neglected to pay the same, as well when the same became payable, as for the space of six months thereafter, to wit, at the county aforesaid. By means whereof, and long before the commencement of the present action, to wit, on the fifth day of February, in the year eighteen hundred and seventeen, the charter of or the act incorporating the said *President and Directors*, became and was null and void, and of no force, and the said *President and Directors* ceased to have any right to have or maintain any action or suit whatever, to wit, at the county aforesaid; and this, the said *Nicholas* is ready to verify. Whereupon he prays judgment if," &c.

*Fourth Plea.* "That the plaintiffs, their action aforesaid thereof against him the said defendant, ought not to have or maintain, because he says, that it was the duty of a committee of the board of directors of the said bank, consisting of at least three of their number, to visit in rotation at least once in every three months during the time which said *Ralph* was cashier of the said *Union Bank*, the vaults in which the cash and other valuable effects belonging to or in the custody of the said bank, were deposited; and also, to make, or cause to be made in their

presence an inventory of the same, to be compared with the books, in order to ascertain their agreement therewith, and make a report to the board. And the said defendant avers, that a committee of the board of directors, consisting of at least three of their number, did not visit in rotation at least once in every three months, during the time which said *Ralph* was cashier of said *Union Bank*, the said vaults, nor did the said committee make, or cause to be made in their presence, an inventory of the said cash and other valuable effects to be compared with the books, in order to ascertain the agreement of the said cash and other valuable effects with the said books, nor did the said committee make a report to the board, but on the contrary thereof, the aforesaid matters and things, which it was the duty of said committee to have done, they wholly neglected and omitted to do, to wit, at the county aforesaid. And the said defendant further says, that any loss, damage or injury, which may have happened to, or been sustained by the said plaintiffs, has happened and been sustained by reason and on account of the said neglects and omissions of them the said plaintiffs; and this he is ready to verify; wherefore the said defendant prays judgment if," &c.

*Fifth Plea.* "That the plaintiffs ought not to have or maintain their aforesaid action thereof against him, because he says, that by a certain act of the general assembly of this state, made and passed at a session of assembly, begun and held at the city of *Annapolis*, on the fifth day of November, in the year one thousand eight hundred and four, entitled, An act to incorporate the stockholders in the *Union Bank of Mary-land*, the proprietors of shares in the said bank, as well as those who might thereafter become stockholders, their successors and assigns, were created and made a body politic and corporate, by the name and style of *The President and Directors of the Union Bank of Maryland*, and it was amongst other things enacted by the tenth section of the said act, that certain rules, restrictions, limitations and provisions, should form and be fundamental articles of the constitution of the said corporation. And the said *Nicholas* further saith, that by the second of said fundamental articles of the said constitution, it is, amongst other things, provided, that no director, having served for three

years successively, shall be eligible for the two succceding years thereafter. And the said *Nicholas* further saith, that at the. time the said *Ralph Higginbothom*, in the said supposed writ-ing obligatory mentioned, was appointed cashier of the said *Union Bank*, by the directors thereof, and at the time of the making the said supposed writing obligatory, to wit, on the twentieth day of March, in the year one thousand eight hun-dred and five, the said *President and Directors of the said Union Bank of Maryland*, were acting under and by virtue of the said act of assembly and conformably thereto. And the said *Nicholas* further saith, that afterwards, to wit, on the thir-ty-first day of December, one thousand eight hundred and six, at a session of the general assembly of this state, begun and held at the city of *Annapolis*, on the third day of November, in the said last year, an act was made and passed by the said general assembly, at the request and solicitation of the said *President and Directors of the Union Bank of Maryland*, and without the knowledge or consent of the said *Nicholas*, entitled, An act supplementary to an act, entitled, An act to in-corporate the stockholders in the *Union Bank of Maryland;* by which said supplementary act it was enacted, that so much of the said second fundamental article of the constitution of the said bank, as rendered a director, after serving for three years successively, ineligible for the two succeeding years, should be, and was thereby repealed. And the said *Nicholas* further said, that the said *President and Directors* of the said bank, and the stockholders therein, assented to the said repeal of so much of the said second fundamental article, and have always, ever since, acted under and conformably to the said original act, as thus altered, and in part repealed, and that at an election of di-rectors of the said bank, held on the first Monday in July, in the year one thousand eight hundred and eight, sundry persons who had been elected and served as directors of said bank, for three successive years previous to the said last mentioned day, were and have been, ever since, continually re-elected directors of said bank, and served as such. And the said *Nicholas* fur-ther saith, that the said *Ralph Higginbothom*, from the time of his appointment as cashier of said bank, and from the time of the making of the said supposed writing obligatory, and

from thence until the said first Monday in July, in the year last aforesaid, did, from time to time, make and give unto the said *President and Directors of the Union Bank of Maryland,* a just and true account in writing, and discharge himself, of, for and from, and did likewise pay and deliver to the *President and Directors of the Union Bank of Maryland,* for the time being, all such sum or sums of money, bills, notes, goods and things whatsoever, which he the said *Ralph* did, from time to time, receive, discharge, or that came to his hands, charge or custody, of or belonging to the said *President and Directors of the Union Bank of Maryland,* or of or belonging to any other person or persons whatsoever, wherewith the said *President and Directors of the Union Bank of Maryland,* for the time being, or their successors, were or might have been charged or chargeable; and also, that he, the said *Ralph* did, in all things, well and truly perform the duties of cashier to the said *President and Directors of the Union Bank of Maryland,* for the time being, to wit, at the county aforesaid; and this, the said *Nicholas* is ready to verify; wherefore he prays judgment if,'' &c. To these pleas the plaintiffs replied, viz.

*Replication to 1st plea.* ''That they, by any thing by the defendant, in his *first* plea, by him above pleaded, ought not to be barred from having their said action thereof against him, because, protesting,'' &c. ''For plea, nevertheless, by way of replication to the said plea, by the defendant, first above pleaded, the plaintiffs say, that at a session of the general assembly of *Maryland,* begun and held at the city of *Annapolis,* on the fifth day of November, in the year eighteen hundred and four, amongst others, a certain act of assembly was passed, entitled, An act to incorporate the stockholders in the *Union Bank of Maryland,* (1804, *ch.* 48,) which follows in these words, to wit:

*An Act to incorporate the Stockholders in the Union Bank of Maryland.*

[The following appear to be the only material parts of the act necessary to be noticed.]

1. WHEREAS the president and directors of the *Union Bank of Maryland,* on behalf of themselves and others, proprietors

of stock in the said bank, have petitioned this general assembly, setting forth, that sundry persons, by articles of voluntary association, have contracted and agreed, each with the other, to conduct and carry on the usual operations of the banking system, at the city of *Baltimore,* under the name and style of *The President and Directors of the Union Bank of Maryland,* and praying that an act may pass to incorporate the stockholders in the said bank; and the same being reasonable, Therefore,

II. *Be it enacted by the General Assembly of Maryland,* That the said bank shall be, and the same is hereby established at the city or precincts of *Baltimore,* at the discretion of the president and directors; and the capital stock of the said bank shall consist of three millions of dollars, money of the *United States,* divided into shares of one hundred dollars each; and that five thousand shares be reserved for the use and benefit of the state of *Maryland,* to be subscribed for by the said state, when desired by the legislature thereof.

VI. *And be it enacted,* That the *president and directors* of the said bank, to wit: *William Winchester,* President; *James A. Buchanan, Solomon Etting, David Winchester, Andrew Ellicott, jr., Luke Tiernan, Charles Ridgely,* of *Hampton, Solomon Birckhead, Thomas McElderry, Walter Dorsey, Henry Payson, Hezekiah Clagett, Isaac Tyson, Ebenezer Finley, Stewart Brown, John Hollins* and *Henry Schroeder,* shall continue to act as such, until the first Monday of July, eighteen hundred and five, and until a new election of directors shall take place.

VII. *And be it enacted,* That the affairs of the said company shall be conducted by a president and sixteen directors, together with such other directors as the state shall appoint, in the manner hereinafter directed, and that there shall be an election of sixteen directors, by ballot, on the first Monday in July next, and on the first Monday in July of each and every year thereafter, by the stockholders and proprietors of the capital stock of the said corporation, and by plurality of votes, at such place, and in such manner, as the president and directors for the time being shall appoint; and those who shall be chosen at any election, shall be capable of serving as directors, by virtue of

such choice, until the end and expiration of the first Monday of July next ensuing the time of such election, and no longer, unless in case of failure of election on the day appointed, and in that case, until such election takes place, and the said directors, at the first meeting after such election, shall choose a president. And in case it should happen that an election of directors should not be made upon the day, when, pursuant to this act, it ought to have been made, the said corporation shall not, for that cause, be deemed to be dissolved; but it shall be lawful, on any other day, within ten days thereafter, to hold and make an election in such manner as shall have been regulated by the laws and ordinances of the said corporation. And in case of the death, resignation, disqualification, or removal out of the state of a director, or his being appointed president of the bank, his place may be filled up by the directors, for the remainder of the year.

VIII. *And be it enacted*, That the directors for the time being shall have power to appoint a cashier, and such other officers and servants under them, as may be necessary for executing the business of the said corporation, and to allow them such compensation for their services respectively, as shall appear reasonable.

IX. *And be it enacted*, That the president and directors for the time being, may make all such rules, orders, by-laws and regulations, for the government of the said corporation, its officers and servants, as they, or a majority of them, from time to time shall think fit, not inconsistent with law or the provisions of this act, the same at pleasure to revise, alter and annul, and may use, employ and dispose of the funds, money and credit of the said bank, as they, or a majority of them, may deem expedient, subject, however, to the restrictions and limitations hereinafter mentioned.

X. *And be it enacted*, That the following rules, restrictions, limitations and provisions, shall form and be fundamental articles of the constitution of the said corporation, viz. &c.

2d. None but a stockholder, except in the case of director chosen by the state, being a citizen of the *United States*, shall be eligible as a director or president; and every president or director, as the case may be, shall cease to be a director or pre-

sident upon his ceasing to be a stockholder, and not more than eleven directors in office shall be eligible for the next succeeding year; and no director, having served for three years successively, shall be eligible for the two succeeding years thereafter.

7th. The president, each director, cashier or treasurer, before he enters upon the duties of his office, shall take the following oath, or affirmation, as the case may be: I ———, do swear, or affirm, that I will faithfully, impartially, diligently and honestly, execute the duties of ———, agreeably to the provisions of law, and the trust reposed in me, to the best of my skill and judgment.

9th. The president and eight directors, shall constitute a board for the transaction of business, but ordinary discounts may be done by the president and five directors; in case of sickness, or the necessary absence of the president, his place may be supplied by a director, who he, by writing under his hand, shall nominate for the purpose.

14th. Every cashier, or treasurer, before he enters upon the duties of his office, shall be required to give bond, with two or more sureties, to the satisfaction of the president and directors, in a sum not less than fifty thousand dollars, with condition for his good behaviour.

XI. *And be it enacted,* That this act shall continue in force until the expiration of the year eighteen hundred and fifteen, and until the end of the next session of assembly thereafter.

And the plaintiffs further say, that after the passage of the said act, and in pursuance thereof, and conformably thereto, the said *directors* for the time being, did constitute and appoint the said *Ralph* to be the cashier of the said *Union Bank of Maryland,* to wit, on the first day of March, in the year eighteen hundred and five, to wit, at the county aforesaid; and the plaintiffs further say, that in pursuance of, and in conformity to, the said act of assembly, the said *president and directors* for the time being, did afterwards, to wit, on the twentieth day of February, in the year eighteen hundred and five, make certain rules, by-laws and regulations, for the government of the said corporation, its officers and servants, to wit, at the county aforesaid; which said by-laws follow in these words:—

*The first code of By-Laws adopted by the Union Bank of Maryland, and which remained in force until the 4th of October 1819, when they were repealed, and those in the printed copy, adopted.*

### BY-LAWS.

[The following appear to be the only parts of the by-laws material in this cause.]

Art. 1. The *President and Directors of the Union Bank of Maryland,* shall take charge of the cash belonging to the said bank, shall receive deposits, issue bills or notes, signed by the president and countersigned by the cashier, to any amount they may think necessary, not exceeding two millions of dollars; discount bills or notes, at the rate of interest charged by other banks in the city of *Baltimore,* and shall do and perform all such matters and things, as may be necessary for conducting and carrying on in a proper manner, the business of said bank; and during the first six months of the operation of this bank, no note or bill shall be discounted for any term exceeding sixty days.

Art. 2. *And be it ordained by the President and Directors of the Union Bank of Maryland,* That all and singular the resolutions and acts of the late commissioners and present directors until this time, be and are hereby confirmed, and held to be good and valid to all intents and purposes, as if the same had been made, and entered into at a regular meeting of the stockholders.

Art. 4. That the bank shall keep open for ordinary business from nine o'clock in the morning till three o'clock, P. M. every day except Sundays, Christmas day and the fourth day of July.

Art. 5. That all bills and notes offered for discount shall be delivered into the bank on such day or days in each week as the directors may hereafter appoint, and be laid before the directors on the next succeeding day, (together with a state of the funds of the bank, at least twice a week) on which day the discount shall be settled, and be drawn for accordingly, at any time after twelve o'clock, and the notes or bills, not discounted, shall be returned on demand.

Art. 6. That all discounts shall be made on personal security, with at least two responsible names, (the firm and all the

partners of a house being considered as one name only,) allowing three days grace on all notes and bills payable at the bank, and discount to be taken for the same.

Art. 7. That to entitle a note or bill to be discounted at this bank, the maker or acceptor thereof must usually reside in the city of *Baltimore* or precincts thereof; and notes made at a distance must have two responsible names residing in the city or precincts aforesaid

Art. 18. That it be the duty of the president to pay all possible attention to the operations of the bank; to take into his safe keeping (at the bank) the plates, paper moulds and bank paper; to superintend the printing at the bank of all bills or notes that may be printed; to keep a regular account of the bank paper, and of the quantity from time to time ordered for impression; to superintend the duty of all persons employed in the bank; to sign all bills and notes which may be issued; and should this bank be incorporated, the president is to have in his charge and custody, the seal of the corporation, and cause the same to be affixed to all such instruments and documents, as the board of directors shall order or authorize; and do all other matters and things that the law directs.

Art. 19. That it shall be the duty of the cashier to countersign at the bank, all bills or notes signed by the president; carefully to observe the conduct of the persons employed under him; daily to examine the settlement of the cash account of the bank; to count the money deposited in the vaults; to compare the amount thereof with the balance of the cash account that day, and in case of disagreement, to report the same to the directors as early as possible; for which purpose, if necessary, the president may call a special meeting.

Art. 22. That a committee of the board of directors, consisting of at least three of their number, shall, in rotation, visit the vaults in which the cash and other valuable effects are deposited, at least once in every three months, and make, or cause an inventory of the same to be made in their presence, to be compared with the books, in order to ascertain their agreement therewith, and make a report to the board; that on the door of the great vault, there shall be three locks, and that the president, cashier and first teller, shall each keep a key.

Art. 24. That a book shall be kept for the use of the board of directors, in which all discounted notes and bills shall be entered, in such manner as to discover at one view, on each discount day, the amount which any person is indebted to the bank, on such notes and bills, in the capacity of payer, and in the capacity of discounter severally.

Art. 26. That the president and directors of the bank aforesaid, be authorised and appointed, and they are hereby authorised and appointed, to make and adopt any further by-laws for the government of said bank, which they may think necessary and convenient, provided they are not contrary to the articles of association.

And the plaintiffs further say, that after the said act of assembly, and after the making of the said by-laws, to wit, on the thirtieth day of March, in the year eighteen hundred and five, the said *Ralph*, in pursuance of the said act of assembly, gave the bond in the declaration mentioned, with the condition therein contained, to wit, at the county aforesaid: And the plaintiffs further say, that the said *Ralph* continued to be cashier, and to act in the capacity of cashier of the *Union Bank of Maryland*, from the day last mentioned, until the twenty-fifth day of May, in the year eighteen hundred and nineteen, under and in pursuance of the said bond last mentioned, to wit, at the county aforesaid: And the plaintiffs further say, that at a session of the general assembly of *Maryland*, begun and held at the city of *Annapolis*, on the fourth day of December, in the year of our Lord, eighteen hundred and fifteen, and ending on the thirtieth day of January, in the year eighteen hundred and sixteen, among other things, a certain act of assembly was passed, entitled, An act declaring the continuation and extension of the charters of the several banks therein mentioned; which said act of assembly, (1815, *ch.* 167,) follows in these words, to wit:

*An Act declaring the continuation and extension of the*
*Charters of the several Banks therein mentioned.*

WHEREAS the *President, Directors and Company, of the Bank of Baltimore;* the *President and Directors of the Union Bank of Maryland,* [and various other banks therein named,] have transmitted to the executive of this state, certi-

ficates of their determination to agree to and accept of the renewal of their charters, upon the terms and conditions prescribed by an act, entitled, A supplement to the act, entitled, An act to incorporate a company to make a turnpike road leading to *Cumberland,* and for the extension of the charters of the several banks in the city of *Baltimore,* and for other purposes, passed at December session, one thousand eight hundred and thirteen: therefore, *Be it enacted, by the General Assembly of Maryland,* That the charters of, or the several acts of assembly incorporating the above mentioned banks, be and the same hereby are continued and extended to the first day of January, one thousand eight hundred and thirty-five, and to the end of the session of the general assembly next thereafter; *Provided,* that nothing herein contained shall be construed to release the said banks from the compliance of the terms and conditions prescribed in the act of assembly, entitled, A supplement to the act, entitled, An act to incorporate a company to make a turnpike road leading to *Cumberland,* and for the extension of the charters of the several banks in the city of *Baltimore,* and for other purposes, passed at December session, eighteen hundred and thirteen, chapter one hundred and twenty-two.

1st. *Breach—Embezzlement.* "And the plaintiffs in fact say, that the said *Ralph,* not regarding his duty as cashier as aforesaid, but fraudulently intending and contriving to injure and deceive the plaintiffs, did, on various days and times, from the day of the date of the said writing obligatory until the twenty-seventh day of January, in the year eighteen hundred and sixteen, and from the said twenty-seventh day of January, in the year eighteen hundred and sixteen, until the sixth day of February, in the year eighteen hundred and seventeen, and from the said sixth day of February, in the year eighteen hundred and seventeen, until the twenty-fifth day of May, in the year eighteen hundred and nineteen, privately, fraudulently, and in violation of his duty as cashier as aforesaid, use, embezzle, take out, and otherwise make away with the funds, monies and promissory notes for the payment of money, commonly called bank notes, to a great amount, to wit, to the amount of fifty thousand dollars, at the county aforesaid, be-

longing the plaintiffs, and wherewith the plaintiffs were chargeable, and which came to his, the said *Ralph's* hands, charge and custody, as cashier as aforesaid, and the same did unjustly detain and convert to his own use, whereby the plaintiffs were greatly prejudiced and damaged, to wit, to the value of fifty thousand dollars, to wit, at the county aforesaid, and this they, the plaintiffs, are ready to verify."

The 2d. assignment of breaches was like the first, except that it charged them to have been committed "on various days and times, from the day of the date of the said writing obligatory, until the 27th of January 1816."

The 3d. assignment of breaches was like the first, except that it charged them to have been committed "on various days and times, from the day of the date of the said writing obligatory, until the 6th of February 1817."

The 4th. assignment of breaches was like the first, except that it charged them to have been committed "on various days and times, from the day of the date of the said writing obligatory, until the 25th of May 1819," without any other allegation of the time.

5th. *Breach—Unlawful discountings.* "And further breach by way of replication to the said plea by the defendant *first* above pleaded," &c. "the plaintiffs say, that the said *Ralph,* not regarding his duty as cashier as aforesaid, but fraudulently intending and contriving to injure and deceive the plaintiffs, did, on various days and times, from the day of the date of the said writing obligatory, until the twenty-seventh day of January, in the year eighteen hundred and sixteen, and from the twenty-seventh day of January, in the year eighteen hundred and sixteen, until the sixth day of February, in the year eighteen hundred and seventeen, and from the sixth day of February, in the year eighteen hundred and seventeen, until the twenty-fifth of May, in the year eighteen hundred and nineteen, privately, fraudulently, and in violation of his duty as cashier as aforesaid, use the funds and monies belonging to the plaintiffs, and wherewith the plaintiffs were chargeable, and which came to the hands, charge and custody, of the said *Ralph,* as cashier as aforesaid, in secretly and unlawfully discounting notes for divers persons, and in appropriating the profits of

such secret and unlawful discountings to his own use, to a great amount, to wit, to the amount of fifty thousand dollars, at the county aforesaid, whereby the plaintiffs were greatly prejudiced and damaged, to wit, to the value of fifty thousand dollars, to wit, at the county aforesaid; and this they, the plaintiffs, are ready to verify."

The 6th, 7th and 8th breaches, were assigned upon unlawful discountings as in the 5th breach, the time being laid as in the 2d, 3d and 4th assignments of breaches, and in that respect only differing from the 5th breach.

9th. *Breach—Conspiracy, &c. False Entries.* "And for assigning further breach by way of replication to the said plea by the defendant, first above pleaded, according," &c. "the plaintiffs say, that the said *Ralph* did, on various days and times, from the day of the date of the said writing obligatory, until the twenty-seventh day of January, in the year eighteen hundred and sixteen, and from the said twenty-seventh day of January, in the year eighteen hundred and sixteen, until the sixth day of February, in the year eighteen hundred and seventeen, and from the said sixth day of February, in the year eighteen hundred and seventeen, until the twenty-fifth of May, in the year eighteen hundred and nineteen, to wit, at the county aforesaid, falsely and fraudulently combine, collude and conspire, with a certain *Andrew Burt*, teller of the said bank, and a certain *Pierce L. Tanner*, book-keeper in the said bank, falsely and fraudulently, and in violation of his duty as cashier as aforesaid, to lend out and give out, and in pursuance thereof, did fraudulently lend out and give out large sums of money belonging to the plaintiffs, and others, wherewith the plaintiffs were chargeable, and which came to the hands, charge and custody of the said *Ralph*, as cashier as aforesaid, and which he has not yet duly accounted for, paid, delivered or discharged himself from; amounting in all to a large sum of money, to wit, to the sum of fifty thousand dollars, to divers persons, and wrongfully and fraudulently to appropriate, and then and there, in pursuance thereof, did fraudulently appropriate the funds and monies of the said bank to their own private purposes, whereby the funds and monies of the said bank were wasted, embezzled, misspent, and otherwise made way with, and un-

justly detained by the said *Ralph*, and by other persons through his means, privity and procurement, to a great amount, to wit, to the amount of fifty thousand dollars, at the county aforesaid. And the plaintiffs in fact say, that neither the said *Ralph*, nor the said *Robert Purviance*, nor the said *Daniel Delozier*, nor the said *Edward Johnson*, nor *Nicholas G. Ridgely*, nor either nor any of them, nor either nor any of their heirs, executors or administrators, has or have yet, either made or given, or caused to be made or given unto the plaintiffs, or their successors, full satisfaction and recompense of and for such monies and funds belonging to the plaintiffs, or to other persons, wherewith the plaintiffs are chargeable, so as aforesaid wasted, misspent, embezzled and otherwise made away with, and unjustly detained by the said *Ralph*, and by other persons through his means, privity or procurement, or any part thereof. And the plaintiffs further say, that the said *Ralph*, in order to conceal the said secret, and unlawful and fraudulent doings from the plaintiffs, at divers days and times after the date of the said writing obligatory, and while he continued cashier of said bank as aforesaid, made or caused, or knowingly permitted to be made, certain false and deceptious entries in the books of the said bank, in violation of his duty as aforesaid, whereby the plaintiffs were greatly damaged, to wit, to the value of fifty thousand dollars, to wit, at the county aforesaid; and this they, the plaintiffs, are ready to verify."

The 10th, 11th and 12th breaches, were assigned upon conspiracy with the clerks and false entries as in the 9th breach, the time being laid as in the 2d, 3d, and 4th assignments of breaches, and in that respect only, differing from the 9th breach.

13th. *Breach—Over Drafts.* "And for assigning further breach, by way of replication to the said plea, by the defendant first above pleaded, according to the form of the statute in such case made and provided, the plaintiffs say, that the said *Ralph*, not regarding his duty as cashier as aforesaid, but fraudulently intending and contriving to injure and deceive the plaintiffs, did, at divers days and times, from the day of the date of the said writing obligatory, until the twenty-seventh day of January, in the year eighteen hundred and sixteen, and from the twenty-seventh day of January, in the year eighteen

hundred and sixteen, until the sixth day of February, in the year eighteen hundred and seventeen, and from the said sixth day of February, in the year eighteen hundred and seventeen, until the twenty-fifth day of May, in the year eighteen hundred and nineteen, during which several times the said *Ralph* continued cashier of the said bank, frequently, and from time to time, wrongfully and unlawfully take out of said bank, divers sums of money, to wit, the sum of fifty thousand dollars, at the county aforesaid, by draughts and checks upon the said bank and otherwise, when he, the said *Ralph*, had not money deposited in the said bank, wherewith to pay the said draughts or checks, and that during the said time the said *Ralph* did not, from time to time, make and give unto the plaintiffs and their successors, a just and true account in writing of all such sum or sums of money, bills and notes, which did from time to time come into his hands, charge and custody, of and belonging to the plaintiffs, or their successors, or to other person or persons, wherewith they, the plaintiffs or their successors, stood chargeable, whereby the plaintiffs suffered great damage, to wit, to the value of fifty thousand dollars, at the county aforesaid; and this they are ready to verify."

The 14th, 15th and 16th breaches were assigned upon over draughts as in the 13th breach, the time being laid as in the 2d, 3d and 4th assignments of breaches, and in that respect only, differing from the 13th breach.

17th. *Breach—Embezzlement of a Check, 21st November*, 1818. "And for assigning further breach, according," &c. "by way of replication to the said first plea, by the defendant, above pleaded, the plaintiffs say, that the said *Ralph*, with a view to injure and defraud the plaintiffs, and in violation of his duty as cashier as aforesaid, did, on the twenty-first day of November, in the year eighteen hundred and eighteen, to wit, at the county aforesaid, take from the funds and monies of the said bank, the sum of eight thousand three hundred and thirty dollars, and fraudulently charged or caused the same to be charged to a certain *William Dandridge*, cashier of a certain bank, styled *"The Bank of Virginia*," which said sum of money was never forwarded to the said *William Dandridge*, or to any person for him, but by the said *Ralph* was fraudu-

lently and wrongfully appropriated to his own private use, the said *Ralph* having charged or caused the same to be charged to the said *William Dandridge* the better to conceal his fraudulent and wrongful purpose from the plaintiffs, in breach and in violation of his duty as aforesaid, and to the great prejudice and damage of the plaintiffs, to wit, to the value of ten thousand dollars, at the county aforesaid; and this they are ready to verify."

18th. *Breach—Another Embezzlement*, 19*th, March* 1818. "And for assigning further breach, according," &c. "by way of replication to the said first plea by the defendant above pleaded, the plaintiffs say, that the said *Ralph*, fraudulently and unlawfully intending to injure and deceive the plaintiffs, and in violation of his duty as cashier as aforesaid, did, on the nineteenth day of March, in the year eighteen hundred and eighteen, take from the funds and monies of the said bank, the sum of seven thousand five hundred and four dollars and eighty cents, and fraudulently and unjustly appropriated the same to his own private uses, which said sum of money the said *Ralph*, with a view to deceive and defraud the plaintiffs, did falsely charge or cause to be charged in the books of the said bank, as for a certain bill of exchange, alleged by him to have been bought by the plaintiffs of a certain *John Gooding*, and which the said *Ralph* pretended to have remitted to a certain *Thomas Williamson*, cashier of a certain bank in the borough of *Norfolk*, styled "*A Branch of the Bank of Virginia;*" which said bill of exchange, or pretended bill of exchange, the plaintiffs say, never was remitted to the said *Thomas Williamson*, but that the said *Ralph* falsely charged the same to the said *Thomas Williamson*, as a pretence to conceal the said fraudulent appropriation from the plaintiffs, in breach and violation of his duty as aforesaid, whereby the plaintiffs suffered great damage, to wit, to the value of ten thousand dollars, at the county aforesaid; and this they are ready to verify."

19th. *Breach—False Statements.* "And for assigning further breach, according," &c. "by way of replication, to the said plea by the defendant first above pleaded, the plaintiffs say, that the said *Ralph*, with a view to deceive and defraud the plaintiffs, and in violation of his duty as aforesaid, did, at vari-

ous days and times, from the day of the date of the said writing obligatory, until the twenty-seventh day of January, in the year eighteen hundred and sixteen, and from the said twenty-seventh day of January, in the year eighteen hundred and sixteen, until the sixth day of February, in the year eighteen hundred and seventeen, and from the said sixth day of February, in the year eighteen hundred and seventeen, until the twenty-fifth day of May, in the year eighteen hundred and nineteen, to wit, at the county aforesaid, knowingly make divers false statements of the condition of the said bank to the plaintiffs, frequently, wilfully and fraudulently charging or causing to be charged, divers individuals and banks, with large sums of money as due and owing to the plaintiffs, than the said individuals or banks in fact owed or were indebted to the plaintiffs, to wit, the sum of fifty thousand dollars, whereby the plaintiffs suffered great damage, to wit, to the value of fifty thousand dollars, at the county aforesaid; and this they are ready to verify."

The 20th, 21st and 22d breaches, were assigned upon false statements made of the condition of the bank, as in the 19th breach, the time being laid as in the 2d, 3d and 4th assignments of breaches, and in that respect only, differing from the 19th breach.

23d. *Breach—Negligence.* "And for assigning further breach by way of replication to the said plea by the defendant first above pleaded," &c. "the plaintiffs say, that the said *Ralph*, on various days and times since the day of the date of the said writing obligatory, and while it was in full force and virtue, and during the time the said *Ralph* was cashier as aforesaid, and before the commencement of this suit, did not carefully examine the conduct of the persons employed under him by the plaintiffs as it was his duty to have done, and as he was required by the said by-laws to have done, but to do so, omitted and neglected, by which said omission and neglect of the said *Ralph*, the plaintiffs were damaged to a great amount, to wit, to the amount of fifty thousand dollars, to wit, at the county aforesaid; and this they are ready to verify."

24th. *Breach—Omitted to count the money,* &c. "And for assigning further breach, according," &c. "by way of re-

plication to the said plea by the defendant first above pleaded, the plaintiffs say, that the said *Ralph*, in violation of his duty as cashier as aforesaid, at various days and times, since the date of the writing obligatory, and whilst the same was in full force and virtue, and during the time the said *Ralph* was employed by the plaintiffs as cashier as aforesaid, and before the commencement of this action, did not, when it was his duty to have done so, count the money deposited in the vaults of the said bank, and compare the amount thereof with the balance of the cash account of the said bank, in the manner he ought to have done, but omitted and neglected so to do, whereby large sums of money, to the amount of fifty thousand dollars, wherewith the plaintiffs were chargeable, and which were in the charge and custody of the said *Ralph* as cashier as aforesaid, where wholly lost, and the plaintiffs greatly prejudiced and damaged, to wit, to the value of fifty thousand dollars, to wit, at the county aforesaid; and this they are ready to verify."

25th. *Breach—Did not compare the books*, &c. "And for assigning further breach by way of replication to the said plea by the defendant first above pleaded, according," &c. "the plaintiffs say, that the said *Ralph*, in violation of his duty as cashier as aforesaid, at various times during the time he was cashier as aforesaid, and after the date of the said writing obligatory, and whilst the same continued in full force and virtue, and before the commencement of this action, altogether omitted and neglected to examine and compare the several books of account of the bank, which were kept by the clerks and subordinate agents of the said bank, under the superintendance and direction of the said *Ralph*, as cashier as aforesaid, as it was his duty to have done, whereby material errors, mistakes, false statements and disagreements arose and occurred therein, and large sums of money, wherewith the plaintiffs were chargeable, and which came to the hands, charge and custody of the said *Ralph* as cashier, were thereby wholly lost, to the amount of fifty thousand dollars, and the plaintiffs have thereby sustained damage to the value of fifty thousand dollars, to wit, at the county aforesaid; and this they are ready to verify."

26th. *Breach—Did not examine cash account.* "And for assigning further breach, by way of replication to the said plea,

by the defendant first above pleaded, according," &c. "the plaintiffs say, that the said *Ralph*, in violation of his duty as cashier as aforesaid, during the time he was employed by the plaintiffs as cashier as aforesaid, and after the date of the said writing obligatory, and when the same continued in full force and virtue, and before the commencement of this suit, did not daily examine the settlement of the cash account, as it was his duty to have done; but wholly neglected and omitted to do so, whereby the plaintiffs have sustained great damage, to the amount and value of fifty thousand dollars, to wit, at the county aforesaid; and this they are ready to verify."

27th. *Breach—Negligence in not reporting deficiencies.* "And for assigning further breach, by way of replication to the said plea, by the defendant first above pleaded, according to the form of the statute in such case made and provided, the plaintiffs say, that after the date of the said writing obligatory, and while the same was in full force and virtue, and during the time the said *Ralph* was employed by the plaintiffs, as cashier as aforesaid, and before the commencement of this suit, at various days and times, there were large and improper deficiencies of the money in the vaults of the said bank, which the said *Ralph* as cashier as aforesaid, ought to have reported to the directors of the said bank, but which, on the contrary, in violation of his duty as cashier as aforesaid, he wholly omitted and neglected to do, by which omission and neglect the plaintiffs have sustained great damage, to wit, to the value of fifty thousand dollars, to wit, at the county aforesaid; and this the plaintiffs are ready to verify."

28th. *Breach—Did not account, &c.* "And for assigning further breach, by way of replication to the said plea, by the defendant first above pleaded, according," &c. "the plaintiffs say, that the said *Ralph* since the date of the said writing obligatory, and while the same continued in full force and virtue, and during the time he was employed as cashier as aforesaid, and before the commencement of this suit, did not, from time to time, make and give unto the plaintiffs, a just and true account in writing of all such sums of money, as from time to time came to his hands, charge and custody, as cashier as aforesaid, wherewith the plaintiffs were chargeable, as it was his

duty to have done, but wholly omitted and neglected so to do, by which omissions and neglect, the plaintiffs have sustained great damage, to the amount and value of fifty thousand dollars, to wit, at the county aforesaid; and this they are ready to verify."

29th. *Breach—Received money, &c. Did not pay, &c.* "And for assigning further breach, according," &c. "by way of replication to the first plea by the defendant above pleaded, the plaintiffs say, that the said *Ralph*, since the date of the said writing obligatory, and while the same continued in full force and virtue, and during the time he was employed and acted as cashier as aforesaid, and before the commencement of this suit, did from time to time, receive into his charge and custody as cashier as aforesaid, divers large sums of money, bills and notes, to the amount and value of fifty thousand dollars, belonging to the plaintiffs, and wherewith they were chargeable, which the said *Ralph* has not since paid or delivered to the plaintiffs, or otherwise discharged himself from, as he ought to have done, but so to do, hath wholly omitted, neglected and refused; whereby the plaintiffs have susutained great damage, to wit, to the value of fifty thousand dollars, to wit, at the county aforesaid; and this they are ready to verify."

30th. *Breach—Combination to take money, &c.* "And for assigning further breach, by way of replication to the said plea, by the defendant first above pleaded, according," &c. "the plaintiffs say, that the said *Ralph*, since the date of the said writing obligatory, and while the same continued in full force and virtue, and during the time he was employed and acted as cashier as aforesaid, to wit, at the county aforesaid, did falsely and fraudulently combine, collude and conspire with a certain *Andrew Burt*, teller of the said bank, and a certain *Pierce L. Tanner*, book-keeper in the said bank, falsely and fraudulently, and in violation of his duty as cashier as aforesaid, to take out of the said bank, a certain sum of money, to wit, the sum of eight thousand dollars, which had been before that time deposited by, and belonging to a certain *Amos A. Williams*, and in pursuance thereof did fraudulently take out of the said bank, the said sum of money, to wit, the sum of eight thousand dollars, which had been before that time deposited as aforesaid, the

said sum of money being money wherewith the plaintiffs were chargeable, and which came to the hands, charge and custody of the said *Ralph* as cashier as aforesaid, and which he has not yet duly accounted for, paid, delivered or discharged himself from, whereby the plaintiffs were greatly damaged, to wit, to the value of fifty thousand dollars, to wit, at the county aforesaid; and this they are ready to verify: wherefore they pray judgment, and their debt aforesaid, together with the damages on occasion of the detention thereof, to be adjudged to them, &c."

*Replication to the second plea.* This replication assigned similar breaches to those assigned under the replication to the first plea.

The plaintiffs demurred generally to the defendant's *third, fourth,* and *fifth* pleas, to which there were joinders in demurrer.

The defendant demurred generally to the 1st, 4th, 5th, 8th, 9th, 12th, 13th, 16th, 17th, 18th, 19th and 22d breaches assigned in the replications to the *first* and *second* pleas, to which there were joinders in demurrer. To the other breaches, viz. the 2d, 3d, 6th, 7th, 10th, 11th, 14th, 15th, 20th, 21st, 23d, 24th, 25th, 26th, 27th, 28th, 29th and 30th, in the 1st and 2d replications of the plaintiffs to the 1st and 2d pleas, the defendant rejoined, denying the matter of each of the said breaches directly, concluding each rejoinder to the country, and on which issues of fact were joined

The cause was then, on the prayer of the parties to amend their pleading, continued for several terms, and at the term when the cause was tried, the defendant asked and obtained further leave to amend his pleadings. He then filed the following plea, in addition to those before filed, viz. *Sixth plea.* "And the said *Nicholas G. Ridgely,* by leave of the court here, according to the form of the statute in such case made and provided, comes and further defends the wrong and injury when, &c. and says that the said plaintiffs their action aforesaid thereof against him, the said *Nicholas,* ought not to have or maintain, because he says that on or about the thirtieth day of March, in the year of our Lord eighteen hundred and five, to wit, at the county aforesaid, the said supposed writing obligatory was presented

and shown by the said *Ralph* to the said *Nicholas,* and the said *Nicholas* was then and there requested by the said *Ralph* to join in the said supposed writing obligatory as co-security with other securities, for him, the said *Ralph;* and the said *Nicholas* assenting to such request of the said *Ralph,* did then and there sign and seal the said supposed writing obligatory, and returned the same to the said *Ralph,* to be by him submitted to the said *President and Directors of the Union Bank* (the plaintiffs in this cause) for their approbation and acceptance; and if the said supposed writing obligatory should be approved and accepted by the plaintiffs, that then and in such case the said supposed writing obligatory was to be considered and delivered as the act and deed of him, the said *Nicholas,* and not otherwise. And the said *Nicholas* avers, that the said supposed writing obligatory never was approved and accepted by the plaintiffs by any act in their corporate capacity; and so the said *Nicholas* says that the said supposed writing obligatory is not his act and deed; and of this he puts himself upon the country, and so forth." This plea was verified by the oath of the defendant. The plaintiffs joined in issue.

The county court rendered judgment for the defendant on the demurrers to the 1st, 4th, 5th, 8th, 9th, 12th, 13th, 16th, 17th, 18th, 19th and 22d breaches to the 1st and 2d pleas; and rendered judgment for the plaintiffs on the demurrers to 3d, 4th and 5th pleas of the defendant. The plaintiffs then suggested similar breaches to the defendant's 3d, 4th and 5th pleas as they had assigned to the 1st and 2d pleas. Upon the issues joined upon the several rejoinders of the defendant to the several breaches assigned by the plaintiffs to the *first* and *second* pleas, and to the issue joined to the *sixth* plea, the jury found for the defendant; although in the record the verdicts were informally stated by the clerk, and which by consent of the parties were amended. The jury also returned the following inquisition as to the breaches suggested to the 3d, 4th and 5th pleas, viz. "We the undersigned jurors, being duly empannelled, under and by virtue of an order of this court, for inquiring at bar, to assess the damages sustained by the plaintiffs by reason of any breaches assigned and suggested by them in this cause, upon which issues in fact were not joined, and verdict given for the

defendant, and being duly sworn thereto, in open court, having made inquiry thereof, do, upon our corporal oaths, find as follows; that is to say, upon the second breach, the third, sixth, seventh, tenth, eleventh, fourteenth, fifteenth, twentieth, twenty-first, twenty-third, twenty-fourth, twenty-fifth, twenty-sixth, twenty-seventh, twenty-eighth, twenty-ninth and thirtieth breach, assigned and suggested by the plaintiffs under the third plea; and upon the same breaches, numbered as aforesaid, and assigned and suggested by the plaintiffs under the fourth plea; and upon the same breaches, numbered as aforesaid, and assigned and suggested by the plaintiffs under the fifth plea, that the plaintiffs have sustained and proved damage to have been sustained by them, and under the direction of the court, the jury find for the plaintiffs, and they assess the damages of the plaintiffs to one cent, and no more, on each breach above mentioned. In witness whereof, the undersigned jurors have to this inquisition set their hands and seals, in open court, this twelfth day of May, in the year of our Lord one thousand eight hundred and twenty-four." Signed and sealed by the jurors. The plaintiffs then moved the court to order judgment to be entered upon the said inquisition. Which motion the court overruled, and directed judgment to be entered for the defendant.

*Bills of Exceptions.* 1. The defendant, by his counsel, just previous to the swearing of the jury, in the above case, at this present term, asked the leave of the court to amend his pleadings by pleading and filing the following plea, numbered 6. [Which was a copy of the *sixth* plea heretofore inserted.] To the making which amendment, the plaintiffs, by their counsel, objected, because said plea came too late, and was incompatible and inconsistent with the defendant's other pleas, and against the eleventh and thirty-third of the standing rules of this court, viz.

"Rule XI. The 20th day of February, and the 1st day of September, shall be the rule days; and whenever a rule is laid to declare or to plead, the declarations and pleadings are to be filed on or before the rule day; when a declaration, or any part of the pleadings is filed on or before the rule day, in pursuance

of a rule previously laid, the adverse party shall be bound to answer the same, and to file the pleadings necessarily arising in succession, on or before the second day of the next succeeding term, either party failing to comply with this rule, may have judgment of *non pros.* or by default, entered up against him, whenever the action is called, upon the first going over the docket; but the general issue plea may be pleaded by a defendant at any time before judgment by default is entered against him, although he hath not pleaded before the rule day; this, however, will never be considered as a reason to delay the trial."

"Rule XXXIII. No incompatible pleas shall be received; as *non assumpsit* and tender; *non assumpsit* and release; *non assumpsit* and infancy; *liberum tenementum* and justification; *nil debet* and *nil habuit in tenementis;* not guilty and *liberum tenementum;* not guilty and license; *non est factum* and payment or set off, and *non est factum* and release." But the Court, [*Archer,* Ch. J. and *Hanson* and *Ward,* A. J.] overruled the objection, and gave the defendant leave to amend his pleadings in the manner aforesaid, by filing said plea. The plaintiffs excepted.

2. On the trial of this cause, the plaintiffs to support the issues on their part, produced as a witness, *Henry Payson,* to prove that he was president of the *Union Bank of Maryland* from the 27th April 1812, until the 27th May 1819, and thereafter; and that *Ralph Higginbothom* was acting as cashier of said bank from its first organization, until the 27th May 1819; that a certain book now shown to him with the words "bylaws," printed in gilt letters on the back thereof, and the same words on the 1st page thereof, which it is agreed shall be part of this bill of exceptions, was, during the time he was president of said bank, one of the books of the bank, and that the rules therein contained (and which it is admitted are truly transcribed in the plaintiffs' replication,) were always considered by the directors and officers of the bank, as the by-laws of the bank, and under which the said directors and officers always acted, and that he as president of the bank was the depository of the said book, and that said by-laws in said book, were in

the handwriting of the said *Higginbothom;* and that said *Payson* (the witness,) was summoned as a witness by both parties, and examined without objection, by plaintiffs, and cross examined by defendant at a former trial of this cause, at March term of this court, 1822, and that, to the best of his recollection, he stated at said former trial, that he, the witness was, during all the time aforesaid, owner of stock in said bank; and the said witness being now duly sworn, stated that he is now a stockholder in said bank, and has no recollection, that when he was examined as above stated, at the former trial of this cause, he was then examined as to the fact of his being a stockholder in said bank, but that he has every reason to believe that the defendant and his counsel then knew that he was a director and stockholder in the said bank; and thereupon the defendant, by his counsel objected to the said witness as incompetent to prove any of the matters aforesaid, except that he is a stockholder, and stated himself on his examination at the said former trial, to have been then a stockholder.    Which objection the court sustained, and excluded the witness.    The plaintiffs excepted.

3. At the trial of this cause, the plaintiffs, to prove the issue on their part, offered in evidence—*First.* A paper entitled "Articles of Association of the *Union Bank of Maryland,*" which paper it is admitted by the defendant, contains the original articles of association, under which the bank transacted business prior to the passage of the act of incorporation, and which paper it is agreed shall be herewith filed as a part of this exception.    *Second.* The plaintiffs produced a book, on the back of which is printed in gilded letters, the words "by-laws," which book is herewith filed, and is to be considered a part of this exception; and the plaintiffs offered in evidence that the said book is one of their books, and is the one in which the proceedings of the *President and Directors of the Union Bank* were entered, so far as the same were reduced to writing, and contains the proceedings as aforesaid, so far as the same were reduced to writing, from the time of the original association until the charter was obtained, and also after the charter was obtained until the year eighteen hundred and nineteen; that there is no other book in which the proceedings of the presi-

dent and directors as aforesaid, were entered during the said period aforesaid, and no other writing or memorandum of their proceedings when they were assembled as the president and directors as aforesaid. *Third.* The plaintiffs offered to read in evidence from the said book, a writing headed the by-laws, under which, as the plaintiffs allege, the said president and directors acted. *Fourth.* The plaintiffs offered to read from the said book a resolution passed by the board of directors of the original association, on the 27th of September 1804, "That notice be given in the public newspapers in this city, that a petition would be presented to the general assembly of *Maryland,* at their next session, for a law to incorporate the stockholders of the said institution." *Fifth.* The plaintiffs offered in evidence the act of incorporation, and the several other acts of assembly, relating to the said incorporation, duly authenticated, copies of which are herewith filed, and are to be considered as part of this exception by agreement of parties. *Sixth.* The plaintiffs offered to read from the said book, entitled "by-laws," the following entry: "Thursday, 24th January, 1805. At a meeting of the president and directors this day, the members on behalf of the state being present, the charter, so far as it relates to the oath of officers, being read, it was resolved, That the president, each director, and *cashier,* take the following oath or affirmation, as the case may be—'I ——, do swear or affirm, that I will faithfully, impartially, diligently and honestly, execute the duties of a *director,* agreeably to the provisions of law, and the trust reposed in me, to the best of my skill and judgment.' This being done, they proceeded to vote on the propriety of advertising," &c. which said entry the plaintiffs gave in evidence, was in the handwriting of the said *Ralph Higginbotham.* *Seventh.* The plaintiffs offered to read an entry from the said book before mentioned, as follows: "Whereas by an act to incorporate the stockholders in the *Union Bank of Maryland,* it is, among other things enacted, that an election for sixteen directors, to conduct the affairs of the said bank, shall be annually held on the first Monday in July. And whereas the said first Monday in July may sometimes fall on the fourth of said month, on which the bank will be shut, agreeably to the provisions of the fourth article of the by-laws, or-

dained and passed for the regulation and government of the said corporation," &c. *Eighth.* The plaintiffs offered to read from the said book, an entry made on the 30th of August 1819, in the following words and letters, "*S. Etting, D. Winchester* and *A. Ellicott,* are appointed a committee to revise the by-laws." *Ninth.* The plaintiffs offered in evidence the by-laws, as revised, a copy of which is herewith filed and agreed to be considered as a part of this exception. *Tenth.* The plaintiffs offered in evidence the bond in the declaration mentioned, which it is admitted was signed and sealed by the defendant in this cause. The plaintiffs, further to prove the issues on their part, produced *John Hollins,* a competent witness, who gave in evidence to the jury, that he was a member of the corporation of the *Union Bank,* at the time of its incorporation, and had been so under the articles of association; that he continued to be a member of said corporation for several years after the act of incorporation. The said witness also gave in evidence, that upon inspection of the book marked "by-laws," as produced in court, he knew the said "by-laws," or regulations entitled "by-laws," and many of the other minutes written therein for a long period after the act of incorporation, as well as before the said act from the commencement of the association, to be in the hand-writing of *Ralph Higginbothom,* who was at the time of the said writing, and afterwards, the cashier of the said bank; the said witness also gave in evidence, that he believed the said writings entitled, "by-laws," as aforesaid, to be the true by-laws of the plaintiffs, and adopted and used by them, although the witness did not know that he had ever before seen the book in which they were written, his memory as to this matter being too uncertain to identify the said book; and the said witness being interrogated to each "by-law" separately, as written and numbered in the said book, gave in evidence, that while he was a director in the said bank, it was the usage of the said bank to act according to the first article of the said by-laws, whether the bank acted agreeably to the second article he did not remember. That the bank practised conformably to the 3d article, also to the 4th. To the 5th article of the by-laws, the witness gave in evidence that the president and directors for the first five or six months after their association, and before the

act of incorporation, met but once a week, but at the end of that time, the said president and directors met always twice a week, and this article was then complied with. That the bank acted according to the 6th article, and also the 7th and 8th. The 9th article the witness could not say how far it was complied with, as it would have required a person to be in the bank to know it; of the following articles up to the 20th, the witness gave in evidence, it was the usage of the bank to act according to them; of the 20th article he did not remember; the 21st article was a customary rule; the 22d article he did not remember that it was complied with, but that it was understood by the directors to have been a part of their duty; the 23d article he did not recollect; the 24th and 25th were according to the usage of the bank; and to the 26th, the witness stated that he knew of no revision of the by-laws. The witness further gave in evidence, that he never heard of any other by-laws, than those which had been read. The plaintiffs further produced *Solomon Birckhead*, a legal and competent witness, who gave in evidence that he was formerly a member of the association, and one of the first board of directors, and that he remembered there were by-laws in the said bank, although he could not undertake to identify them. The plaintiffs also produced *Stewart Brown*, a legal, competent witness in the cause, who gave in evidence, that he also had been a director in the said bank, for one or two years, a short time after its incorporation, and had also been a member of the association. The witness further stated that he was not acquainted with the by-laws produced in court, his memory not being sufficiently strong to enable him to recollect, but upon hearing them read, he gave in evidence that the direction and government of the bank, was in general conformable to these regulations, but never saw the rules now produced, or any other. The plaintiffs further offered *James A. Buchanan*, a legal and competent witness, who gave in evidence that he had been a member of the original association, and also of the bank, after its incorporation, and was for some time a director; that he had no recollection that he had ever seen the by-laws, though he presumed he had seen them as a director. Being examined to the by-laws separately, the witness gave in evidence, that with the exception of the articles Nos. 1, 2, 10,

11, 12, 13, 20, 25 and 26, of which he had no distinct recol-
lection, he remembered that the bank was usually regulated ac-
cording to the system prescribed in the said by-laws, and parti-
cularly in regard to the cashier's duty, as contained in the 19th
article; he remembers that such regulations were required of
him, and in regard to the 25th article, he remembered such a
rule, although he knew nothing of its execution; the witness
further gave in evidence, that he knew of no other regulations
of the bank, than those read, and that in general, he believed
them to have been complied with, yet that they were not ri-
gidly observed, either by the directors or officers. The plain-
tiffs further produced *George T. Dunbar*, a legal and compe-
tent witness in the cause, who gave in evidence that he was a
clerk in the bank of the plaintiffs, at the time of the act of in-
corporation; that at that time the said *Ralph Higginbothom*
was the cashier of the bank of the plaintiffs, and the said writ-
ings, entitled, "by-laws," are in the hand-writing of the said
*Ralph*. And also that the minutes in the said book, from the
commencement of the institution, until the act of incorporati-
on, and from that time for several years afterwards, are in the
handwriting of the said *Ralph*, and the said minutes were kept
by the said *Ralph*, who was considered in the bank the proper
officer to write the said minutes. The said witness also gave in
evidence, that while he remained in the bank, the said *Ralph*
was in the habit generally of performing the duties, though not
with regularity, assigned to the cashier by the 19th article of
the by-laws. The plaintiffs produced *Thomas N. Gouldsmith*,
a legal and competent witness in the cause, who gave in evi-
dence that he had been a clerk in the said bank for the last ten
or twelve years, during the greater part of which time the said
*Ralph* was cashier of the said bank; that in the book, entitled,
"by-laws," many of the minutes, and particularly those pur-
porting to be during the first five or six years of the charter,
are in the handwriting of the said *Ralph*, and that the said
writings, entitled, "by-laws," are all in the handwriting of
the said *Ralph*. The witness further gave in evidence that said
*Ralph* was in the habit of performing the duties which are
enumerated as duties of the cashier in the 19th article of said
by-laws, or that he professed to perform them, though it was

done with irregularity. The plaintiffs also produced *George Taylor*, a legal and competent witness, who gave in evidence that he was a director in 1817 or 1818—that when he was elected a director, he inquired at the bank for the by-laws, and that a book or paper containing by-laws, similar in purport to those which were produced by the plaintiffs in court, and read to the other witnesses, were delivered to him by some officer of the band; that he remembered them, because the board acted according to them while he was a director, though they were not very rigidly observed; he remembered them also from the fact, that discussions as to what were the rules in particular cases would sometimes take place at the board, and that such questions would be decided by the older members, who were more conversant with the rules than himself, in a manner agreeable to the rules he had heard read, but no book or paper containing the by-laws was ever produced; he did not particularly recollect the book in court, so as to be able to identify it. The witness further stated, that he was in the bank when the new by-laws were adopted in 1819; that he was present at the meeting when the new by-laws were adopted, and that these old ones, now in court, were the by-laws which were revised by the board; that the bank, as long as he was a director, and until the new by-laws were adopted, corresponded in its regulations and government, with the system contained in the by-laws in the book now offered in evidence, and that the witness never heard of two sets of by-laws previous to the revision, as above mentioned. The plaintiffs further produced *Jonathan Pinkney*, a legal and competent witness in the cause, who gave in evidence, that he is, at this time, the cashier of the plaintiffs, and had been so from the year 1819. That when he came into the bank he found the book, entitled, "By-Laws," among the other books of the corporation, and that the said book had the reputation in the bank of being the former by-laws and minutes of the corporation, and that the new by-laws were adopted a short time before he became the cashier of the plaintiffs; the said witness also gave in evidence that the said by-laws, as well as the minutes for several years, were in the proper hand-writing of the said *Ralph Higginbothom*, the former cashier. The plaintiffs further gave in evidence by *Elias Glenn*, Es-

quire, a competent witness, that he was a director in the *Union Bank* for two years, and thinks he was so between the years 1806 and 1811; knows that certain by-laws were handed to him when he was sworn in as a director, or about that time, and that he read them, but the contents of them he does not recollect; he thinks that when they were shown to him, some of the other directors told him the bank had a set of by-laws, and that it would be necessary for witness to read them, as he was now a director; witness is not sure that the by-laws he read were in a printed or written form; he never heard of but one set of by-laws, in said bank; does not know whether the by-laws contained in the book produced by the plaintiffs, entitled, "By-Laws," are the same as those he read, some of them, as far as he has now read them, which is to the seventh in said book, were exactly the same as the usage of the bank, and some were not, but he does not say that the said by-laws in said book, were or were not the rules of the bank. He says, that so far as the word "week," at the end of the fourth line of the 5th article of the by-laws in said book the usage of the bank was in exact conformity with said rule, but that the usage of the bank was directly, contrary to that part of the said articles, which directs that the discounts should not be paid till after 12 o'clock of the day on which the discount was made; that they were paid out at any time after they were made, and passed to the credit of the persons for whom they were made; he does not think the board ever sat so long as 12 o'clock at their discount meetings. Witness has himself often drawn out his discounts before 12 o'clock, as well as those which were made for himself, as upon the checks of other persons, for whose use discounts were made; that he has had a conversation lately with Mr. *Etting*, one of the directors of the bank at the present time, and one of the present plaintiffs, and that Mr. *Etting* told him, in that conversation, that it has ever been the usage of the bank to pay out discounts whenever they were applied for without regard to time; witness does not undertake to say whether such a rule as that discounts should not be paid out till after 12 o'clock existed or not. The defendants then offered in evidence, from the minutes in the said book of the proceedings of the plaintiffs, that there is no entry or memo-

randum of the adoption of the writing above produced, as the by-laws of the said bank by the vote of the said corporation, or of the president and directors thereof; that the proceedings in 1819, upon the subject of the revision of the by-laws, were after the dismissal of the said *Ralph Higginbothom* from employment in the said bank, and also, that the minutes in the said book contain no memorandum of the appointment of the said *Ralph* as cashier of the said bank after it was incorporated. And thereupon the defendant, by his counsel, objected to the reading of the said writing, headed "by-laws," produced as above mentioned, as and for the by-laws of the said corporation, and as prescribing, among other things, the duties of the said *Ralph*, while he was in the employment of the said bank; and the court were of opinion that the said writing could not be read in evidence for the purposes aforesaid. The plaintiffs excepted.

4. The plaintiffs, in addition to the matters and things contained in the preceding bills of exceptions for the plaintiffs, further produced in evidence the bond and condition, of which oyer is given in this cause, as set forth in the pleadings; and also gave in evidence, that the defendant signed and sealed the same; and further gave in evidence by *Jonathan Pinkney*, the present cashier of the said bank, that when he entered upon the said office on the 16th November, 1819, he found the said bond, as now produced, deposited among the archives and valuable original papers and documents of the said bank, in an iron chest in the banking-house of the said corporation, together with other papers purporting to be the bonds of the tellers, book-keepers, and other inferior officers of the said bank, and that this bond had ever since so remained in possession of the said bank, until it was delivered out to the attorney of said bank by the witness, as cashier thereof, to be used upon the trial of this cause. Whereupon the court inquired of the plaintiffs' counsel whether there was any evidence that the bond, upon which this suit was brought, had ever been received as satisfactory by the *President and Directors of the Union Bank* other than what is stated in this and the preceding exceptions, and being answered by the plaintiffs' counsel in the negative, instructed the jury that the cashier, before he entered

upon the duties of his office, was required by the act of assembly to give a bond, with two or more sureties to the satisfaction of the president and directors, for his good behaviour, and there was no legal evidence of any bond having been given to their satisfaction, which could bind the sureties in this case; and they must therefore find for the defendant on the issue joined on the *sixth* plea.    The plaintiffs excepted,

5. Upon the evidence contained in the preceding bills of exceptions, the plaintiffs, by their counsel, prayed the court to instruct the jury, 1st. That the jury, in the absence of all other evidence respecting the execution of the said bond, were at liberty to infer from the foregoing evidence that the said bond was duly executed and delivered by the said defendant, and duly accepted by the said plaintiffs, notwithstanding no written evidence of the acceptance thereof by the said corporation, or its board of directors, was adduced by the plaintiffs at this trial, and that a written acceptance thereof was not necessary to give validity to the bond.  2. That under the issue joined upon the sixth plea of the defendant, the production of the said bond by the plaintiffs, and their possession thereof, together with the proof and admission that the defendant had signed and sealed the same as aforesaid, were sufficient *prima facie* evidence of the due execution, delivery and acceptance thereof in law, and that the burden of proof of the non-acceptance thereof, or of the other special matter set forth in the sixth plea, lies upon the defendant; and in the absence of all proof on the part of the defendant touching the matters set forth in the said sixth plea, the jury ought, on the issue joined upon that plea, to find a verdict for the plaintiffs.  Both of which directions the court refused to give; but were of opinion, and so instructed the jury, that the cashier mentioned in said bond, was required by the act of assembly to give a bond with two or more sureties, to the satisfaction of the president and directors of the bank, for his good behaviour, and there was no legal evidence of any bond having been given to their satisfaction which could bind the surety in this case, and they must therefore find a verdict for the defendant on the issue joined on the said *sixth* plea.  The plaintiffs excepted.

6. At the trial of this cause, and after the opinion and direction had been given by the court, as stated in the fourth and fifth bills of exceptions of the plaintiffs, in order to prove the breaches and damages assigned and suggested in this cause, in addition to the testimony stated in the preceding exceptions, offered to give in evidence the several original corporation books of the plaintiffs, called offering books, legers, scratchers, cash books and statement books, which purported to contain as well the accounts of the said bank with its customers, as also statements of the affairs, property, debts and credits, of the said corporation, during the whole period between the 20th of January 1805, and the 6th of February 1817, and to prove that the said books were kept by a certain *Pierce L. Tanner*, and a certain *Jacob Hart*, as officers of the said corporation, during the time aforesaid, and to prove that the said *Pierce L. Tanner* was resident out of the jurisdiction of this court in parts unknown, and that the said *Jacob Hart* was dead, and that the several entries contained in the said books, were in the proper hand-writing of the said *Tanner* and *Hart*, and were kept under the superintendance and direction of the said *Ralph Higginbothom*. And also offered to prove by the said books, that divers false entries, mistakes, omissions, irregularities and material disagreements, occurred therein by the neglect and fraud of the said *Ralph Higginbothom*, and the said *Pierce L. Tanner*, and that there were great deficiencies in the funds of the bank, by reason whereof the plaintiffs had sustained great losses. Whereupon the defendant, by his counsel, prayed the opinion of the court to the jury, that upon the evidence and directions in the preceding exceptions, the evidence offered as stated in this exception, is not admissible for the purpose of proving the plaintiffs entitled to damages either on the issues joined or on the breaches suggested; which opinion the court gave, and accordingly rejected the evidence. The plaintiffs excepted; and the judgment being for the defendant, the plaintiffs appealed to this court.

The cause was argued at June term last, and afterwards re-argued in writing, before BUCHANAN, Ch. J. and EARLE, MARTIN, and DORSEY, J.

*Mitchell,* and *Kennedy,* for the Appellants, contended,

1. That the liability of the defendant on the bond extended to a period beyond the original term to which it was enacted that the charter should continue.

2. That the execution and delivery of the bond were sufficiently proved on the part of the plaintiffs to hold the defendant liable in this action.

3. That the defendant's sixth plea ought not to have been accepted. 1. Because it came too late and by surprise on the plaintiffs. 2. Because it is incompatible with the other pleas in the cause.

4. That the court below erred in taking from the jury, as stated in the plaintiffs' 4th and 5th bills of exceptions, the question of the due delivery, execution and acceptance of the bond; and also that the court erred in refusing the two prayers of the plaintiffs contained in their 5th bill of exceptions, and in the opinion and instructions given by them as stated in said 5th bill of exceptions.

5. That if acceptance of the bond, on the part of the plaintiffs, were necessary, that fact was sufficiently proved by their possession of the bond and the other evidence offered in the cause, and ought to have been left to the jury; and that the court erred consequently in the opinion expressed in the plaintiffs' 4th bill of exceptions.

6. That it was not necessary that the bond should be accepted in writing.

7. That the by-laws of the bank were sufficiently proved by the evidence in the cause.

8. That the court erred in rejecting the evidence, as stated to have been offered, in the plaintiffs' 6th bill of exceptions, the said evidence being proper to have gone to the jury to prove the breaches assigned and suggested by the plaintiffs.

9. That the court erred in rejecting the testimony of *Henry Payson,* and in sustaining the objection made by the defendant's counsel as set forth in the plaintiffs' 2d bill of exceptions.

10. That the court were in error in sustaining the demurrers by the defendant to the breaches assigned under the 1st and 2d pleas; because all the said breaches were good as far as they charged the defendant with defaults from the date of the bond.

11. That a judgment according to the prayer of the plaintiffs ought to have been entered in their favour upon the inquisition by the jury; and that the judgment entered in favour of the defendant was erroneous.

1. *As to the first bill of exceptions.* The *sixth* plea ought not to have been *received*—considering the *other pleadings* and the *time* when offered. It was inconsistent with the first plea of *performance*, and the second plea of *payment*. The cases in the books, will sufficiently show the court that these pleas are deemed incompatible in the *English* practice, and never allowed there, unless by special application to the court within the first rule-day for pleading, so that the parties may have early notice and come fully prepared to try both issues. But what was the case here? The cause had been at issue upon *all* the pleadings more than *three years.* The first rule to plead had expired as early as the 1st of September, 1819, and the leave to amend had expired on the 20th of February, 1824. The XI. rule inhibited all special pleas after the rule-day had expired, and the XXXIII. rule had expressly enacted as the law of the court, that the pleas of *non est factum* and *payment, set off* and *release,* should not stand together. The defendant has sworn to this plea—of course he was always apprised from the commencement of the suit, (March term, 1819,) of this defence. With this knowledge he lies by *five years,* until 8th May, 1824, and at the moment of trial, more than thirty days after the commencement of *that term,* and after all the witnesses had been summoned and were attending, and just as the jury were about taking the oath, he comes down upon the plaintiffs with a new plea, requiring a new replication and new proof, and other witnesses. It will be observed that the replications to the 1st and 2d pleas allege the *due execution of the bond*—the appointment of the cashier, and his acting under the bond; and issue is joined on the breach of his duties alone—so that under the issues already joined the execution of the bond was *admitted.* The standing rules of the court also further guaranteed the plaintiffs against surprise from *any* special plea at that time, and especially against a plea contradicting what was already admitted upon the record. And yet the court, without rescinding those rules, and with no special reason as

signed for dispensing with them, received this new plea and compelled the plaintiffs to reply *instanter* and proceed to trial on this new issue, or to submit to a further delay of six months, after the suit had been procrastinated five years! How the learned counsel can argue that this was no surprise upon the plaintiffs, or how they have discovered that no continuance was asked, cannot readily be divined. The surprise was inevitable, and no such fact is stated upon the record, as a waiver of time to reply, and cannot be presumed—although on *principle* it would not vary the hardship of the case. This court, it is believed, will decide this exception upon principles applicable to *all* cases, and it is most respectfully submitted, whether the first exception exhibits a proper exercise of the sound discretion entrusted to the county courts by the acts of assembly of 1809, *ch*. 153, *s*. 1.

2. As to the *fourth* and *fifth bills of exceptions*. In considering these exceptions *together*, it is proposed to inquire in the first place on which party the proof lies by the 6th plea. 1st. As to the *onus probandi*. The 2d prayer of the 5th bill of exceptions asserts that the burden of proof is cast *on the defendant* by this issue; and that in the absence of all proof on *his* part and the production of the bond by the plaintiffs, coupled with the admission that the defendant signed and sealed it, entitled the plaintiffs to a verdict on this issue. The defendant's counsel deny this proposition, on the ground that the special circumstances stated in the plea are not put in issue—but merely the *conclusion* which contradicts an affirmative in the declaration, and so puts the plaintiffs to prove their averment. They urge with much subtlety, that if the special circumstances stated in the plea are to be considered as new matter in avoidance, the plea should have concluded with a verification, whereas it is well established that such a plea ought to conclude to the country. It is admitted that the conclusion of this plea is right; but the fallacy of this ingenious argument lies in the application of the ordinary rules of pleading in other cases to the plea of special *non est factum*, or as Lord *Coke* terms it, the general issue *with an issent*. 5 *Com. Dig*. 387. *Whilpdale's Case*, 5 *Co. Rep*. 119. This is a peculiar plea, which impliedly *admits* the signing and sealing, but seeks to avoid the writ-

ing *as a deed*, by reason of extrinsic circumstances. It is a plea *sui generis,* and disused in modern times for the reason assigned by Lord *Holt,* in *Bushell vs Pasmore,* 6 *Mod.* 218. "That it is impertinent, as it puts the *defendant* to proof of such extrinsic circumstances in avoidance, in consequence of the implied admission contained in it." One of the defendant's counsel argued as if it were optional with the defendant to shift the burden of the proof by the form of the *conclusion.* If the defendant concludes with a verification, then the plaintiff (says he) may take issue upon either of the facts; but if the conclusion be to the country, the preceding matters are only inducement and cannot be traversed; so that the plea is in *that case* only the simple general issue denying the averments in the declaration. It would be indeed an extraordinary rule in pleading, that the affirmative of the issue should *depend* upon the conclusion of a plea. The conclusion of a plea depends on the simple inquiry whether there be a direct averment and denial, without regard to the nature of the issue. The rule is well established, "that if the plea conclude with a *special* negative to the affirmative in the declaration, (as in this case,) it *must* conclude to the country, and the *defendant* must prove the special matter, if the plaintiff join issue upon the whole plea." The *similiter* puts the *whole plea* and not the *conclusion* of it in issue. Thus, in covenant, if the breach consists in nonpayment of a sum of money at the day, or in not repairing, and the defendant avers payment or repair, and concludes to the country; yet the issue lies on the *defendant.* So if lessee is to pay rent during the life of *J. S.* and the plaintiff avers a breach and the continuance of *J. S's,* life, and the defendant asserting the death of *J. S.* concludes to the country and *specially* negatives the averment in the declaration; yet the burden of proof lies on the *defendant.* 1 *Chitty's Plead.* 535, (537.) Again, "A conclusion of law is never traversable." Whether the special matters of fact set forth in the plea are sufficient to avoid this deed if proved, is a question of *law;* whether these exist or not is a question of *fact.* If the defendant had concluded with a verification, the plaintiff must have denied specially the matters of fact set up in the plea, and tendered an issue to the country, in which the defendant *must* have joined; because he

could only reassert the same matters in a rejoinder, and could not depart from his plea; but as he concludes this plea to the country, the plaintiff had no alternative but to add the *similiter* which denies the *whole matter* of fact asserted in the plea. (1 *Chitty's Plead.* 549.) Neither party is at liberty to conclude *either* way as he may deem fit, excepting only in the single case where one of several facts is denied with a *formal traverse.* 1 *Chitty's Plead.* 538, 549, (550.) Where the words, *"virtute"*—*per quod "pretextu,"* et *"ita quod,"* &c. introduce a consequence or inference from preceding matter, they are *not traversable. Priddle & Napper's* case, 11 *Coke,* 10. *Henry Pigot's* case, *Ib* 27. *Beal vs Simpson,* 1 *Lord Ray.* 408. *The King vs The Mayor, &c. of York,* 5 *T. R.* 66. *Bennet vs Filkins,* 1 *Saund.* 23, *(note 5.)* 5 *Com. Dig.* tit. *Plead.* (E. 30,) 412. 1 *Chitty's Plead.* 627. See *Precedents,* 2 *Chitty's Plead.* 589. That the proof of this issue lies exclusively on the defendant by long established and unshaken decisions, appears from the following authorities. *Bushell vs Pasmore,* 6 *Mod.* 218. *Henry Pigot's* case, 11 *Coke,* 27. 1 *Chitt. Plead.* 478, 479. *Gardner vs Gardner,* 10 *Johns. Rep.* 47, 49. *Van Valkenburgh vs Rouke,* 12 *Johns. Rep.* 337. *Coare vs Giblett,* 4 *East,* 94, 95. *Butler & Baker's* case, 3 *Coke,* 26. 3 *Dane's Ab.* 466. *Souverbye vs Arden,* 1 *Johns. Chan. Rep.* 250, 255. 5 *Com. Dig.* 643. *Whelpdale's* case, 5 *Co. Rep.* 119. *Stark. Evid.* 479, 474. 1 *Phil. Evid.* 128, 129. *Bull. N. P.* 172. 2d. But 2dly, admit the issue lay upon the *plaintiffs,* have they not given sufficient *prima facie* evidence of the due execution and acceptance of this bond to justify the *first* prayer in the *fifth* bill of exceptions? Possession of a bond by the obligee, and proof of signing and sealing by obligor, are in ordinary cases sufficient to justify an inference of due delivery and acceptance. Even Chief Justice *Marshall* admits this to be so in the case of *individuals;* and that assent or acceptance are to be *presumed* from the beneficial nature of the grant or deed—indeed it will not be denied by our learned opponents. That such is the established doctrine in *England* and in several of the *United States,* appears from *Butler & Baker's* case, 3 *Co. Rep.* 26. *Periman's* case, 5 *Co. Rep.* 84. *Souverbye vs Arden,* 1 *Johns.*

*Ch. Rep.* 250, 255. *Wood vs Owings,* 1 *Cranch,* 251. *Jackson vs Phipps,* 12 *Johns. Rep.* 418. *Clarke vs Ray,* 1 *Harr. & Johns.* 323. Acceptance is always *implied,* and *refusal* must be proved to defeat the deed. *Shep. Touch.* 54, 56, 57, 74, 75. *Whelpdale's* case, 5 *Co. Rep.* 119. 2 *Stark. Evid.* 479. *Johnson vs Baker,* 4 *Barn. & Ald.* 440. *Wankford vs Wankford,* 1 *Salk.* 301. Is there any feature in the structure of *corporations* to subject them to a different rule? The decision of Chief Justice *Marshall,* at *Richmond,* gave birth to the *sixth* plea in this case. But that decision proceeded upon the old settled doctrine, that secondary evidence could not be admitted which presupposed better evidence behind, and within the power of the party. He presumed there was written evidence of the acceptance in that case; *but that decision has been overruled by the supreme court at the last session,* (the chief justice being the only dissentient) *(a).* Nay, this very point has been settled with us in this court in the case of *The Farmers' Bank against Whittington,* 6 *Harr. & Johns.* 548. In that case this court held, with his Honour Judge *Martin,* who tried the case, that unless it actually *appeared* that there *was* a written entry of the fact offered to be proved by parol evidence, then such evidence was admissible to prove any act of a corporate board or body. It appearing from the record of the proceedings, that there is no such entry in this case, parol evidence is admissible to prove the delivery to the obligees and their acceptance of the security.

3. The evidence offered in this case was *sufficient* to warrant this inference by the jury, and the court therefore erred in the opinions stated in the *fourth* and *fifth* bills of exceptions. 1st. It was *acted under* by the cashier and the bank; and even acceptance of a charter has been implied by a corporation acting under it. *The King vs. Barzey,* 4 *Maul. & Selw.* 255. *The King vs. Amory,* 1 *T. R.* 575. 2d. It was placed by the former cashier, who was the common agent of the *defendant* and of the bank, among the *muniments* of the bank, and *left in their possession,* when he left the bank. It was found by Mr. *Pinkney,* the present cashier, in the iron chest in the vault of the bank, which is not in the custody of the cashier, but of

*(a)* *Bank of United States vs Dandridge,* 12 *Wheat.* 64.

the *president,* as the court will perceive by the 18th and 19th articles of the by-laws.   The corporate seal and valuable *muniments* of the bank are kept in this iron chest     Finding the bond in such a place is good legal evidence of delivery.   *Mechanics' Bank vs Bank of Columbia,* 5 *Wheat.* 337.   *Fleckner vs United States Bank,* 8 *Wheat.* 357.    *Patterson vs Bank of Columbia,* 7 *Cranch,* 299.    *Trials per Pais,* 370. 2 *Bac. Ab.* 648.    5 *Bac. Ab.* 160.    *Goodright vs Straphan,* 1 *Cowp.* 204.  The case of *Smith vs The Governor and Company of the Bank of Scotland,* 1 *Dow's Reports,* 272, in the House of Lords, is quite conclusive on this subject, as to the sufficiency of an implied acceptance by that bank, and a complete delivery by the obligor.   The bond in that case had been refused by the bank  and sent back to their agent to be altered by the obligor.   The alteration was made, and while the new bond was in *transitu* by the post office, and *before* it came to the hands of the board of directors, or its officers, the cashier was removed.   Yet this was held by all the judges and the Lord Chancellor, in 1813, to be a sufficient delivery and acceptance to bind the surety.   Compare the circumstances in that case with those that exist here, and can there be a loop left to hang a doubt on?  But it is said, *it ought to appear* at least that a sufficient board was convened to approve. That it was a special power delegated to a special body by the charter, and must appear to have been strictly complied with by those claiming under it.   That they have no common organ of language but when properly assembled and their voice made known by writing.   If there were any force in these objections, no *implied* assumpsit could *ever* be obtained against a corporate body—No *agent* could be appointed by *parol* authority for any purpose.   The supreme court of the *United States,* and most, if not all, of our state courts, have sanctioned such an assumpsit and such a power.   If they can be bound by the acts of agents and by implied contracts, though no proof whatever of a regular assemblage of the directors, or of any vote conferring such powers upon their ostensible agents—*a fortiori*—May their concurrence be presumed when that is to give effect only to a contract *in their favour;* as in the case of *femes covert,* lunatics and infants, *to whom* a grant is valid, though they cannot

contract so as to *bind themselves?* It is further said, that *Higginbotham,* acting as cashier, affords no presumption of his duly qualifying under the *charter,* because he acted as such under the *articles of association* before the charter. The answer is obvious. The condition of this bond *estops* both *Higginbotham* and *Ridgely* from denying that *Higginbotham* was appointed and acted as cashier *under the charter,* for this recites his appointment by those to whom the bond is given, in March 1805. Now the plaintiffs had been incorporated on the 24th of January 1805. But the inquiry is not *when* he signed or *when* the bond was delivered or accepted. That is quite immaterial; for the obligation of the bond only commences from the time of the *first breach* of the cashier's duties. The statute of limitations only runs from the *breach,* and not from the *date;* nor is it declared on as an *obligation made* on any particular day, as seems to be supposed on the other side, but merely as a writing obligatory *bearing date,* &c. Are all the consecrated rules of evidence to be trampled under foot in this case because it is the case of *a surety?* Is not the presumption of law to prevail in *this,* as in ordinary cases, that the instrument was duly executed (signed, sealed and delivered, to the satisfaction of the obligees) on the day that it bears date, unless some tittle of evidence can be adduced to rebut such *prima facie* evidence? Are the court to presume a dereliction of duty in every board of directors for fifteen years in violation of their charter, and in fraud of the stockholders, whose agents they were, for the purpose of approving the cashier's bond, in order to raise a *conjecture* that they suffered this officer to exercise his functions, and committed to his custody all the funds of the institution during all this period, without any security for his good behaviour? Rather will the court presume *omnia rite acta* when no evidence is adduced to shake the good faith and intelligence of those who have acted so long in the direction of that public institution. It is urged further, that there must have been an acceptance by the *president and eight directors;* and that the bare custody of the bond can be no evidence of their satisfaction with the security, and the case is compared to bonds lodged on file on appeals and writs of error. Without examining the positions advanced re-

specting *such* bonds, which it is conceived are not sound, it is sufficient for our purpose to reply, that the cases are not at all analagous. The persons who were to approve this bond were the avowed agents of the *obligees* in their corporate character—a board of perpetual succession, and the same persons who have the custody and control of all the bonds, deeds and muniments of the corporation. Their possession is that of the corporate body itself. As well might it be contended, that the bank had no title to the lot on which their banking-house stands, because that was only built by their president and directors, and there does not appear any endorsement on the deed corresponding with its date of their acceptance of the grant, and no entry in their books of a meeting of the board on that day, nor of the *number* of directors who *were present* when the grant of that lot was accepted by a solemn vote. The universal practice of all corporate bodies throughout this country, and of all judicial and executive public officers must be violated, and all sheriff's, guardian's and administration bonds must be cancelled to make way for this unfledged novelty! We humbly think that ingenious argument must be sustained by something more weighty than a single *nisi prius* decision, however respectable, before this enlightened tribunal will be induced to plunge the people of this state into this unfathomable gulf of uncertainty, respecting all our public securities. It is thought unnecessary to pursue this branch of the argument through the wide range adopted on the other side, especially since the supreme court of the *United States* have decided that no written entry is essential to the validity of any corporate proceeding, and since this court have recently held the same doctrine in a much stronger case than the present. The case of the *Farmers' Bank vs Whittington* is considered by us as quite conclusive on this subject; a decision entitled to higher respect certainly, in this court, than *any other* that can be cited; and yet the learned counsel on the other side take no notice of the case, nor of the case of *Smith vs The Governor, &c.* from *Dow's Reports,* but treat the question as if it were still open.

4. As to the *demurrers,* relative *to the duration of the bond.* It is contended by the appellants that the defendant cannot bring in question the duration of the bond upon *these*

*demurrers;* and that if these breaches are well assigned in other respects, the appellants are entitled to judgment upon all the demurrers in *this* record, *whatever may be the opinion of the court as to the legal duration of the bond.* The court will remark, that the defendant has demurred to all those breaches in the replication which are assigned on a day *subsequent* to the 6th of February 1817, when it is alleged the first charter expired. These breaches may be divided into three classes. 1st. The first class consists of those in which the breaches are alleged to have happened on "various days and times from the day of the date of the bond until the 25th of May 1819." (These are the 4th, 8th, 12th, 16th and 22d breaches.) 2d. The second class consists of those breaches containing *three distinct epochs,* the last of which epoch is assigned thus, "and on various days and times from the 6th of February 1817, until the 25th May 1819," (the last day being subsequent to the limitation in the first charter)—such are the 1st, 5th, 9th, 13th and 19th breaches. 3d. The third class of breaches is where a specific act of fraud is charged on a particular day, that being a day *subsequent* to the expiration of the old charter—such are the 17th and 18th breaches. All these breaches are demurred to by *general* demurrer, on the ground that the *time* mentioned therein is too broad for the extension of the bond. Is the *time* mentioned in either of these breaches *material?* If not, the demurrers cannot be sustained. As to the *first* and *third* class of breaches, the court will observe, they all charged *tortious* acts, and in cases of *tort* the day laid is perfectly *immaterial.* It is not traversable; nor is the plaintiff bound to prove it as laid. Replications under the statute of *William* and *Mary* are subject to precisely the same rules as declarations. Lord *Coke* lays down the established doctrine in such cases. *(Co. Litt.* 282. 7 *Bac. Ab.* 33.) "When the jury upon a plea of not guilty in *modo et forma,* find the goods taken on a different day from that charged, though charged on a day certain, still the verdict is good, though the plea is in *modo et forma,* for the *substantial part* of the issue is whether the goods were taken." So *Chitty* in his treatise on pleading—"The statement of *time* of committing injuries *ex delicto* is seldom material. It may be proved to have been committed

on a day anterior or subsequent to that stated in the declaration, so that it appears to have been before action brought." 1 *Chitty's Plead.* 383. *2 Chitty's Plead.* 367, 368. *White vs Stubbs, 2 Saund.* 295, *(note 2.)* So in *other* actions, where the day is not material in the declaration, the plaintiff may, when it is rendered necessary by the defendant's plea, vary from the day in the replication, and it is no departure. *Millor vs Walker, 2 Saund.* 5, b. *(note.)* As to the *third* class of breaches—the above remarks are equally applicable, and also the further observation, that here are *three epochs* quite distinct from each other; two of which are *confessedly good.* The *third* then is mere surplusage. It may be safely stricken out, and yet the breach be well assigned. "It is a rule that an entire replication bad in part is bad for the whole; but this rule does not apply where the matter objected to is mere surplusage." 1 *Chitty,* 617. "Immaterial averments need not be proved if they can be safely struck out," 1 *Phil. Evid.* 162, 164, *(note.)* 2 *Phil. Evid.* 82. Now in this case the averment of breaches from 6th of February, 1817, until the 25th of May, 1819, may be safely struck out. How then can the *general* demurrer to the *whole* breach be supported? Besides, in all cases where the *time* is improperly laid the demurrer must be *special.* It is only defect *in form.* The plaintiff may waive the time laid in the declaration *at the trial* if he will, and confine his proof within the time of his *title* in trespass, or of the *obligation* on a collateral bond. *Osborne vs Rogers,* 1 *Saund.* 269, (and *note* 21,) and *Manchester vs Vale,* 1 *Saund.* 24, *(note 1.)* By the *general* demurrers to this class of breaches, the defendant admits the cashier's breach of duty as charged on various days from the date of the bond *until February,* 1817. And are not the plaintiffs entitled to recover for *such defaults?* The defendant should have demurred to the averment in the replication, *"that R. Higginbothom continued to act as cashier under and in pursuance of the said bond until the 25th May,* 1819," which averment overreaches all the breaches—which would have presented the question of the legal duration of the bond to the court, (the acts of assembly and the bond being set forth upon the record.) Or he might have traversed this averment specially, and raised the question of law *at the trial,* or he

might have taken issue on these breaches and have objected at the *trial* to *any evidence* of defaults *after the 6th February,* 1817. In the numerous cases cited upon this branch of the argument where this question has been agitated, no one case can be found where the very learned counsel for the defendants, in *England* and in the *United States,* ever thought they could raise this question by demurring *to the time laid in the breaches* assigned under the statute. In *Curling vs Chalklen,* 2 *Maule & Selwyn,* 502, and in *Peppin vs Cooper,* 2 *Barn. & Ald.* 431, as well as in the cases of *Leadley vs Evans,* 9 *Serg. and Lowber,* 306, and *Miller vs Stewart,* 9 *Wheat,* 702, the question was fairly raised, by *a special plea* that the bond was annual, &c. Why was not such a plea put in here, so as to present to the judicial eye of the court the real question sought to be raised; but which it is believed cannot be raised on these pleadings without confounding all distinctions between material and immaterial averments. These views of the preliminary point under the second head of the argument, would seem to render the further discussion of the other points under *this head* superfluous; but as it is desirable to ascertain the opinion of the court upon all the points that may hereafter occur in the further progress of this cause, it has been deemed proper to discuss the question as to the duration of the bond, upon this argument: The defendant's, the appellee's counsel, have arranged this question under two heads. 1st. That this was an annual bond; and 2d. That it was only coextensive with the duration of the first act of incorporation—which will be considered in their order. 1st. *Was it an annual bond?* The whole argument on the other side rests upon a false assumption, that the cashier was an annual officer because he held his office *under annual officers,* viz. the president and board of directors. If we consider the nature of the *power* under which this officer was created, and the tenure by which he held his office, the fallacy of this argument will fully appear. The act of incorporation provides for the *annual election* of the *president* and the *directors;* fixes the day and mode of *their* election, and prescribes *their* respective qualifications. (See *fundamental articles,* 2, 4, 6, *sect.* 10.) Why are no such provisions made respecting the office of *cashier?*

The answer is obvious from article 10. The form of the bond shows that *he* was to be elected during *good behaviour.* No qualifications are prescribed for *this* officer; no limitation fixed to *his* office; no provision that *he* is to hold over in case no election is made on the day fixed, as in the case of directors. The duration of each board regularly terminates on the 1st Monday of July. If the cashier went out with them, how happens it that the 20th and 21st article requires the judges of the election *to notify the cashier* of the persons elected for the *new* board? As no provision is made for *his* holding over, of course *he* goes out of office the day *preceding the election* of the new board if he is only an *annual officer* and no cashier exists until one is chosen by the *new* board. Wherever the legislature intend the officer shall be appointed in a particular manner, and *hold for a specified term,* these are designated. (*Art.* 7. and *art.* 9.) But the cashier is to be elected by one body, and his bond is to be approved by another. The president has no voice in his *election;* but he and the board must both approve of the bond. The amount of the bond is fixed by the legislature, and also the form of it. And moreover, we find in the charter an oath prescribed for *this officer,* and for no other agent of the corporation. Is the cashier *thus* qualified, *thus* sworn, *thus* appointed, *thus* approved, to be viewed as the mere creature, deputy and valet of the directors, their shadow which disappears with their body? No! He is merely nominated by them in the execution of a statutory power, but when nominated, he is in by virtue of the statute, and under the power itself, as an officer of the corporation, and not as a deputy of its deputies, the board of directors. *Fox vs Harcourt,* 1 *Show.* 516, 532. S. C. 4 *Mod. Rep.* 167, and 5 *Bac. Ab.* tit. *Office & Officers,* (H.) 200. If a grant or an appointment be made *without limitation,* it is by the established rules of the common law a grant or appointment *for life.* If a statute creates an office *"quamdiu tantum se bene gesserit,"* the officer has a freehold in his place by the common law, determinable by misdemeanor alone. If the cashier be the officer of the *corporation,* that being a continuing body, his office is of course coextensive with the *"corpus corporatorum.."* *His acts bind the corporation* and *not the board of directors.* He is not the deputy of the presi-

dent and board, but of the corporation. His bond is to the corporation. The condition recites his appointment by the corporation, and the obligors are estopped from denying it. He is known to the public as the officer of the corporation, and as such his vouchers are recognized. Their notes, their correspondence, indeed all their transactions with the state and with other banks are stamped with the superscription of his image. The corporate body, though invisible in itself, is beheld through him *tanquam in speculo.* Is it not better for the corporation, for the public, and even for the surety himself, that this office should be permanent? He becomes daily more perfect from experience. He has a regular renewing bounty on his good behaviour. The risk of his surety is daily diminished, because his cares and duties become every day less onerous. *All* the cases cited on the other side, are cases of subordinate agents or officers acting *under annual* officers, and *binding* by their acts *annual officers alone*, whose power is forever spent with the expiration of the year; but wherever the persons to be affected by the acts of such subordinate agents have a continuing existence; wherever such agents represent and serve a continuing body, and act by virtue of a power that is not exhausted by the amotion of other agents holding by a more limited tenure, such subordinate officers hold over. Thus in the case of *Curling vs Chalklen, 2 Maule & Selwyn,* 502, cited on the other side, the churchwardens and parishioners acted conjointly in the appointment of a collector; yet his office was held a continuing office, notwithstanding the churchwardens were annual officers, and were removable at the end of the year; because the parishioners were still a continuing body corporate, whom the collector represented, though the churchwardens were gone, by whom he was nominated. The same observation will apply to *Hassel vs Long, 2 Maul. & Selw.* 363, and *Miller vs Stewart, 9 Wheaton,* 702, and indeed to *all* the cases cited against us. The court will find upon examination that these are *all* cases where the subordinate officer was the *deputy* of those who *nominated* him—that *his* life depended on *theirs* as his *principals.* The amotion or death of the *principal* then would of course vacate the power. But because the governor and council, who are *annual* officers, ap-

point the judges of this high tribunal, and also the chancel-
lor of the state, was it ever suggested that those officers were
*their* deputies and do not hold their offices during good be-
haviour? So in the case of our senators and registers of wills,
though the appointing power may be extinct, the *result* of its
exertion may be and is *lasting.* The learned counsel opposed
to us rely on the words of the 8th section, as showing that the
cashier was only a servant *"under them;"* that is, under the
board of directors. This argument would reach too far; as it
would leave to the board the same discretion as to the *necessity*
or propriety of appointing *any* cashier as they are vested with,
in relation to the *other servants* or officers there mentioned; to
whom alone these words *"under them"* obviously refer; such
as the *porter,* the *book-keepers, tellers,* &c. The cashier is as
necessary an officer of the corporation as the president. The
board of directors appoint *both,* and it might just as well be
contended that the *president* is only a *deputy of the board* of
directors and not an integral part of the corporation, as that the
*cashier* is. 2d. Does the bond extend beyond the 6th Februa-
ry, 1817? This may be answered by another question—Is *this*
corporation which sues *identical* with *that to which* the bond
was given and *to whom* the service of the cashier was condi-
tioned to be performed? If so, the bond is sufficiently broad
to cover *the whole time* of *R. Higginbothom's* service as
cashier of the president and directors of the *Union Bank.* It
is to be borne constantly in mind, that the *words,* the *very
terms* of the bond, cover *the whole time* that *Higginbothom*
should hold the office. There is no limitation in the preamble
or in any other part of the bond, looking to the expiration of
the first charter. His appointment was not coextensive with
their charter. It was during good behaviour. He held by no
other tenure before 1817, and by the same tenure afterwards.
Here was no *new* appointment of *Higginbothom* after the *new*
charter, and if he did not hold his office legally *afterwards* by
virtue of his *first* appointment at the time this bond was given,
then *all* his *subsequent acts* were invalid and did not bind the
corporation. He had no power, if this argument be well found-
ed, to sign or issue bills, to discharge debts or receive deposits,
or pay checks, &c. so as to bind the stockholders. He was

either cashier *to all intents* and purposes under his *first* appointment *from* 1817 *to* 1819, or not. If the *former,* then the surety has undertaken for his fidelity *during that period;* because no shorter period is limited by the *bond* than during his continuance in that service of those who appointed him. If the *latter,* then *no act* of the cashier after February 6, 1817, is valid in law. And the same construction which will absolve the surety here will annul and cancel every official act of *Higginbothom* respecting the concerns of the bank during those two years. If the corporation *after* 1817 was not *one and the same* with that *before,* then no part of the property, funds or notes of the old corporation belongs to this; no debts owing by or to the old corporation can survive to this; nor could the present plaintiffs maintain a suit upon this bond even against the cashier himself, because they are not the obligees according to that construction. But in *Scarboro vs Butler,* 2 *Levintz,* 237, it was held too clear for argument, that a debt due to a corporation is also due to the second corporation after a renewal of its charter, even though the name of the obligees is changed, and the debt shall be recovered in the new name. So it is laid down by Lord *Coke, (Co. Lit.* 52, b.) that an attorney's power is not countermanded even by a dissolution of the corporation. *Shepman vs Thompson, Willes's Rep.* 105. *Wynne vs Thomas, Ib.* 565. 2 *Livermore on Agency,* 298. Was the duration of this bond then extinguished when the service continued to be to the same persons and the terms of the condition are made coextensive with such service? When the defendant signed this bond, fixing the time of service under that appointment as the only measure of its duration, he must have known that the legislature might with the concurrence of the bank and of the cashier protract his risk and continue the officer beyond the time limited by the first law. Why did he not provide against this by the terms of the bond? As he did not, can he now ask the court to insert for him a new limitation in the contract and restrict it to the duration of the first charter, when he himself has fixed the limitation, not by that, but by the *term* of *service?* Suppose he had declared by parol *at the time he signed the bond,* that he *intended* it should only endure as long as the first charter. The court would not admit of such

parol explanation of his intention to contradict the plain im-
port of the terms used by him in the writing. If the terms of
service of *that corporate body*, is departed from, by construc-
tion, what rule can the court adopt? Shall it be a vague con-
jecture as to the *variance of risk?* Then every change of the
clerks, every augmentation of the capital of the bank called in,
every imposition of new duties upon the cashier by subsequent
by-laws, varied the risk of the surety, by enhancing the re-
sponsibility of the cashier. If the court is to speculate on the
political conjectures of the surety at the time, the practice of
the legislature of this state must have led him to foresee that
the charter would probably be renewed. Every charter had
been renewed in *Maryland* whose limitation had run out. Such
were the *Baltimore Insurance Company*, incorporated by
act 1795, *ch.* 59, for nine years, renewed 1804, *ch.* 37; the
*Maryland Insurance Company* by act 1795, *ch.* 60, and 1804,
*ch.* 106, and the charter of *Baltimore city* continued 1798.
As he made no provision for a limited time of service, he con-
stituted *the cashier his agent* to extend the period from year
to year, with the concurrence of the bank, so long as both should
assent to his holding the office. If the cashier's fidelity be-
came questionable, or his defaults known, the surety could at
any time discharge himself by notifying the other party, and
requesting his removal. But after standing by from the year
1814, (when the first act of assembly was published, renewing
the charter,) until 1819, and seeing this cashier continuing to
hold his office, and knowing that his own bond was in possession
of the bank, guaranteeing the faithful service of *Higginbothom*,
shall the defendant now be permitted to say that he was *not* his
surety for the two last years of his service? We do not con-
tend, that the surety is ever to be held beyond the strict scope
and letter of his engagement. We admit that he is not to be
made constructively liable, but we know of no case where he
has been relieved in a court of law from the plain contract, be-
cause he has received no value for his undertaking. How do
the cases, which will no doubt be cited on this point against us,
trench upon our doctrines? They consist of three classes. 1st.
Those, where there was an *express* limitation in point of time
by reciting the duration of the office, or referring to the law

which limited it. And the default occurred *subsequent* to the *express* limitation in the engagement. Such are *Arlington vs Merrick*, 2 *Saund.* 412. *Liverpool Water Company vs Atkinson*, 6 *East*, 507. *Wardens of St. Saviour vs Bostock*, 5 *Bos. & Pull.* 175. *Hassell & Clark vs Long*, 2 *Maul. & Selw.* 363; and *United States vs Kirkpatrick*, 9 *Wheat.* 702. 2d. Those where the persons bringing the suit were different from those contracted with, and one or more of the plaintiffs had not been obligees of the contract, or sued for different interests; as *Wright vs Russell*, 3 *Wils.* 530; where the contract was with *Wright* as a sole trader, and he sought in that suit to charge the surety for his moiety of co-partnership loss. So in *Barker vs Parker*, 1 *T. R.* 287. The bond was to the testator for the fidelity of clerk in his service. After his death the executor carried on the trade, and sued for a loss in such distinct trade. The court very properly held it a distinct concern from the business of the testator, and that the bond did not survive to the *executor*, so as to cover defaults in *his* service. 3d. Cases of *partnership bonds*, where one partner dies or goes out, or a new one comes in. In *all* these cases, the interest that accrues after such event, is a distinct interest from the previous one which was guaranteed, and the courts have held, that the bond did not extend to a new partnership; because, the characters of the partners was an essential ingredient in the contract. Such are the cases of *Strange vs Lee*, 3 *East*, 484–9. *Pepin vs Cooper*, 2 *Barn. & Ald.* 421. *Weston vs Barton*, 4 *Taunt.* 673. *Myers vs Edge*, 7 *T. R.* 250. *Leadley vs Evans*, 9 *Serg. & Lowb.* 306. But where the bond is given to a *fluctuating body*, the change of the members does not destroy the obligation of the bond, because individual character does not enter in the consideration of the surety from the very nature of the association. The case of *corporations* is made an *express exception* from the general rules in the above cases by Lord *Ellenborough*, in *Strange vs Lee*. The same doctrine is laid down in *Medcalf vs Bruin*, 12 *East*, 399; and cases there cited. *Barclay vs Lucas*, 1 *T. Rep* 291, *(note a.)* *Dance vs Girdler*, 4 *Bos. & Pull.* 34, 41. *Hassell & Clark vs Long*, 2 *Maule & Selw.* 363. *Miller vs Stuart*, 9 *Wheaton*, 680; and *especially*, *Curling vs Chalklen*, 3 *Maule & Selw.*

502.   One of those cases turned upon the circumstance that the bond was given to a *voluntary* association, and default occurred *after* it was *incorporated;* held, that not being incorporated, the obligees could not transmit the obligation to their *successors,* but only to their individual administrators or executors. In the case of *Barclay vs Lucas,* Lord *Mansfield* endeavoured to establish a different doctrine, but failed; although the principles he there asserts are fully sanctioned by all subsequent decisions, that if it had been a case where the bond *could* be given to the house or firm, it would continue in force as long as the house should exist. Now the only case where it can be *so* given consistently with the rules of law is, that of corporations whose obligations are transmitted to *successors.* But here are no successors; it is the *identical* person who sues, with whom the bond was made, the first corporate body never did expire; its life was never suspended for an instant. *Higginbothom* held in 1819 under the same appointment that he held in 1805.   His commission was the same; the obligees were the same; and his duties were the same in 1819, as when the bond was given; the new law did not operate as a grant, but as a confirmation.   If a temporary law be continued by another, the former statute is as if it had been made perpetual at first.   *Vin. Ab.* tit. *Statutes,* 513.   6 *Bac. Ab.* 372. *Shepman vs Henbest,* 4 *T. R.* 114.   A covenant runs with a corporation, though the charter be renewed.  4 *Leon.* 187, case 290.   So the new body may sue for breaches as well before as afterwards.  *Lee vs Waring,* 3 *Desaussure,* 70, 73.   *Copley vs Delaunoy,* 2 *Ld. Raym.* 1056.   *Burland vs Tyler, Ib.* 1391.   *Lee vs Pilney, Ib.* 1513.   *Vin. Ab* tit. *Covenant,* 112, 416.   The case of a covenant by a lessee for life to a corporation sole, to victual the *cellerer.*   The corporation was dissolved, and possession given to a new body, the lessee was held bound to victual the steward of the new body; this is a case precisely in point.   Finally, if the cashier be the *deputy* of the *corporation,* and his principal still lives and breathes, considers, approves or condemns, is still occupied in the same business, and in the same place, under the same charter and authority; so is his deputy in full life, vigour and health, with all his functions unimpaired.   As well might we dispute the identity

of our image in a clear running stream, because the drops that reflected it a moment since are not the same that reflect it *now,* as to deny that the cashier of the *seventh* of February, 1817, was the same officer that acted that day, the hour, the moment, the *punctum temporis* before. Who can catch the last glimpse of the old charter, or the *first* of the *new?*

5. As to the plaintiffs' 2d, 3d and 6th *bills of exceptions.* 1st. *Henry Payson was a competent witness* to prove himself the depositary of the book called the By-Laws, &c. as a muniment of the bank. The case of *Rex vs Netherthrong,* 2 *Maule & Selw.* 337, is precisely in point, and in that case the interest of the witness was admitted. *Northrop vs Speary,* 1 *Day's Rep* 23. *Peak. Evid.* 155, 169. *Moor vs Pitt,* 1 *Ventr,* 3<sup>59</sup>. *Weller vs The Governors of the Foundling Hospital, Peake, N. P.* 153. The objection on the other side that he had ceased to be the depositary in May 1819, and therefore not competent, is singular, because the facts offered to be proved, occurred while *Payson* was the depositary and *Higginbothom* was cashier. He alone of course could identify the by-laws which had prescribed the cashier's duties under this bond, and, if he were a competent witness, to prove himself the depositary of this book. The decision of the county court was erroneous as stated in the plaintiffs' 2d exception; because they held him incompetent to prove *any of the matters* offered to be proved by him. 2dly. *The by-laws were sufficiently proved.* These were the rules of duty prescribed for the cashier, and under which he acted. They are proved in toto as to the cashier's duties, the only point material, by *James A. Buchanan,* by *Dunbar* and *Goldsmith,* and the *genuineness* of the book was proved by *Jona. Pinkney.* All the witnesses prove the 19th article prescribing his own duties to be in the handwriting of *Higginbothom.* The court below proceeded on the ground that a *written entry* was the *only* legal evidence of the appointment of a cashier or of the *rules of his conduct.* As this question has been discussed under the first division of the argument, it will not be repeated here. By the charter, (9th sect.) the president and directors were authorised not only to make by-laws, but such rules, orders and regulations, for the government of the officers and servants of the bank, as they should

see fit, either in writing or otherwise; and *Ridgely* guaranteed *Higginbothom* should faithfully perform such rules and regulations whether in writing or not. *John Hollins,* a former director, proves that these by-laws offered were *adopted* and *used* by the bank, although he could not identify the book; but the plaintiffs gave other evidence that there was no other book in which the proceedings of the board were entered. How could the rules of conduct be better identified and established? 3d. As to the *sixth bill of exceptions—(The admissibility of the books in evidence.)* It appears that the court below on this bill of exceptions rejected all evidence of the truth of the breaches, before the jury had found the truth of the matters of fact alleged in the *sixth* plea; the court thus assuming the question of fact, that the bond was so delivered as was stated in the plea. The opinion given on the 6th plea only ascertained what was sufficient evidence of acceptance of the bond. And the question whether it was delivered *conditionally* to await such acceptance or not, was a pure *question of fact,* and not covered by the opinion of the court. Delivery by obligor, and legal acceptance by obligee, are two distinct matters. The opinion of the court assumes that absolute delivery would not be good and sufficient, however satisfactory; that there can be no presumed assent of the obligee, but there must be *written* acceptance to make it his (the obligor's,) deed. Deed, or not, is a question for the jury. Nominal damages ought to be assessed on *all* the breaches, and if nominal, why not *real,* by the same jury that tried the issues? They had a right to find a verdict *against the direction* of the court upon *all* the issues, especially on the sixth plea, and the court had no right to reject evidence legal upon *one* issue, upon the presumption that the jury would find another issue conformably to the direction of the court which would render such issue nugatory. If the evidence offered here was admissible *before* the court had expressed its opinion on the sixth plea, it was admissible *after.* The competency of evidence does not depend upon the order in which the issues are tried; there being no legal evidence of the bond in the opinion of the court. When the *fourth* and *fifth* exceptions were signed by the court, it did not preclude the plaintiffs from offering further proof of it in a later stage of the

case. At all events, all the issues were on trial *together*, and were to be found by *the same verdict*, and the court had no right to shut out evidence to prove the breaches assigned, upon a presumption that the jury would find that there was no bond. The court decided both law and fact on the issue upon the sixth plea, in order to exclude this evidence. 4th. *As to the proof of the books.*—They are public corporation books, in which the state itself is interested to a large amount; of a corporate body so recognized as a part of the state, that some of its officers are appointed annually by the legislature, under whose direction the books are kept. The books are directed to be inspected by the treasurer of the state, and are as much public records as the books of the county clerks, surely as much as those of the bank of *England*, and other public corporations. Again, the *genuineness* of the *entries* or their *falsity*, compared with each other, was alone in issue, and not the truth of the facts which those entries professed to assert. It is one thing to offer an entry to prove the delivery of an article, or the payment or receipt of money, and quite another to prove merely the *genuineness* of the entry itself, by proving that *A. B.* or *C.* made such an entry; and that he made others inconsistent with it; so that one or the other must be false. Now, the 20th, 23d and 25th breaches assigned, put in issue the false entries by the clerks in the books, as the consequence of the cashier's neglect of duty; and the 10th and 11th breaches put in issue the charge, that the cashier fraudulently caused and permitted deceptious entries to be made in these books. *Barry vs Bebbington*, 4 *T. R.* 514. *Stead vs Heaton, Ib.* 669. *St. Lawrence vs Webb*, 3 *Bro. Parl. Cas.* 640. *Price vs Earl of Torrington*, 1 *Salk.* 285. *Warren vs Greenville*, 2 *Stra.* 1129. How were *these* breaches to be proved? Surely *not* by the conspirators, even if present; but by any indifferent witness who could prove these entries to be made by them, or in their handwriting—The books being the common organ of deceit between the clerks and the cashier. Besides, the conspirators, *Burt* and *Tanner*, could not have been compelled to answer, if they had been present, and *Hart* was dead. The books were not offered to prove *per se*, that *they were kept* under the superintendence of *Higginbothom*, but *that fact* was offered to

be proved as a distinct fact by *other* evidence, as well as the fact that *Jacob Hart* was dead. *All* the books were offered, because some might explain the others, and if only part of them had been offered, it would have been objected to, as only a mutilated confession, or an extract from a deed, &c. Besides, if these are to be considered *only as entries*, by the agents of the cashier acting under his superintendence, they would have been admissible in evidence; because the witnesses were out of the jurisdiction, and not within the reach of the party, and their residence unknown, so that no commission could be issued. *Nichols vs Webb*, 8 *Wheat.* 335, 336. *Owings vs Speed*, 5 *Wheat.* 423. 1 *Phil. Evid.* 169. Finally, the entries were evidence as *acts covenanted against* by the cashier and his surety. They both knew that the conduct of the clerks in keeping these books was subject to the cashier's superintendence. The complaint is, that he did not superintend their conduct in this respect, nor report their defaults to the board when he knew it, as was made his duty by the by-laws. We complain that he knew that the clerks made false entries in the books of the bank; that he knew that they received money with which the bank was chargeable, which they did not credit to the depositors, and that they paid out money of the bank to persons who ought not to receive it. *Barry vs Bennington*, 4 *T. R.* 514; and all this is proved by their own confessions, who were common agents between the cashier and the bank. We do not complain that he did not perform what was impossible, but that he connived at all these acts of misconduct in the clerks. In the case relied upon on the other side, *(Manhattan Company vs Lydig.* 4 *Johns. Rep.* 377,) the depositor employed a clerk *out* of his proper department, and the court held the bank liable *only in* the department where they had employed him. It is said we did not offer to prove his connivance at the false entries. The question is, whether this was not directly in issue; and if so, whether the evidence offered did not tend to prove the issue? Is a bill of exceptions to recite all the pleadings, in order to show the evidence rejected, pertinent to the issue, or will not the court inspect the pleadings to see whether such evidence offered *could* in any way *tend* to prove the issue? The by-laws proved *it* to be the duty

of the cashier to inspect the books; his duty was in issue, and if the books were offered *first*, were they to be rejected, because the other matters in the same issue, were not first proved? The plaintiffs had a right to prove any one of the facts in issue, in such order as they pleased, and the natural order was *first* to prove these were *false entries*, and *then* to proceed to the proof that they were with the connivance of the cashier; and *lastly*, that this was a violation of his official duty. *Upon the whole*, it is submitted to the court, that the court below erred, not only in all the points involved in the *three bills of exceptions* presented, under *this* branch of the argument, but also in the several opinions canvassed in the *two first branches* of this argument. And that, although sureties are not to be made liable *by construction*, they are not on the other hand to be relieved from the letter and spirit of their solemn engagements, upon which faith has been reposed by multitudes of helpless members of the community, whose all has been embezzled and squandered, and who have *now* left to their hopes, no other resource than those high tribunals of justice who are entrusted with the protection of their rights against lawless depredations. If sympathy is to approach the bench in behalf of the surety, is a deaf ear to be turned to the cry of the widow and the fatherless? *(a.)*

*Taney, R. Johnson* and *Eichelberger*, for the appellee. 1*st branch of the argument*. 1. Points on the plea of *non est factum*—1st, 4th and 5th *bills of exceptions*. 1st. The amendment was not too late. The court had the right to permit it to be made at the time it was done. Act of 1809, *ch.* 153, *sec.* 1. 2d. The plaintiffs were not surprised. They did not ask time "to prepare to support their cause." There can be no error in not giving them time, when they did not desire time. 3d. The plea of *non est factum* is not inconsistent (in the legal sense of the word,) with the plea of performance. *Steph. on Plead.* 293. 1 *Chitty's Plead.* 541. *Com. Dig.* tit. *Pleader*, (E 2,) 5 *Bac. Ab.* 448. *Wright vs Russell*, 3

*(a)* The preceding Argument of the Counsel of the Appellants is intended to embrace that made by them, as well in the opening of the case, as in reply to the Arguments of the Counsel of the Appellee.

*Wils.* 536.  *Peppin vs Cooper,* 2 *Barn. & Ald.* 432.   *Dance vs Girdler,* 4 *Bos. & Pull.* 34.   *Macclellan vs Howard,* 4 *T. R.* 194.   *Jenkins vs Edwards,* 5 *T. R.* 97.   4th.  The special plea of *non est factum,* does not throw the burthen of proof on the defendant.   There is no issue joined on the special circumstances stated in the plea.   The affirmation in the declaration, that it is the "writing obligatory," of the party, and the denial of that fact in the plea, makes the *issue* between the parties.   Upon this issue the affirmation is on the part of the plaintiff; the denial on the part of the defendant.   And as the plaintiff holds the affirmative, he is, according to the settled rule in courts of justice, bound to prove his allegation.   In the cases of infancy, duress, usury, &c. the burthen of the proof lies on the defendant, and in those cases the plea always concludes with a verification, and the issue is joined on the matter alleged in the plea, in which issue the affirmation is on the part of the defendant, and the denial on the part of the plaintiff. See the precedents, 2 *Chit. Plead.* 464, 465, &c.   In the case of *Bushell vs Passmore,* 6 *Mod.* 217, and referred to in 5 *Bac. Abr.* 373, the issue was joined on the matter alleged in the plea.   The affirmation of the defendant was traversed by the plaintiff, and issue thereupon joined.   *On that issue the defendant held the affirmative, and the plaintiff the negative; and it is only to a case of that description that the dictum of Holt* can be supposed to apply.   If the issue be necessarily on the matter alleged in the plea, then the plea of delivery as an *escrow* could not conclude to the country.   If the substance of the plea be the matter stated in avoidance, *then, as this is new* matter alleged by the defendant, the plea must conclude with a verification.   For the conclusion to the country is never proper unless it follows the denial of some fact alleged on the other side.   It is this affirmation on one side, and negation on the other, which makes the issue between the parties.   But it seems to be well settled, that the conclusion to the country is proper in a plea of this description.   2 *Chit. Plead.* 463, *(note t,)* and the cases referred to in that note. We conclude, therefore, that the burthen of proof is on the plaintiffs.   They hold the affirmative of the issue, and must prove that it is "the writing obligatory" of the defendant.

5th. It is contended that the plaintiffs have not proved that it is the deed of the defendant.. The only proof on this point is stated in the *fourth* bill of exceptions; that the bond was sign-ed and sealed by the defendant, and was found by the present cashier of the plaintiffs, in the manner described in this excep-tion, when he entered on his office of cashier, November 16, 1819. The bond is dated March 30, 1805. There is no sub--scribing witness to it, and it does not, on its face, purport in the usual form, to have been "signed, sealed and delivered" by the defendant. By the charter, *sect.* 14, of the fundamental articles, it could not be the bond of the defendant unless it was accepted as such by the president and directors; and the board which accepted the bond must consist of the president and eight directors. No business but that of ordinary discounts could be done by a smaller board. *Vid.* rule 9th. It appears that there was no written evidence of acceptance by the bank. In maintaining the proposition above stated, it is insisted that there could be no legal acceptance in behalf of the corporation unless it was in writing. The president and directors are the representatives of the corporation, and could do no corporate act unless they were assembled together in the character of president and directors. The bond in question could be legal--ly accepted only when they were thus assembled. When they are thus assembled, they have no common voice by which they may be heard to pronounce that they are satisfied with the bond, and thus evidence by words that they have accepted it. They have no common hand which can be seen to receive the paper, and thus evidence, by the act, that they are satisfied with it. Their assent, their will, cannot be evidenced in the same man-ner as that of an individual; and as they cannot be heard to speak, or seen when they act like an individual, it seems of ne-cessity to follow that their acts must be proved in some other manner; that is, by writing or the common seal. Anciently, their acts could be evidenced by the common seal only; in modern times by writing, because in modern times the writing may be proved with as much certainty as the common seal. The proposition now under discussion is supported by adjudged cases as well as by sound reason. 1 *Fonb.* 305, *(note o,)* ed. of 1807. *Bank of Columbia vs Patterson,* 7 *Cranch,* 299,

305. . *Fleckner vs Bank of United States*, 8 *Wheat.* 357, 358. All of these cases imply, that the corporate act must be evidenced by writing; and this is in analogy to the proceedings of all political as well as corporate bodies; whether those bodies be representative or primary, they all keep a written journal of their acts, and their decisions are evidenced by the writing only. Any other rule would be pregnant with mischief. In the *Bank of Columbia vs Patterson*, it was admitted in the case that the corporation had authorised the committee to make agrèements on the subject. The manner in which such an authority from a corporation must be proved was not a question before the court. If writing is necessary to confer the power, the admission included it. When, therefore, in that case, the court speaks of the evidence of the contract, they speak of the promise of the agent, he being first proved to have been duly appointed by the corporation. The acts and promises of agents may, doubtless, be proved by parol. For although they are the agents of a corporation, yet they themselves are not a corporation. They must act, and promise, and contract as natural persons, and their contracts may, therefore, be made and be evidenced like the contracts of other individuals; that is, *by words.* It is not intended to maintain that in every case of express contracts made by the agent of a corporation, the party claiming the benefit of the contract must produce written evidence of the agent's authority. Although a corporation can neither be seen nor heard, yet in legal contemplation, it can both see and hear. And if it permits any one to hold himself out to the public as their agent in any particular business, and by its acquiescence induces a belief in the agency, the corporation, like an individual, would be bound by his acts, whether the agent was lawfully appointed or not. The law will not sanction the fraud of a corporation, sooner than that of an individual. So too in cases of implied contracts. In some of these cases the contract implied is a mere fiction of law invented for the purposes of justice. When the law implies a contract, it implies a valid contract, a legal undertaking, and consequently it must and does imply every thing that is necessary for that purpose. If a writing be necessary to evidence the contract of the corporation, the law implies the promise in writing upon the same

principle that it implies the promise by parol in the case of an individual. Both are equally fictions, and the one can as properly be implied as the other. The cases of parol agreements by the duly authorised agent of a corporation, and the cases of implied contracts, are perfectly consistent with the principles now contended for. The cases of implied contracts prove that a corporation may contract without its seal; that is, without deed; and it is on this ground that assumpsit is maintained on them. But they do not prove that such contracts need not be in writing. They do not touch that question. If, however, the court should be of opinion, that *"the satisfaction"* of the president and directors might be declared by parol, and need not be evidenced by writing, yet it is contended, that such parol acceptance must be proved to have been made by the president and eight directors duly assembled; and that the mere possession of the instrument in the manner and at the time stated in the exception, is not of itself sufficient evidence of such parol acceptance. It may be admitted for the sake of this argument, that in the case of an individual obligee his possession of the instrument is of itself sufficient evidence of the delivery without the aid of any other circumstance, provided the signing and sealing by the obligor be proved or admitted. Yet this proposition can hardly be deemed a settled one in *regard to a deed*, and is well worthy of the deliberate consideration of this court, before it is here pronounced to be a general rule of law. *Bull. N. P.* 250. *Talbot vs Hodson,* 7 *Taunt.* 251, (2 *Serg. & Lowb.* 91.)

But conceding the proposition to be true in the case of an individual, it is denied that the same rule can apply in this case. The reason of the rule would fail—1. The bond in question is declared upon as a bond dated March 30, 1805. In order to support the declaration it must be proved as a bond of that date. 5 *Bac. Ab.* 159, 160. Now in the case of an individual obligee there is at the date of the instrument a person in existence and in a condition, to accept, and no steps are necessary to be taken by him to obtain a proper attitude for receiving it, when the delivery is tendered. But in this case something more was necessary than the mere existence of the corporation. There must also have been a board convened consisting of the presi-

dent and eight directors, in order to accept this bond. There must have been a board larger in number than that required for the ordinary purposes of the bank; for the president and five directors are authorised to make ordinary discounts, which is the usual and chief business of the bank. There is no evidence that a board competent to accept was in actual existence, that is, assembled together on the day averred in the declaration; on the contrary, the minutes of the bank go to show there was no such board on that day. Yet the plaintiffs insist that the jury may, from the fact of possession in 1819, presume a delivery and acceptance on the 30th of March, 1805, without offering any evidence that, on the day last mentioned, the obligees or any body for them, were in a condition capable of accepting. *Jackson vs Phipps*, 12 *Johns.* 418, 422. 2. In the case of an individual obligee the bond cannot be delivered to him as an *escrow*. Whatever conditions may be annexed to the delivery by the obligor when he delivers it to the obligee, the bond is absolute according to its tenor the moment it is accepted into the hand of the obligee. When, therefore, the obligee is found in possession of the instrument, it is not a matter of speculation, nor even a subject of proof, whether it is an *escrow* or an absolute deed. If it came into his hands from the obligor, or by his authority, the delivery by operation of law is absolute and not an *escrow*. His possession, therefore, may be deemed evidence of an absolute delivery, because it could not come into his possession without his consent to receive it; and if he accepted, it was, when accepted, necessarily an absolute deed and not an *escrow*. In the case of an individual then, a lawful possession by the obligee is inconsistent legally with any other state of things than an absolute delivery and acceptance. It cannot, lawfully, get into his hands but as the deed of the obligor, and the law will not presume that the possession was unlawfully obtained. But in this case it is entirely otherwise. The bond may, and perhaps must, come into the possession of the president and directors as an *escrow*. It must come into the hands of the president and directors before they can pass judgment on its sufficiency; and after it is in their possession, the law makes it an *escrow* until they have declared their approval in some way. This instrument, then, may have

come into their hands originally as an *escrow;* their possession is consistent with its being an *escrow.* How, then, can that possession be evidence that it is not an *escrow,* but an absolute deed? As they would, in the ordinary course of business, obtain possession of it as an *escrow,* it would seem to follow, that it should be presumed to be an *escrow* until the plaintiffs prove that its character was changed; at all events the possession is consistent with its being an *escrow* as well as it is consistent with its being an absolute deed. The possession, therefore, cannot be evidence that it was not an *escrow,* but an absolute deed. If there was not a board to act upon it, when it was received, it would naturally and properly be placed where it was found until the board did act upon it. Indeed, it does not appear from the testimony to have been out of the possession of the cashier, who was the principal obligor; and nothing can be inferred from his acting as cashier afterwards, for it appears in evidence that he acted as cashier for more than two months before the bond is alleged to have been given. 3. There is yet another distinction between this case and a bond to an individual obligee. This instrument could not be accepted by the corporation aggregate; that is, by the stockholders themselves: it could not be accepted by agents or officers *appointed by them,* for they had not the power to make an election, as a corporation, until the first Monday in July, 1805. The persons named, or the president and any eight of them, were the agents, constituted by law to act in behalf of the corporation. It was a special authority conferred by law, and in all cases of special authority, the power given must appear in the proceedings to have been strictly followed. The chancellor is, by law, the agent of the obligee, to approve and accept for him a writ of error bond. The county court has the like authority in appeal bonds; yet it never has been supposed that such a bond, found in the custody of the officer of the court among the "archives and valuable papers of the court," was of itself evidence that it had been approved and accepted by the chancellor, or the county court, without the aid of any other circumstance. It is believed it never can be so held in the cases of writs of error bonds and appeal bonds, and this case is, in principle, perfectly analogous to these cases. It may, also, be added that in the

case of an absolute deed, or a bond for the payment of money, the party obligee or grantee being in possession, may be presumed to have accepted it, because it was for his benefit to accept it. But, in this case, unless the security was good, it was not for the benefit of the corporation to accept it, and there is nothing in the case to show that the security was good; and no argument can be drawn from the fact of *Higginbothom's* continuing to act as cashier, for it is in proof that he acted as cashier for more than two months without any bond. For aught that appears in the case, it may have been the interest of the corporation to refuse this bond and demand better security. But, conceding for the sake of the argument, that the possession is sufficient evidence that the instrument was delivered and accepted; yet it is denied that it can be evidence of the delivery and acceptance on the day it bears date, which is the day alleged in pleading by the plaintiffs, &c. to be proved by them. In the cases in which it has been held that a deed shall be presumed to have been delivered on the day it bears date, it will be found (or is to be inferred from the period at which the decision was made) that the deed upon the face of it purported to be delivered on that day. The bond, in the body of it, usually, and, indeed, always certifies, that it is sealed on that day. The subscribing witnesses certify that it was "sealed and delivered" in their presence. The old deeds, therefore, and most of the modern, bear on the face of them the evidence that they were completely executed on the day they bear date. Of such deeds it may reasonably be predicated that they were executed at the time they profess to have been executed; and it is of such deeds, it is believed, that the courts speak when they say it is to be presumed they were executed on the day they bear date. But, this instrument, although it professes to have been sealed on March 30, 1805, does not purport to have been delivered on that day; and, indeed, does not on the face of it contain any evidence that it was delivered at all. It does not, therefore, come within the reason of the rule. Again; in all of the above mentioned cases there was a body in existence and in a condition to accept on that day; and it so appeared. But, in this case, there is no such evidence; and, indeed, it would appear from the proceedings of the bank, that there was not on the 30th

of March, 1805, a meeting of the president and eight directors. Moreover, it is believed that in all of the cases in which the rule is laid down, the precise day of the delivery did not materially affect the rights and obligations of the parties. The date of the delivery was not of the substance of the contract. But, in this case the time of the delivery and acceptance is of the very essence of the contract. The whole extent of the defendant's liability depends upon the time it was accepted. The time is not less material than his signature and seal; and it would seem to be just as reasonable to presume his signature and seal, because the obligee was in possession, as to presume the precise time of delivery, in the absence of all proof as to that time. The possession itself may be considered as equivocal, for it seems to have been in the possession of the principal obligor, and in his power and under his control until 1819. The instrument in question is a common law instrument, and to be proved and established according to the principles of the common law. No argument can be drawn from promissory notes and other instruments of modern invention, which are not governed by the rules of the common law. In fine, this is the case of a surety; it is one of that class of cases in which the rights of the plaintiffs are strictly scanned and no implication or intendment made to the disadvantage of the defendant. *Miller vs Stewart*, 9 *Wheat*. 702  703. The first division of the argument, that is the points arising on the plea of *non est factum*, is here concluded. As these questions seemed to depend on the application of general principles, in the absence of adjudged cases, on the very points in controversy it was supposed that it would be more satisfactory to the court to state the argument somewhat at large. Except the case decided by Ch. J. *Marshall*, there is, perhaps, no case directly on any of the points in controversy, on this part of the subject. The other points of the case will be more briefly disposed of.

2. *As to the duration of the bond.* The points under this head of the argument arise on the demurrer to the first breach assigned in the replication to the first plea. The defendant's 1st plea is general performance. The plaintiffs reply, and assign as the first breach the embezzlement by *Higginbothom* of $50,000 on various days and times between the date of the bond

(March 30, 1805,) and the 25th of May, 1819.   The defen-dant demurred to this breach, and the judgment of the court be-low was in his favour.   If the breach assigned was too large, that is, if the condition of the bond did not cover the whole space of time, the plea was ill on demurrer, and the judgment of the court, therefore, right.

It is insisted that the breach assigned was too large, upon the following grounds: 1st. It is contended, that if the instru-ment in question be the bond of the appellee, yet he was not thereby liable as the security of *Higginbothom* for any em-bezzlement which took place after the first Monday in July, 1805, at which time a new election of directors took place. The charter directed that the affairs of the corporation should be conducted by the president and directors; see *sect.* 7.   By *sect.* 6, the persons there named are to act as the president and directors until the first Monday in July 1805, and until a new election of directors.   By sec. 8, the directors *for the time being* have power to appoint a cashier and such other of-ficers and servants *under them* as may be necessary for exe-cuting the business of the corporation.   The cashier then was one of the servants under the directors, to enable them to exe-cute the business of the corporation.   The business of the cor-poration was to be managed by these directors until the first Monday in July 1805, and no longer—provided the new elec-tion took place on that day.   Now as the president and direc-tors were appointed for a limited time, and to perform certain duties, and the cashier was a deputy or servant under them to aid in the performance of those duties, it is insisted that his ap-pointment cannot endure longer than that of the appointing power.   In other words, as the directors themselves had no power to manage the *business of the corporation* after the first Monday in July 1805, they could confer no power to do so, on any agent or servant, by virtue of their appointment.   They could give no greater power to their servant, the cashier, than they themselves had.   The law indeed might authorise them to appoint for a longer time, but as the law does not pro-fess to confer such a power, the question must depend upon the general doctrine of principal and deputy.   The principles above stated will be found to be established by the following cases:

*Lord Arlington vs Merricke,* 2 *Saund.* 411.    *Liverpool Water Works vs Atkinson,* 6 *East,* 507.    *The King vs Corporation of Bedford Level, Ib.* 363.    *Wardens of St. Saviour's vs Bostock,* 5 *Bos. & Pull.* 175.    *Hassell vs Long,* 2 *Maule & Selw.* 363.    *Peppin vs Cooper,* 2 *Barn. & Ald.* 431.    *Leadley vs Evans,* 9 *Serg. & Lowb.* 306.    It is not necessary to enquire whether the president and directors might not so have taken the bond as to hold the security bound for a longer period.    The above cases, it is conceived, abundantly show, that the bond in question cannot be construed to hold the surety liable beyond the time to which the appointment itself was limited.    2dly.  But if it be even conceded, for the sake of the argument, that the above proposition cannot be maintained upon the principles and authorities above stated, yet it is insisted that the defendant was not liable for any embezzlement which took place after February 6, 1817, when the first charter expired.    It may be admitted, that the defendant is liable to the new corporation, to the full extent of any contract he made with the old one, no matter whether the *breach* occurred before or after the expiration of the first charter.    But it is contended that his contract could not be enlarged by the renewal of the charter.    His liability as security could not be increased without his consent.    It could not be made to extend to times or things for which he had not contracted.    When he entered into the contract it is very clear that as the law then stood he could not be liable beyond February 6, 1817.    The days of the corporation were numbered, and they ceased to exist on that day.  They could, by no possible interpretation of the charter, appoint a servant for a longer period.    They could have no servant after that time; for there would, as the law then stood, be no master to serve.    Can a new law enlarge the liability of a surety without his consent?  Is the contract to be expounded by the law as it was when the contract was made?  Or, is it to be interpreted by laws passed afterwards?  It is believed that the answers to these questions can hardly be a matter of doubt.  And the following cases, (if cases be necessary on such a point,) it is hoped, will be deemed conclusive.  *Fell on Guar.* 116, 117, *(note.)  Barker vs Parker,* 1 *T. R.* 287.  *Miller vs Stewart,* 9 *Wheat.* 702.    *United States vs Kirkpatrick, Ib.* 733.

*Strange vs Lee,* 3 *East,* 490.    *Dance vs Girdler,* 4 *Bos. &
Pull.* 34.    *Ludlow vs Simond,* 2 *Caine's Cas. in Error,* 1.
The present case bears a very strong analogy to that of *Bar-
ker vs Parker,* 1 *T. R.* 287.    There, a bond was given with
condition that a clerk should serve faithfully, and account for
all money, &c. to the obligee and *his executors.*    After the
death of the obligee, the executors continue the business and
retain the clerk in the same employment.    It was held, that
the obligor was not liable for money received by the clerk in
the service of the executors.    Lord *Mansfield* says, "This is
a very plain case.    The service *in the contemplation of the
parties,* was the *service of the testator.*    There was no idea
*then* of carrying it further."    Now, in the present case the
contract of the defendant was to secure the fidelity of a ser-
vant in the service of a corporation.    This corporation is a le-
gal, artificial being, depending entirely for the commencement,
duration and termination of its existence upon the power creat-
ing it—the legislature.    At the time this contract of the de-
fendant was made, there was a legal statutory life assigned to
this legal, artificial being.    Was not then the service, *in the
contemplation of the parties,* a service during the life of this
artificial being, as this time was limited *at the time of the con-
tract?*    Was there any idea *then* of carrying it further?    When
the charter was renewed, the corporation became, with regard
to the defendant in this cause, precisely like the executors with
regard to the defendant in the case of *Barker vs Parker.*
They were, as to him, the executors of the old corporation,
retaining the same servant in the same employment.

3. *Points on Evidence.* 1. The first question under this head
is presented by the plaintiffs' *second* bill of exceptions.    Was
*Henry Payson,* who at the time of the trial was a stockholder
in the bank, and therefore to gain by a verdict for the plaintiffs,
a competent witness? 1st. It is in the first place insisted that
upon the general rules of evidence he was not competent to
testify in support of his own interest.    2dly. It is insisted that
he was not excepted out of the general rule by reason of being
the depositary of the by-laws.    For it appears by the excep-
tion that he ceased to be the president on the 27th of May,
1819, and consequently at that time ceased to be the deposita-

ry. 2. The second question of evidence is under the plaintiffs' third bill of exceptions, upon the admissibility of the writing offered as the by-laws of the corporation. The court refused to suffer the writing to be read in evidence as the by-laws of the corporation. It was offered as containing the written by-laws of the corporation. It is contended, 1st. That by-laws, *ex vi termini*, in modern times mean written enactments, and the power given by the charter ought to be so interpreted. The cases where they have been suffered to be proved by parol, were the cases of ancient corporations, and when the writing might be presumed to be lost. 2dly. The evidence stated in the exception does not prove *that the entire paper offered* was adopted as the by-laws of the corporation. And it was that *particular paper*, and the *whole too of that particular paper*, that was offered to be read as the written by-laws of the corporation. It is *not identified by any of the witnesses, as the paper adopted and passed by the corporation as their by-laws*. 3dly. The paper itself on the face of it, purports to be the by-laws of the *association* and not of the corporation— See *art.* 18, and *art.* 26. The parol evidence was offered to contradict the writing. If the corporation adopted similar by-laws by parol, and by-laws can be proved by parol, then the witness ought to state in words the contents of the parol by-laws. The written by-laws of the *association* could not be read as evidence of the parol by-laws of the corporation. It will be noted that the heading to by-laws is not in the book produced, and rejected by the court, as stated in the exception.

The last question is on the admissibility of the books. If the court below were right in their direction upon the plea of *non est factum*, they are then clearly right in this opinion. For it would be absurd to admit evidence to prove damages for the breach of the condition of a bond, when the bond itself was not proved—when there was no contract to be broken, and consequently no damages to be claimed for a breach. If, however, the court erred as regards the issue of *non est factum*, yet it is insisted that the said books were not admissible for the purpose for which they were offered. 1. The general superintendance and direction of *Higginbothom*, mentioned in this exception must, unquestionably, be understood to mean, his gene-

ral superintendence and direction as cashier.   There is no evi-
dence that he directed the particular entries, or even saw them
or knew that they were made.   The cashier's duty of super-
intendence is precisely like the president's, and nobody sup-
poses that the president is responsible by reason of his super-
intendence, for the false entries alleged to exist in the books—
*Art.* 18, 19.   2. The entire books were offered, and not parti-
cular items, and a part of the entries in the books were made
by a witness still living.   The relaxation of the rule as to the
handwriting of an absent witness, it is contended, is confined to
the single case of an instrumentary witness, and has never been
carried farther.   The books could not, therefore, be read un-
less the living witness was called to prove his entries, and for
the best reason—because he would be able to explain why they
were made.   *Cooper vs Marsden,* 1 *Esp. Rep.* 1.   3. The
books were offered, not only to show that they contained false
entries and omissions; but also, to prove *by the books* that such
false entries, &c. occurred therein by the neglect and fraud of
*Higginbothom.*   Now, although the books might show false
entries and mistakes, they could not show that they occurred
by the fraud or neglect of *Higginbothom;* and being offered
for a purpose for which they were clearly incompetent, they
were properly rejected by the court.   They could not, in any
view of the subject, be evidence to charge the defendant, un-
less they were coupled with an offer to prove, that the entries
spoken of were occasioned by his neglect of duty, or that he
knew their falsehood, and connived at it—no such proofs are of-
fered; the books are offered *by themselves, and it is not even
said that it was the duty of Higginbothom to inspect them.*
1 *Starkie,* 50, 51, 305, 306.   2 *Starkie,* 41 to 47, 401, 403,
406.   3 *Starkie,* 1300, tit. *Res inter alios.*   If the cashier
could have performed his duty, and yet these false entries have
been made, the court will presume that he did perform his duty;
they will not presume fraud.   The case of the *Manhattan
Company vs Lydig,* 4 *Johns. Rep.* 377, shows that when or-
dinary and legal diligence was used by the bank, still such false
entries may occur, which might have been prevented by extra-
ordinary diligence.   And when it is stated, as it is in that case,
that the *bank* was not bound to use any extraordinary diligence

to detect and prevent the false entries of its book-keeper, it necessarily follows that the cashier was not bound, he being the principal officer of the bank, and the bank being clearly responsible for any omission of duty on his part. It is, also, to be remarked that *Spencer*, J. in delivering the opinion of the court in the above cited case, observed, that the bank had pursued the usual and uniform method, and could not be subjected to the charge of negligence, which they certainly would have been had it been the duty of the cashier to exercise such extraordinary diligence as would have enabled him to discover the false entries of the book-keeper. The truth is, and every body, in the slightest degree acquainted with such matters, knows, that the exercise of such a degree of diligence on the part of the cashier, would be utterly incompatible with a faithful performance of the ordinary and important duties of that officer. It is scarcely considered necessary to assign any reasons why the books are not admissible, in this case, as the books of a corporation. It will be perceived, by the court, that all the elementary writers on the subject, of the most approved authority, lay down the rule broadly, that the books of a public corporation are only evidence as between the members, and not as between the corporation and a stranger. By *stranger* is meant any one who is not a *member* of the corporation. In the present case, every one is a *stranger who is not a stockholder* in the bank. The cashier, *as such*, is not a member of the corporation. He may be a stockholder, and thus a member of the corporation, and the books might, for some purposes, be evidence against him. But it would be in his character of *stockholder*, and not in his character as cashier, in which he is as much a stranger, as to this point, as if he had never been within the walls of the banking house. *Starkie on Evidence*, 297 to 300. *Philips*, 319. This is *a fortiori*, true with regard to the surety of the cashier. Upon a view, therefore, of the whole case, it is submitted that the judgment of the county court, on all the points was right, and ought to be affirmed.

*Curia adv. vult.*

BUCHANAN, Ch. J. at the present term, delivered the opinion of the court.    At the trial of this cause in the court below, *six* bills of exceptions were taken on the part of the plaintiffs, upon which this court is called on to decide.    The suit was instituted upon an instrument of writing, purporting to be a bond, executed on the 30th of March, in the year 1805, to the plaintiffs, by *Ralph Higginbothom,* in the character of cashier of the institution, as principal, and the defendant and others, as his sureties.    The declaration is in the usual form of debt on bond.    The defendant, among other pleas, pleaded in the first instance general performance.    The plaintiff replied, assigning various breaches, and several issues were joined, both of fact and in law, to which it is not necessary here to advert. In this state of the pleadings, the cause was continued by consent from term to term, with leave to the parties to amend their pleadings, until the term at which it was tried, when the defendant, by his counsel, asked leave of the court to amend his pleadings, by filing a special plea of *non est factum,* which was objected to by the counsel for the plaintiffs.    But the court overruled the objection, and permitted the defendant so to amend his pleadings; which forms the subject of the first exception.

The grounds of objection to the plea being received at that stage of the cause, are—*First.* That it came too late.    *Second.* That it is inconsistent with the defendant's plea of general performance, and other pleas; and *Thirdly.* That it is against the *eleventh* and *thirty-third* standing rules of that court.

As to the *first* of these grounds, it might be sufficient to observe, that it is a general issue plea, and like other general issue pleas, need not be pleaded before the rule day, but may be received when the cause is called up for trial, and did not therefore come too late in this case.    In addition to this, it is not at variance with the *eleventh* rule of the court, which expressly provides, that "the general issue plea may be pleaded by the defendant at any time before judgment by default is entered against him, although he hath not pleaded before the rule day;" and also that "it will never be considered as a reason to delay the trial."    And by the act of assembly of this state of 1809, *ch.* 153, *s.* 1, it is declared, "that the courts of law shall have power to order and allow amendments to be made in all pre-

ceedings whatever before verdict, so as to bring the merits of
the question between the parties fairly to trial; with the further
provision, that "in all cases where amendments are made, the
adverse party shall have time to prepare to support his case;
but the case shall not be continued to the next term, unless the
court shall be satisfied that the same is necessary." That the
court then had authority to permit the amendment objected to,
so far as concerns the time at which the plea was offered, is
unquestionable. And the argument directed against that au-
thority, drawn from the supposed surprise and hardship on the
plaintiffs, would be more applicable to an objection to the forc-
ing a plaintiff in such a case into an immediate trial, which is
not presented by any thing appearing in this record; the ques-
tion arising on this bill of exception, not being whether the
plaintiffs were improperly forced into the trial of the cause at
that time, but whether the plea was properly received. Be-
sides, under the 11th rule referred to of the court, the filing a
general issue plea, when a cause is called up for trial, is not of
itself a cause of continuance. And although by the act of 1809,
*ch.* 153, when an amendment is made at the trial, time is to be
given, during the term, to the adverse party to prepare to sup-
port his case; yet the cause is not therefore to be continued,
unless the court shall be satisfied that a continuance is necessa-
ry. And there is nothing to show, either that a continuance
of the cause, or time to prepare to support their case, was asked
for in behalf of the plaintiffs, and refused by the court, or that
they were forced into an immediate trial unprepared; on the
contrary, the record exhibits an objection only to the plea be-
ing received, and that, on the three grounds stated in the bill
of exceptions, that it came too late, was inconsistent with the
defendant's other pleas, and against the 11th and 33d rules of
the court. Moreover, the cause appears to have been continu-
ed from term to term for several terms, to that at which it was
tried, not under a rule on either party, but by consent, with
leave generally to the parties to amend their pleadings; so that
in receiving the plea, there was no surprise or hardship on the
plaintiffs to be complained of.

But if it rendered a continuance of the cause, or further time
to the plaintiffs during the term, for preparation, necessary,

which continuance or time was an application refused by the court, an objection would more properly have laid to such refusal.

The *second* ground of objection. The incompatibility of the pleas of general performance and *non est factum*, is equally untenable. Whatever apparent inconsistency there may be between such pleas, it is not of a character to prevent their being received; and such has been the practice of permitting them, under the construction of the statute, 4 *Ann, ch.* 16, that it may now be considered a settled rule or law of pleading.

To confine the defendants to pleas strictly consistent, would be greatly to narrow the benefit of the statute; as a special, and a general issue plea, could in such case, seldom, if ever, be pleaded, the latter always denying, and the former generally confessing and avoiding the charge. And as the statute itself makes no such distinction, it is not by construction limited to strictly consistent pleas; but the chance is given to the defendant of succeeding, not only on the strength of his own case, but on the weakness also of the plaintiffs, by permitting apparently incompatible pleas to be pleaded—as not guilty, and accord and satisfaction; not guilty, and *son assault demesne;* not guilty, or *non assumpsit,* and the statute of limitations; *non est factum* and payment; *non est factum* and general performance, &c. Hence the common form of pleading such pleas, to be found in the most approved books of entries, and the many cases in the books of reports in which they have been received. Of which the case similar to this in *Wright vs Russell,* 3 *Wils.* 536, may be taken as an apposite example; where after the pleas of *non est factum* and performance, judgment was given for the defendant on his demurrer to the plaintiff's replication.

*Non assumpsit,* or *non est factum,* and a tender, are not permitted to be pleaded, on the ground, that one goes to deny the existence of any cause of action, and the other admits it; and that if the general issue should be found for the defendant, it would appear on the record in the action of *assumpsit,* that no debt was due, in the face of the defendant's admission by the plea of tender, that something was due; and in the action of debt, that there never existed such a bond as that declared on, when the plea of tender admits something to be due on that

very bond. *Maclellan vs Howard*, 4 *T. R.* 194. *Jenkins vs Edwards*, 5 *T. R.* 97. But the pleas of general performance and *non est factum*, though apparently inconsistent, cannot produce on the record the same incongruity, both going to deny the plaintiff's whole cause of action. And the general issue and a tender, are the only pleas that are now disallowed on the mere ground of inconsistency; (1 *Chitty's Plead.* 541, 542. *Step. on Plead* 293, 459;) unless it be by the 33d rule of the court, that seems to have been relied upon, declaring "that no incompatible pleas shall be received;" but which is certainly at variance with the well established practice on the subject of pleading, and inconsistent with that due exercise of discretion, which is required of the courts of this state by the act of 1809, *ch.* 153, giving them power "to order and allow amendments to be made in all proceedings whatever before verdict, so as to bring the merits of the question between the parties fairly to trial;" since under that rule (if of binding authority,) a plea necessary to the bringing the merits of the question between the parties fairly to trial might be excluded.

The discretion vested in the courts by that act, is not a capricious, but a sound legal discretion, to the proper exercise of which the party claiming it is entitled, and from which he cannot properly be debarred, by any rule that is the mere creature of the court; and the permitting the amendment proposed in this case to be made, was, we think, a proper exercise of that discretion, according to the spirit and intention of the acts, and the settled practice, in relation to the pleading a special and general issue plea, although apparently inconsistent, notwithstanding the 33d rule, which was properly dispensed with.

The questions presented by the *second* and *third* bills of exceptions taken by the plaintiffs, arise on points of evidence. The *first* as to the competency of a witness produced on the part of the plaintiffs; and the *second* on the admissibility of a writing, headed "By-Laws," which was offered to be read on the part of the plaintiffs, as and for the by-laws of the corporation, under which the president and directors acted, and as prescribing, among other things, the duties of *Ralph Higginbotham* (the principal in the bond,) while he was in their employment as cashier. *Henry Payson*, the person produced

as a witness, being proved to be a stockholder in the bank at the time of the trial, his testimony was objected to, for any purpose but to prove himself a stockholder; and rejected by the court on the ground of interest.

It is admitted, upon general principles of evidence, that in a suit brought by a bank, one who is a stockholder, and interested in the event of the suit, is not a competent witness in behalf of the institution.    But that general rule is not without exception; for though an interested corporator cannot be received to testify generally for the corporation, yet it does not therefore follow, that he is competent for no purpose; but he may be placed in a situation to render him a necessary and competent witness for some purposes.    Of which the case of *The King vs The Inhabitants of the township of Netherthong*, 2 *Maul. & Selw.* 337, is an appropriate example, where a rated inhabitant of the township of *Netherthong*, whose interest was admitted, was called by the respondents, and was held to be competent to give evidence as to the custody of a certificate from the township of *Honley*, (which was produced,) acknowledging the pauper's grandfather and father to belong to *Honley*, in accordance with the decision in another case, that was mentioned by Lord *Ellenborough.*

*Payson* being a stockholder in the bank, was not a competent witness for the plaintiffs for all purposes; but he was offered to prove, among other things, that he was the president of the bank from the 27th of April 1812, until after the 27th of May 1819; that as such, he was the depositary of the bank; and that during the time he was president, a certain book called the By-Laws, was one of the books of the bank.  And if an interested corporator is competent to give evidence in behalf of the corporation, as a *depositary of the muniments*, in relation to his custody, of a paper produced as one of the muniments, why was not *Payson* within the exception to the general rule, and competent to prove himself the depositary of the book called the By-Laws, as a muniment of the bank? The only argument urged against his competency, as being within the exception is, that at the time he was called as a witness, he appears from the plaintiffs' own offering to have ceased to be the depositary. But that, it is conceived, makes no difference, and that he was

a competent witness to identify the book as a muniment of the bank, during the time that he was the despositary, *Higginbotham*, too, then acting as the cashier, and being a witness for that purpose, that he ought not to have been rejected as incompetent to prove any of the matters for which he was offered.

He was not competent to prove that it continued to be one of the books of the bank, after he had ceased to be the depositary, and when he stood only in the relation of a stockholder in the bank, any more than any other stockholder. But admitting the existence as to depositaries, of the exception to the general rule of evidence, no reason is perceived, why his having ceased to be the depositary at the time he was called as a witness, disqualified him from proving the book produced to have been a muniment of the bank, while he was the depositary; the nature of his interest as a stockholder not being changed, but remaining the same as it was, while he continued to be the depositary.

The objection to the admissibility of the writing headed "By-Laws," is, that they purport, upon the face of them, to have been the by-laws of the banking association, styled *"The President and Directors of the Union Bank of Maryland,"* when the business was transacted under the articles of association, and before the act of incorporation, and that they do not sufficiently appear to have been adopted by the corporation as their by-laws."

By the *ninth section* of the charter the president and directors, for the time being, are authorised to make all such rules, orders, by-laws and regulations, for the government of the corporation, its officers and servants, as they, or a majority of them, from time to time may think fit, and the same at pleasure to revise, alter and annul. It may here be admitted, that the charter contemplates written by-laws; and then the question is, whether these are the written by-laws of the corporation?

They are in writing, and if they were ever adopted by the president and directors, or a majority of them, as by-laws for the government of the corporation and its officers, they became, by such adoption, the written by-laws of the corporation. It appears from the statement of the evidence, that the book marked *By-Laws,* from which the writing objected to was offered to

be read, was one of the books of the corporation, and that, in which the proceedings of the president and directors were entered, from the time the charter was obtained, until the year 1819, so far as they were reduced to writing, and that there was no other book, in which their proceedings were entered during that period, nor any other writing or memorandum of their proceedings. One of the witnesses, the cashier who succeeded *Higginbothom,* in the year 1819, and after other by-laws had been adopted, proves, that when he went into the bank, he found the same book among the other books of the corporation, and that it had in bank the reputation of being the former by-laws and minutes of the corporation. If then there were any by-laws of the corporation, they were contained in that book, and were they that were offered to be read, and were rejected by the court—there were none other.

It is contended, 1st., That there is no evidence that the entire writing, headed "By-Laws," was adopted as the by-laws of the corporation. And 2d. That there does not appear to have been any entry or memorandum of such adoption, among the minutes of the proceedings of the corporation.

As to the *first* of these positions. The writing, headed "By-Laws," consists of 26 articles, the witnesses who were examined in relation to their adoption, had each of them been a director under the charter, except two who had been clerks; and the proof is, that the 19th article prescribing the duties of the cashier, which, in truth, is all that is material in this part of the case, was required by the corporation to be particularly observed; and that *Higginbothom,* acting as the cashier, after the act of incorporation, was in the habit of observing, or of professing to observe it, but that he did not perform the duties with regularity. With regard to the rest, several of the witnesses, taking their testimony together prove, that the government and proceedings of the bank were in conformity with all of them, with the exception only of the 20th and 23d, concerning which they have no distinct recollection, and which have no relation to the duties of the cashier; some, that the direction and government of the bank was in general in conformity with them; one, that when he was elected a director, in 1817 or 1818, he inquired for the by-laws, and that a book or paper

was delivered to him by an officer of the bank, containing by-laws similar to those in question; that he remembers them, among other things, from the fact, that questions sometimes arose at the board, as to what were the rules in particular cases, which were decided agreeably to the by-laws offered to be read; and because the regulations and government of the bank corresponded, while he was a director, and until other by-laws were adopted in 1819, with the system prescribed by the articles, headed "By-laws." And another, that when he was sworn in as a director, between the years 1806 and 1811, or about that time, certain by-laws were handed to him, as proper to be read by him as a director; but does not prove that these are or are not the same; and it appears that all the articles, headed "By-Laws," and many of the minutes entered in the book, entitled, "By-Laws," which was kept by *Higginbothom,* as cashier, were in his handwriting. This is the substance of the material part of the oral testimony stated in the *third* bill of exceptions, and it seems to us to be quite sufficient to show a practical adoption by the corporation of the articles, headed "By-Laws."

As the book, in which they are written, was one of the books of the corporation, and the only book in which any of the proceedings of the president and directors were entered, from the time the charter was obtained until 1819, and as there was no other writing or memorandum of their proceedings, it was necessarily the book that was put into the hands of the two witnesses, when they first went into the bank as directors. And what circumstance could be stronger to show, that the writing or articles, headed "By-Laws," had before been adopted by the corporation as such, than the delivery of the book containing them, by one of its officers, to a newly appointed director, on his inquiring for the by-laws, and their being handed to another, on the occasion of his being sworn in, as proper to be read by him as a new director? The testimony of each of those witnesses goes to the whole writing, and not to any particular article. It was put into their hands to read, as containing a system of by-laws, not confined to one portion more than another, but embracing all the articles of which it consists. And although they do not identify the writing pro-

duced, by swearing it is the same which they saw in the bank, and of which they speak; yet its identity is sufficiently establish-ed by the proof, that the book containing it was a book of the corporation, in which the proceedings of the president and di-rectors were entered until the year 1819, and that there was no other in which any of their proceedings were entered, nor any other writing or memorandum of their proceedings before that period. The testimony then of these witnesses, clearly relates to the articles headed "By-Laws," and evinces the understand-ing at the bank upon the subject, and the light in which they were viewed. And the proof by some of the witnesses, that the direction and government of the bank was generally in con-formity with the system they presribe; by one, that the regu-lations and government of the bank, corresponded with them as a system, and that they governed the decision of questions, which occasionally arose as to what were the rules in particular cases; by some that the proceedings and government of the bank were in conformity with 24 of the 26 articles, particular-ly in the recollection of the witnesses; and by some, that the 19th article was required by the corporation to be particularly observed, and that *Higginbothom* himself, acting as the cashier, professed to observe it, form together a mass of evidence rela-tive to the acts and general government of the corporation, con-clusive of their adoption as a system, and not of particular arti-cles merely, if they could be adopted otherwise than by writ-ing. They were treated and acted upon as a system, and there is nothing to show that they were partially adopted only, or that any particular articles of that general system were except-ed.

But it is supposed, *secondly*, That an entry or memorandum in writing was necessary to their adoption by the corporation. No reason has been shown in argument, nor can we perceive any, why their adoption may not be proved, as well by the acts and uniform course of proceeding of the corporation, as by an entry or memorandum in writing. They were originally the by-laws of an association, and an entry or memorandum would have been evidence only as an act of the corporation of their adoption; and, without the common seal, which was once held to be necessary to every act of a corporation aggregate, could

no more unite the several assents of the individuals composing it, so as to make it the act of the corporation, than any other act without the common seal.

But it is admitted, that a corporation aggregate may *now* act without its common seal; and if so, why may not the adoption by such a corporation, of a set of written rules, (already prepared by others,) as and for its by-laws, be evidence otherwise than by writing? Where is the law substituting writing for the common seal, and declaring it to be necessary in all cases? If there is any act of a corporation that need not be in writing, it would seem to be such an act of adoption; not being a contract, but a recognition only, of certain written rules for its own government, and that of its officers and servants, which, when adopted, whether by writing or otherwise, become its written by-laws, speaking the sense of the corporation; and it does not appear to be material, in what manner, or by what acts, its assent to them is manifested, assuming that it need not be evidenced by the common seal.

In this case authority to make by-laws is specially delegated by the charter to the president and directors, without any direction as to the manner in which it is to be done. And if in the exercise of that authority, as the agents (under the charter,) of the corporation, they could adopt as rules for its government, the written by-laws of the former associations, which is not denied, it was no more necessary to be done in writing, than the acts of any other duly appointed and authorised agents. And it will not be contended, that an agent, duly authorised and appointed by a corporation, can only act or contract by writing.

But authorities are not wanting to sustain the position, that acts or contracts of corporations may be proved otherwise than by writing, and may be inferred from other corporate acts; two only of which will now be noticed, which are we think conclusive upon this point of the case. *The Bank of Columbia vs Patterson's Adm'rs.* 7 Cranch, 299, and *Whittington vs The Farmers Bank of Somerset and Worcester,* 5 Harr. & Johns. 489. *The Bank of Columbia vs Patterson's Adm'rs.* was an action of *assumpsit,* by *Patterson's* administrators, for work and labour done by their intestate, for the bank, growing

out of a sealed agreement between *Patterson*, and an authorised committee of the directors of the bank, in their own names. There was no entry or memorandum in writing produced, of the adoption by the corporation of the contracts of the committee, nor of any vote for the payment of the money. But it appearing that the corporation had from time to time paid money on the contracts to the intestate, and that they were for the benefit of the corporation, the court said the jury might from that evidence "legally infer, that the corporation had adopted the contracts of the committee, and voted to pay the whole sum which should become due under the contracts, and that the plaintiff's intestate had accepted the engagement." And in *Whittington vs The Farmers Bank of Somerset and Worcester*, it was decided by *Worcester* county court, and on appeal affirmed by this court, that it was not necessary an order of the president and directors should be in writing to give it validity, but that it might be proved, if not reduced to writing, by oral testimony.

But the proof in this case of the adoption by the corporation of the writing produced, as its by-laws, does not rest entirely on oral testimony. There is among the minutes of the proceedings, which were produced, a written recognition of them in these words: "Whereas by an act to incorporate the stockholders in the *Union Bank of Maryland*, it is among other things enacted, that an election for sixteen directors to conduct the affairs of said bank, shall be annually held on the first Monday in July: And whereas the said first Monday in July may sometimes fall on the fourth of said month, on which the bank will be shut agreeably to the provisions of the fourth article of the by-laws, ordained and passed for the regulation and government of the said corporation," &c. *Now that this* entry relates to the writing or articles headed "By-Laws," and could have related to nothing else, is manifest, not only from what has been already said, and the proof that there were no others, but also from the language of the fourth article itself, under that heading; which is in these words: "That the bank shall keep open for ordinary business, from nine o'clock in the morning till three o'clock P. M. every day, except Sundays, Christmas day, and the fourth day of July;" providing, as stated in the

entry, for the bank being shut on the fourth of July. It is not indeed a resolution of adoption, nor the act by which they were adopted and made the by-laws of the corporation, but an acknowledgment that they had been previously adopted and made, and were then the by-laws of the corporation. It will bear no other construction, and it may be likened to the case of *Fleckner vs The United States' Bank,* 8 *Wheat.* 338, where a resolution passed by the president and directors of the Planters Bank of *New-Orleans,* declaring that an endorsement which had before been made of a note by its cashier, was made by the authority of the president and directors, and ratifying the act of the cashier, was held to be not a mere ratification of the transfer, but a binding acknowledgment of its original validity. As here, the subsequent entry is an acknowledgment of a previous adoption, not of a part only, but of the whole writing as a system of by-laws, which are declared to have been ordained and passed, for the government and regulation of the corporation. Besides they are set out in the replication, and alleged to be the by-laws of the corporation, and violations of them, so far as they prescribe the duties of the cashier, are assigned as breaches; on which breaches issues are tendered by the defendant, and joined by the plaintiffs; so that they are virtually admitted by the defendant in his pleadings.

Two questions arise on the *fourth* and *fifth* bills of exceptions, growing out of the special plea of *non est factum.* 1st. Whether, there being no written acceptance produced, of the instrument on which the suit was brought, there was other sufficient legal evidence, from which the jury might have inferred that it was duly delivered by the defendant, and accepted by the plaintiffs; which is presented, both by the *fourth* bill of exceptions, and the *first* prayer of the plaintiffs in the *fifth* bill of exceptions. The 2d. Whether the plea, that the supposed writing obligatory was delivered as an *escrow,* imposed upon the defendant the burden of proving the special matter alleged in the plea; which arises on the *second* prayer of the plaintiffs in the *fifth* bill of exceptions, and will be first examined.

It is a general principle of pleading, that where a plea produces a direct affirmative and negative, by denying the allega-

tion in the declaration, it should conclude to the country, whether the affirmative of the issue is held by plaintiff or defendant, and that the proof of the affirmative rests on him who asserts it. But when new matter is introduced on either side, the pleading ought to conclude with a verification. Thus, in the application of these rules, the plea of general *non est factum* in an action of debt on a bond, which, by denying the allegation in the declaration that it is the writing obligatory of the defendant, makes the issue between the parties, concludes to the country, and throws the whole proof of the execution of the bond, including the delivery, upon the plaintiff, who in that case asserts the affirmative.

But the defendant may, under that issue, give in evidence any thing which goes to show that the instrument of writing was originally void at common law, as lunacy, fraud, coverture, &c. or that it had become void subsequent to the execution, and before the bringing of the suit, as by erasure, alteration, &c. because the plea of *non est factum* puts in issue as well its continuance as a deed, as its execution; and it is enough if it was not his deed at the time of pleading. Or the defendant may plead any such special matter. But if he chooses to do so, being new matter, he must do it with a verification, and holding the affirmative, he draws the burden of proof upon himself. So if he seeks to avoid the bond, for duress, infancy, usury, &c. which cannot be given in evidence under the general issue, (the bond not being therefore absolutely void, but voidable only,) he must plead such new special matter with a verification, and the proof lies upon him. In every such case the issue is upon the matter specially alleged in the plea.

That the defendant may give in evidence, under the plea of general *non est factum*, that the instrument of writing was delivered as an *escrow* on a condition not performed, is every where to be found; and it is equally will settled, that he may plead it specially, and that the proper conclusion to that plea is to the country; because it is a special negative to the affirmative in the declaration—the allegation in the declaration, that it is the writing obligatory of the defendant, including the allegation of the delivery of it as a deed; and it is this conclusion

to the country that raises the question, whether the proof is on the plaintiff or defendant

In *Bushell vs Pasmore, 6 Modern*, 218, it is said by *Holt*, Ch. Justice, that "all these special *non est factums* in case of *escrow*, erasure, &c. are impertinent, for thereby the defendant brings all the proof upon himself; whereas by pleading *non est factum* generally, he would turn the proof, of whatever is necessary to make it his deed, upon the plaintiff;" thus making no distinction between the different pleas of special *non est factum* as to the burden of proof. And in 2 *Stark. Evid.* 482, the same broad position is laid down, that "where the plea is *non est factum* generally, the proof is upon the plaintiff; but where the plea shows that the deed is void for special matter, the issue is on the defendant," with a reference to the case of *Bushell vs Pasmore.* This writer then, adopts as a rule of evidence, the doctrine asserted in *Bushell vs Pasmore,* that in all cases of special pleas of *non est factum,* without any distinction, as *per fraud,* lunacy, delivery as an *escrow,* erasure, &c. the proof rests on the defendant.

The position laid down by *Holt* in *Bushell vs Pasmore,* is translated into 5 *Bac. Ab.* 373, with a marginal *quere,* as to the case of an *escrow.* We have seen it no where denied; and the force of that *quere,* is much weakened by the reason there given for it, "for it is his deed though delivered to another on condition." Now in such case, the instrument is not delivered as a deed on condition, but given to another as an *escrow,* to be by him *delivered as a deed* to the obligee, on a condition precedent. And it is only on the ground, that it is not his deed, that the defendant can give it in evidence under the plea of general *non est factum.* The plea of *escrow* admits the signing and sealing only, but denies the delivery as a deed, which makes an issue between the parties; and the conclusion being properly to the country, the plaintiff has no choice but to add the *similiter;* and the conclusion, &c. "and so," &c. being a conclusion of law, and not issuable, the issue is upon the whole plea; and the question for the jury is a question of fact, whether it was delivered as a deed, and that depending upon the truth of the special matter alleged in the plea, which if not pleaded, the defendant could only avail himself of by

proof. And what is there in the pleading the same matter that dispenses with the proof, and imposes upon the plaintiff the necessity of disproving it? It is but the assertion of the defendant in the shape of a plea, and cannot avail him, if unsustained by proof, any more than any other special matter alleged in avoidance, or which shows, if true, that the instrument of writing was originally void at common law; as for fraud, coverture, &c. or that it had become void subsequent to the execution, and before the bringing of the suit, as by erasure, &c. which it is incumbent upon the defendant alleging it to prove—every thing necessary on the part of the plaintiff, the signing, sealing and delivery being admitted, and the issue being upon the matter specially alleged in the plea. So where the delivery as an *escrow* is pleaded, the issue is upon that special matter; which being alleged and relied upon by the defendant to show that it is not his deed, the proof of that allegation (he holding the affirmative,) rests upon him. And if there be no proof on the part of the defendant, the possession of the instrument by the plaintiff, is *prima facie* evidence of the delivery as a deed, which is all he has to show, and is sufficient to sustain the issue on his part—the signing and sealing being admitted, and the delivery as a deed, being the only matter in issue between the parties, upon the special allegations in the plea. And the plaintiff is not driven to any further, or stricter proof of the delivery, than such as is held to be sufficient under the plea of general *non est factum*. When it is said, that the special pleas of *escrow*, erasure, &c. throw all the proof upon the defendant, it is only meant, in relation to the special matter that is alleged, as operating to do away the effect of what is admitted, to wit, the signing, sealing and delivery, in the cases of erasure, &c. and the signing and sealing, in the case of *escrow*, but not the delivery as a deed, which is not admitted. Therefore, if the delivery as an *escrow* be proved on the part of the defendant as alleged in the plea, the proof of the performance of the condition lies upon the plaintiff where the affirmative is with him.

In this view of the plea of *escrow*, if this was the case of any individual plaintiff, we think, in the absence of all evidence on the part of the defendant, the possession and production of the instrument of writing by the plaintiff, would be sufficient *prima*

*facie* evidence of the due delivery and acceptance, to entitle him to a verdict, on the issue joined upon the *sixth* plea. But being the case of a corporation, it is supposed to differ from the case of an individual; and that the possession and production of the instrument by the plaintiffs, is not sufficient legal evidence of the delivery and acceptance as a deed, without some entry or memorandum in writing of such acceptance. Which leads to the inquiry, whether a written acceptance is essential to the validity of a bond executed to a corporation; and that involves the consideration of the question arising on the *fourth* bill of exceptions, and the *first* prayer in the *fifth* bill of exceptions.

It is contended that a written acceptance must be produced; that nothing else will suffice; and that no other facts or circumstances, however conclusive they might be in the case of an individual, can be received to raise a presumption in favour of a corporation, of its corporate assent, or from which its adoption or acceptance can be inferred, on the broad ground, that a corporation aggregate is incapable of doing any act except by writing.

But is it true that a corporation is incapable of doing any act that is not evidenced by writing? It seems to have been formerly held, that a corporation aggregate could only act by its common seal, could do nothing without deed. But that doctrine is now no where sanctioned as a universal proposition. It has long since been held, that such a corporation may employ one in ordinary services without deed, as a cook, butler or servant, and may appoint a bailiff to distrain, without deed or warrant. 2 *Bac. Ab.* tit. *Corporation,* (E. 3,) 13. 3 *Lev.* 107. *Anon.* 1 *Salk.* 191. And in *Harper vs Charlesworth,* 4 *Barn. & Cress.* 575, Mr. Justice *Bayley* said, "a corporation can only *grant* by deed, yet there are many things which a corporation has power to do otherwise than by deed. It may appoint a bailiff, and do other acts of the like nature." And it is now well settled, that it may be bound by a promise express or implied, arising from the acts of its agent, appointed and authorised by a corporate vote only, unaccompanied by the common seal.

It is said by different writers, treating of the manner in which corporations aggregate may act, that "gifts by and to them must be by deed." That "in general a corporation aggregate

cannot take, or pass away any interest in lands, or do any act of importance without deed," &c.    But conceding that anciently a corporation aggregate could do nothing but by deed, we have seen, that in more modern times the rule has been broken in upon, in the language of *P. Williams* in his argument in *Rex vs Biggs,* 3 *P. Wms.* 423, "for conveniency's sake."    And in that case, which was an indictment for erasing an endorsement on a bank note, there being a special verdict, finding the prisoners guilty of the erasure, and that the note was made and signed by one *Joshua Adams,* who was entrusted and employed by the bank of *England* to sign bank notes, but not under the common seal, it was elaborately argued by *P. Williams,* that the appointment of *Adams* was not valid, because not made under the common seal of the corporation; and also strongly urged from the importance of the trust, and not being an ordinary employment, that if in any case whatever, an authority given by a corporation ought to be under its common seal, it was that.    The prisoner, however, was condemned, and the appointment of course held to be valid.    It does not appear whether the appointment of *Adams* was or not by writing, but it was without deed, it was not under the common seal of the corporation; and it was not a small matter, nor an appointment on ordinary service, but of an agent, employed in an *important* trust, and the decision too, was in the case of felony, involving the life of the accused.    If it be treated as an appointment in writing, for which the case, neither as reported in *Strange* 18, nor *P. Williams,* furnishes any sufficient warrant, it shows, that the old doctrine, that a corporation aggregate must in all things act by its common seal, and can do no act of importance without deed, is no longer regarded, that being a case of the appointment without deed, of an agent to an important trust, connected with the highest interests of the corporation; and if considered as an appointment not evidenced by writing, it is a decision very strongly applicable to this case.

It is unnecessary to multiply cases to show, that the acts of corporations may now be evidenced by writing without seal— that is fully admitted; but it is strongly urged, that although they may now act without deed, yet that their acts cannot be evidenced otherwise than by writing.    And for that we have

been referred to 1 *Fonb.* 306, *(note o. )* *The Bank of Colum-bia vs Patterson's. Adm'r.* 7 *Cranch*, 299, and *Fleckner vs United States Bank*, 8 *Wheaton*, 338; but they do not support the position. In the note in *Fonblanque* it is said, "and the agreement of the major part of a corporation being entered in the corporation books, though not under the corporate seal, will be decreed in equity." The only ground upon which such an agreement can be enforced, is the capacity of a corporation to make a contract without seal, contrary to the ancient doctrine. But it is not there said, that a corporation can make no agreement, nor do any act except by writing; nor does the inference appear to be a ready one, that an agreement not in writing, or not entered upon the corporation books, cannot be enforced. And opposed to such an inference, is the case of *The King vs The Inhabitants of Chipping Norton*, 5 *East*, 239; where a corporation at a court leet, let certain tolls belonging to the corporation by a verbal agreement; and it was held, that the corporation could not pass the tolls by a verbal demise, but that it was a license to collect the tolls, and might be a ground on which to apply to a court of equity. The principle there decided, was not that the verbal agreement was a nullity, but only that it did not operate at law to pass the interest in the tolls, which could only be demised by deed; yet that it bound the corporation as a license, and was a contract or agreement fit to be enforced by a court of chancery In *The Bank of Columbia vs Patterson's, Adm'r.* the court takes notice of the ancient doctrine, that corporations could do nothing without deed. But says, they may now "by mere vote, or other corporate act not under their corporate seal, appoint an agent, whose acts and contracts, within the scope of his authority, would be binding on the corporation." Now to say, that a corporation may "by a mere vote or other corporate act," appoint an agent, is surely not to say, that it can only appoint an agent in writing, as a vote need not of necessity be reduced to writing, and "other corporate act," are very indefinite terms, and would rather seem to imply any act, whether in writing or otherwise; and the term "mere vote," would seem to import a naked vote, not clothed with the solemnity of writing. And the case itself, with the opinion of the court upon the whole

case, seems to show, that the terms "a mere vote or other corporate act," were not intended to be restricted to mean, a vote or other act in writing. The contract which gave rise to the suit, was personal, under the hands and private seals of the agents of the corporation. But it appeared in evidence, that it was for the exclusive use and benefit of the corporation, and made by their agents for purposes authorised by the charter, and that the corporation had from time to time paid money on the faith of it to the plaintiff's intestate. And from that evidence, the court decided, that "the jury might legally infer, that the corporation had adopted the contract of the committee, and had voted to pay the whole sum, which should become due under the contracts, and that the plaintiff's intestate had accepted their engagement," although there was no entry or memorandum in writing of the adoption of the contract by the corporation, nor of any vote for the payment of any part of the money. Here, then, was an unwritten act of a corporation, suffered to be inferred from other unwritten acts and circumstances. And no argument can fairly be drawn from the circumstance, that the corporation was defendant in that case; it was not put upon that ground by the court, or that the corporation might have kept any thing back, or that its recorded vote had been lost; but the decision went upon the broad principle, that a corporation might act without writing, and that its acts might be proved by circumstantial evidence; without adverting to any distinction between a corporation plaintiff and defendant. Nor could a corporation, because defendant, be presumed to do, what by its constitution it was incapable of doing. Besides, it will be remarked, that the jury were permitted to infer, from the facts and circumstances in the case, that the corporation had adopted the contracts, and voted to pay the money, not by a written act of adoption, or a written vote, but generally that it had adopted them, and voted to pay the money that should become due under them. And if an adoption in writing, or a written vote, had been intended, it would most probably have been so said; it is not so said, and there does not appear to be any thing in the whole case, from which it can be fairly implied. And in *The King vs The Inhabitants of Chipping Norton*, *5 East*, *239*, where the case states the agreement of the cor-

poration to have been a verbal one, which though not sufficient to pass the interest in the tolls, which from their nature could only be transferred by deed; yet it was held to be a ground for an application to a court of equity; which could not have been, if the agreement was void for want of being in writing. The case of *Fleckner vs The United States Bank,* does not sustain the position contended for. It is the case of *a written vote* of the board of directors; and the court, acting upon the facts of that case, says, the acts of such body or board, evidenced by a written vote, are as completely binding upon the corporation, and as complete authority to their agents, as the most solemn acts done under the corporate seal. It vindicates only, the binding effect of a written vote without seal, against the argument pressed at the trial, that a corporation could only act through the instrumentality of its common seal; but goes no farther, and does not touch the question, whether a corporation can act otherwise than by writing. It is admitted that in modern times corporations may act by writing without the common seal; but it is supposed, that the use of the seal grew out of the state of the times in which it originated, when seals were more common, and better known, than signatures, and the authentication of instruments by seals, was more certain, and attended with fewer difficulties and perplexities, than any other mode of authentication; and that the use of the seal is only dispensed with, because writing may *now* be proved with as much certainty as the common seal.

But that would seem to be a mistake, and that the greater facility and certainty, attending the authentication of an instrument by the use of the common seal, was not the reason why it was originally held, that corporations could act in no other way. It would have been a very good reason for preferring the use of the seal, to any other less certain mode of authentication, but not a sufficient reason for rejecting all other modes; nor does it any where appear, that the rule was originally introduced for that reason. *Blackstone,* in his commentaries, vol. 1, page 475, says, "a corporation being an invisible body, cannot manifest its intentions by any personal act or oral discourse; it therefore only acts and speaks by its common seal. For though the particular members may express their private

consents to any acts, by words or signing their names, yet this does not bind the corporation; it is the fixing of the seal, and that only, which unites the several assents of the individuals who compose the community, and makes one joint assent of the whole." It was not, therefore, as a mere rule of evidence that the common seal was required, because more certain, and more susceptible of proof than writing, or any other mode of authentication; but because it was supposed, that a corporation being an invisible body, it was incapable of manifesting its intentions, by any personal act or oral discourse; and that having neither hand nor mouth, it could no more write than speak.

But as some mode of action was necessary to its operations, the common seal, which is incident to a corporation, was resorted to as an artificial representative; embodied in which shape, it could alone appear—the hand and mouth of the corporation, by which only it was permitted to act or speak. This technical nicety has however gradually given way to the public convenience, and the attenuated notion that the seal only was capable of uniting the several assents of the individuals composing the community, and making one joint assent of the whole, has yielded to the sober sense of mankind, which no longer delights in mere technicalities. Yet the character and constitution of corporations remaining the same, and the united assents of the individuals composing the community, being as necessary now as formerly, to constitute an act of a corporation, their assent must be proved in some way. But by what law, or on what principle, has writing been substituted for the common seal, and had imparted to it, the magical power which it did not formerly possess, of uniting the several assents of the different individuals who compose the community? Let it be borne in mind, that at the time when the seal was alone held to be capable of performing that office, writing was necessary to show to what it was the seal did unite the several assents of the individual corporators. But the writing alone was nothing, it had no agency in manifesting the assent of the corporation, it was the thing only assented to, and the seal it was, appended to it, that spoke the presence of the corporation, and manifested its assent. If there be any law substituting writing for the common seal, and declaring it to be the only means by which

the assent of a corporation can be manifested, it has not been produced, and we know of none such; or if there be any decisive authorities establishing that position, they have not been referred to. There are many authorities showing that corporations may act without seal, among which may here be again mentioned the cases before referred to, of *The King vs Bigg,* (in which the corporation was not a party,) where it was held, that the Bank of *England* might, without the common seal, entrust and employ a man to sign bank notes; the note (o) in 1 *Fonb.* 306, where it is said, "and the agreement of the major part of a corporation being entered in the corporation books, though not under the corporate seal, will be decreed in equity;" and *Fleckner vs The United States Bank,* in which, in speaking of a written vote of the board of directors of that bank, the court says—"the acts of such a body or board, evidenced by a written vote, are as completely binding upon the corporation, and as complete authority to their agents, as the most solemn acts done under the corporate seal." But they go no farther. Seeing then, that the seal was originally required, not for the purpose merely of authenticating the writing to which it was appended, but for the technical purpose of uniting and expressing the joint assent of the corporation which could not be done by the particular members signing their names, and that writing was not competent to perform that office, and there being nothing peculiar to modern times imparting to it that quality, it cannot be required for that purpose; but if required at all, it can only be as evidence of the acts of a corporation, which, like the acts of natural persons, are subjects of proof. And the seal being no longer regarded as a necessary agent, to express the intention of a corporation, by uniting the several assents of the individual members, and making one joint assent of the whole, (which it is seen may now be otherwise manifested,) by what rule of evidence is it, that corporate acts are all required to be evidenced by writing, which of itself, when unaccompanied by a seal, is only parol evidence? We know of no such rule in practice; the general principles of evidence acknowledge none such, and when the acts creating corporations, do not direct it, we do not perceive why their acts must be established by positive record proof only; and why the corpo-

rate assent may not be inferred from facts and circumstances, which in regard to individuals, would be decisive in relation to transactions of a similar character. The question being, (now that the seal is dispensed with for that purpose,) not as to the mode of uniting the corporate assent, but as to the mode of proving the assent or act of a corporation. The proof by writing may be more eligible than facts and circumstances not reduced to writing, because more certain, and attended with less difficulty and perplexity; but it does not therefore follow, that it is the only mode of proof that can be admitted.

If that could be received as a sufficient reason for requiring written evidence of the acts of a corporation, it would apply with equal force to the transactions of natural persons, written evidence of which would, as well as in the case of a corporation, be attended with more certainty, and fewer difficulties, than circumstantial proof. But such a principle has never been admitted among the general rules of evidence, and the acts of individuals are continually established by presumptions arising from other facts and circumstances; and that not confined to the acts of a single individual, but extending equally to the joint transactions of several, though of the most solemn and important character. And it seems to us, that (the seal being dropt as necessary to unite the several assents of the individual members,) there is nothing to show, that writing is substituted in the place of the seal for that purpose, and that the same presumptions arise from the acts of corporations, as from the acts of individuals; consequently, that the corporate assent, and corporate acts, not reduced to writing, may be inferred from other facts and circumstances, without a violation of any known rule of evidence. In which we feel ourselves strengthened by authorities that will here be briefly adverted to.

In *The King vs Amory*, 1 *T. R.* 575, it is clear from the course of reasoning, both of the judges and the counsel concerned in the argument of the cause, that the acts of the corporate officers of an existing corporation, were considered as admissible evidence, from which the fact of the acceptance of a new charter might be inferred, and that it was not necessary to produce a written instrument, or recorded vote of acceptance. And if the acceptance of a new charter by an existing corpo-

ration, need not be in writing, but may be inferred from other facts and circumstances, it is difficult to imagine, why other acts of a corporation, or the acceptance of other instruments, may not be inferred in like manner. In *The King vs The Inhabitants of Chipping Norton,* we have seen, that the verbal agreement of a corporation was held to be a ground for an application to a court of equity. The agreement, therefore, was not considered void, for the want of being in writing. In *Wood vs Tate,* 5 *Bos. & Pull.* 246, which was an action of replevin, founded upon a distress for rent by the bailiff, of the bailiffs and burgesses of the borough of *Morpeth,* it was held by the court, that the payment of rent from time to time, by the plaintiff, to the officers of the corporation, was alone sufficient evidence of a tenancy from year to year under the corporation, to entitle the corporation to distrain for rent in arrear. In *Doe, on the demise of the Earl of Carlisle, vs Woodman and Forster,* 8 *East,* 228, it was held, that the payment of rent by the bailiffs of the borough of *Morpeth,* was evidence of a tenancy in the corporation. We have before seen, that in *The Bank of Columbia vs Patterson's Adm'rs.* where it appearing in evidence that the corporation had from time to time paid money on the personal contracts under their private seals of its committee, which were for the benefit of the corporation, it was held by the supreme court of the *United States,* that the jury might legally infer from that evidence that the corporation have adopted the contracts. In *The Proprietors of the Canal Bridge vs Gordon,* 1 *Pick. Rep.* 297, it was held, that corporations could be bound without a vote or deed by implications from corporate acts. Chief Justice *Parker,* in delivering the opinion of the court, said, "It is true that the acts, doings and declarations of individual members of the corporation, unsanctioned by the body, are not binding upon it; but it is equally true, that inferences may be drawn from corporate acts, tending to prove a contract or promise, as well as in the case of an individual; and that a vote is not always necessary to establish such contract or promise." The question was, whether *The Proprietors of the Canal Bridge* had assented to a proposition by another corporation? And proceeding to comment upon the evidence, the judge said, "here was a direct and plain pro-

position, and if it had been met by as plain an acceptance by vote recorded, no one would imagine that any question could arise as to the effect." And he added, "the question is narrowed to this; have *The Proprietors of the Canal Bridge* assented to this proposition and acted under it? We find no vote to this effect; but we do find, that the cross bridge was suffered to unite with theirs pursuant to the proposition, and that for four years, all were suffered to pass without toll, who came from *Charlestown* to *Cambridge*, or *vice versa.* Now corporations can be bound by implications, as well as individuals, as has been before stated, and no acts could be stronger to show an assent to a proposition, an agreement or bargain, than those which have been mentioned." Here was no vote or written memorandum, nor any foundation for presuming a vote, or other written assent of the corporation. On the contrary, the court went expressly on the ground that there was no vote, but that the assent of the corporation might be inferred from other corporate acts. And in *Whittington vs The Farmers Bank of Somerset and Worcester*, before adverted to, it was decided, that it was not necessary an order of the president and directors should be in writing to give it validity, but that it might be proved, if not reduced to writing, by oral testimony. Other decisions in *Pennsylvania, New-York* and *Massachusetts*, might with effect be brought into this discussion, but it is thought to be unnecessary. In *Smith and others vs The Governor and Company of the Bank of Scotland*, in the House of Lords, 1 *Dow's Rep.* 272, the appellants were sureties in bond to the bank of *Scotland*, with *Patterson* the principal, who was an agent of the bank. The bond was at first sent to the bank, but returned to *Patterson* to get it properly executed, and was then sent back again to the bank; but while it was *in transitu*, and before it got back to the bank, or into the hands of its officers, *Patterson* was removed from his office. One of the questions raised in the House of Lords was, as to the due delivery of the bond. Lord *Eldon* said, "the court below had attended to the objection with respect to the delivery of the deed, they seemed to have considered it properly delivered, and he did not think, there was sufficient ground to quarrel with their decision on that head." Lord *Redesdale* said, "as *Patterson* seemed to

have acted as the agent of the bank in the transaction, delivery to him might be considered as delivery to the bank." And the House of Lords decided, "that if not impeachable on other grounds, it was to be considered as a delivered deed." The case was argued by Sir *Samuel Romilly* and Mr. *Brougham* for the sureties, and is a very strong case. The opinion of Chief Justice *Mashall*, in *The Bank of the United States vs Dandridge*, in the Circuit Court of *Virginia*, (which was exactly similar to this,) "that the bond was inoperative, unless the assent thereto of the directors, had been entered on the record of their proceedings," was pressed upon us in the argument. And if any thing could have caused me to doubt, it would have been the opinion of that distinguished judge; the decision however, of the circuit court, has we are informed been reversed in the Supreme Court of the *U. S.* by the unanimous opinion of all the other judges. It will be admitted, that a corporation may be bound by the acts of its duly authorised agent, although such acts are not reduced to writing. The charter of this bank requires, that the cashier shall give bond with two or more securities, "to the satisfaction of the president and directors." If there had been no such provision, and the corporation had appointed an agent, or board of agents, or a committee, for that purpose, could it have been successfully contended, that the acceptance of the bond by such agent or committee, or board of agents, must have been in writing? If not, what is there in this case, to distinguish it materially from that? Are not the directors constituted by the charter the duly authorised agents of the corporation?

By the *seventh section* of the charter, it is provided, that "the affairs of the said company shall be conducted by a president and sixteen directors, together with such other directors as the state shall appoint." By the *eighth section*, the directors are empowered to appoint a cashier and other officers for conducting the business of the corporation. By the *ninth section*, the president and directors are empowered to make by-laws, &c. for the government of the corporation, &c. By the 9th fundamental article of the constitution, the president and eight directors are constituted a board for the transaction of business; and by the 14th, the cashier is required to give bond

with two or more sureties, to the satisfaction of the president and directors.

The directors then are agents of the corporation appointed by the charter, and why should their acts, within the scope of their authority, be required to be in writing, more than the acts of agents appointed by the corporation itself? The acceptance of the cashier's bond, is within the scope of their authority, and the terms of the charter from which they derive that authority, do not require their acceptance, or their being satisfied with the sureties in the bond, to be in writing, nor do we perceive on what ground the affirmative of the proposition can at this day be maintained. But it is thought unnecessary farther to prosecute the examination of this branch of the case. The bond in question, which was not attested, having been found deposited among the archives and valuable original papers and documents of the bank, in an iron chest in the banking-house of the corporation, together with other papers, purporting to be the bonds of the tellers, book-keepers, and other inferior officers; and having been produced at the trial by the plaintiffs, and *Higginbothom,* whose original appointment as cashier, is recited in the bond, having been continued in the constant employment of the bank from that time until he was dismissed in 1819, without any reappointment, or on any other bond being given, we think the jury, in the absence of all other evidence respecting the execution of the bond, ought to have been permitted to infer, that it was duly executed and delivered by the defendant, and accepted by the plaintiffs; which acceptance necessarily included the approbation of the board, or their satisfaction with the sureties, and was not necessary to be in writing.

The question presented by the plaintiffs' *sixth* bill of exceptions, is upon the admissibility of the corporation books, on proof that they were kept by *Pierce L. Tanner* and *Jacob Hart,* as officers of the corporation; that the several entries contained in the books, were in the proper handwriting of *Tanner* and *Hart*; that they were kept under the superintendence and direction of *Higginbothom;* that *Hart* was dead, and that *Tanner* was residing out of the jurisdiction of the court in parts unknown; which were rejected by the court as inad-

missible. And perhaps it could not well have been other-wise, after the bond on which the suit was brought had been rejected.

It appears from the pleadings in the cause, which are very prolix and complicated, that the fact of there being in the books, false and deceptious entries, made by the clerks with the knowledge and connivance of *Higginbothom*, were dis-tinctly put in issue on several of the breaches assigned in the replication. The books were not offered for the purpose of proving the truth of the facts which the entries professed to as-sert, as in the case of an offer to prove, by the entries in a book, the delivery of the articles charged. But to show as facts what entries were in the books, which could only be done by the production of the books themselves. For which purpose, un-der the pleadings in the cause, and being of opinion that the bond was improperly rejected, we think the books ought to have been received in evidence, on proof that they were kept by *Tanner* and *Hart* as officers of the bank, and that the en-tries were in their handwriting; which we think might well be done in such a case, in order to lay a foundation for letting in other testimony to show fraud, malconduct, neglect, or viola-tion of duty on the part of *Higginbothom*, and of *Tanner*, in relation to the entries, and the manner of keeping the books. Moreover, it is stated in the exception, that the plaintiffs offer-ed to prove that the books were kept under the superintendence and direction of *Higginbothom*; and if that were the fact, their admissibility was no more subject to objection, than if they had been kept by himself.

Upon the whole, then, we concur in opinion with the *Balti-more* county court on the plaintiffs' *first* bill of exceptions, and differ from that court upon all the other exceptions taken by the plaintiffs.

The questions raised on the demurrers by the defendant, in relation to the duration of the cashier's bond, present, we think, but little difficulty, and will be briefly disposed of. The ori-ginal act of incorporation was limited in its duration to the ex-piration of the year 1815, and to the end of the next session of assembly thereafter, which was the 6th day of February 1817; and by the act of 1815, *ch.* 167, it was extended to the 1st of

January 1835, and to the end of the session of the general assembly next thereafter.    By the charter the directors are to be chosen annually, and for that reason, connected with the *eighth* section authorising the directors for the time being to appoint a cashier and other officers, it has been contended *first*, that the appointment of cashier is an annual appointment, and that the obligation of the bond in question did not extend beyond the end of the year next ensuing the appointment of *Higginbo-thom* as cashier.    If the premises were true, the conclusion would be unavoidable.    But the premises, we think, are not true; and that the appointment of cashier is not an annual appointment, but limited only by the duration of the charter, subject to the removal of the incumbent by the directors, as occasion may require.    If the cashier was a mere clerk or *agent* of the directors, who are themselves annually appointed, it might be otherwise; but he is not the mere servant or clerk of the directors who appoint him, but an officer of the corporation, appointed by its agents duly authorised for that purpose, whose limited term of service has no connexion with the duration of his appointment.    The provision in the charter, "that the directors for the time being shall have power to appoint a cash-ier," does not mean that the office of cashier must annually become vacant, and that every new set of directors are to appoint a new cashier.    The *eighth section* of the charter provides for the annual election of directors; and if it had been intended that a cashier should be also annually appointed, the reasonable presumption is, that it would have been so directed    And in the absence of any such provision, the words "the directors for the time being shall have power to appoint a cashier." &c. must be understood as meaning only, that whenever, for any reason, the appointment of a cashier should be necessary, the then board of directors should be authorised to make the appointment.    In giving this construction to the *eighth section*, some aid is derived from the use of the same language in the *ninth section*, which provides "that the president and directors for the time being, may make all such rules, orders, by-laws and regulations, for the government of the corporation," &c.  Now it cannot be intended that every new board shall make a new set of by-laws, &c. but only when by-laws, &c. are to be made,

to authorise the making them by the then board of president and directors.

But it is contended, *secondly*, that the bond in this case is only co-extensive with the limitation of the original act of incorporation; that is, that it does not reach beyond the expiration of the year 1815, and the end of the next session of assembly thereafter, which was the 6th of February 1817, and that the defendant is only responsible for violations by *Higginbothom* of the condition of the bond, between the date and the 6th of February 1817. In construing this bond, we must look to the intention of the parties at the time it was executed. It is a question of intention which, when ascertained, must govern the construction. When the bond was executed then the act of incorporation, under which it was given, was limited in its duration to the 6th of February 1817. The bond looked to the time for which *Higginbothom* was appointed, and that was restricted by the limitation of the charter as it then stood. What then was the intention of the parties? And where is that intention to be found? Where but in the original act of incorporation, under which the bond was executed? And looking to that act, it would seem to be very clear, that no responsibility was contemplated beyond the period of its duration—"there was no idea *then*, of carrying it any further." The parties knew the legal duration of the charter expressed upon the face of it; they contracted with a view to that duration, and the contract must be expounded as the law was when the contract was made. The president and directors, under the authority given them by the act of incorporation, to appoint officers of the corporation, could not appoint them for a term of service exceeding the legal existence of the corporation. With that corporation, limited in its duration to the 6th of February 1817, the defendant contracted for the fidelity of one of its officers while in its service, which service could not, as the law then was, point to a period beyond the existence of the corporation itself. It is true a power rested in the legislature to extend the duration of the charter, which has since been done. But it was not with the corporation in its enlarged shape, that the defendant contracted. And what the contract was, at the time it was entered into, so it remains; and the act of 1815,

extending the duration of the charter, could not enlarge the liability of the defendant without his consent. If he had been asked at the time of executing the bond, whether he would be willing to become a surety for *Higginbothom*, for any length of time to which the charter might be extended by the legislature, of which it was a creature, it may be, that he would have assented to it; but it is by no means evident that he would; and we are not to speculate on what he might have been willing to do. We can look only to what he did. The bond is general to *The President and Directors of the Union Bank of Maryland*, and recites, that they had employed *Higginbothom* in the capacity of the cashier, and such other business as they might think fit to employ him about; without a word in relation to any extension of the charter, or any services to be performed beyond the time to which the then charter was limited. We cannot then presume, that any extension of the charter was in the contemplation of the parties, but that the contract was made with a view to a law, which by its own limitation was to expire on the 6th of February 1817; and we must expound the contract, by the law as it then was, and not by the continuing act of 1815, which did not enter into the contract, and could not enlarge it. We think, therefore, that the defendant is not responsible on that bond or contract, for any thing done, or omitted to be done, by *Higginbothom*, after the 6th of February 1817, acting in the character of cashier; and that the several demurrers on the part of the defendant were properly sustained by the court below.

The authorities relied upon by the counsel for the plaintiffs to show, that the day laid is often immaterial, and that the demurrers could not be supported, whatever might be the legal duration of the bond, are not applicable to such a case as this. It is very certain, that the day laid is frequently not material; as in trespass, where the injury charged may be proved to have been committed on a day before or after the time stated in the declaration; provided it appears to have been before the action was brought, the substantial part of the issue being, whether the trespass was *committed*, and not *on what day* it was committed. And if in such a case, the day was material, as the ob-

jection would not appear upon the record, but depend upon the evidence, it could not be taken advantage of by demurrer.

But here, so far as the breaches demurred to allege matter as violations of the condition of the bond, after the sixth of February in the year 1817, the time laid is material; it is the very matter in controversy between the parties, depending upon the true construction of the contract, and raises the question of the legal responsibility of the defendant for any acts or omissions of *Higginbothom* as cashier, after the period of the original limitation of the charter, and the objection does not depend upon the evidence, but appears upon the record.

The objection is not to the form in which the breaches are assigned, nor to the introduction of merely immaterial matter; that might be treated as surplussage; but to the allegation of material matter beyond the responsibility of the defendant, on which he could not with safety have gone to issue.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.